# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

Parker Hannifin Corp.,                                    Case No. 1:19cv00617

                     **Plaintiff,**

    -vs-

                                    **JUDGE PAMELA A. BARKER**

Standard Motor Products, Inc.,

                    **Defendant**       **MEMORANDUM OPINION AND ORDER**

Currently pending is Defendant Standard Motor Products, Inc.'s Motion to Dismiss Complaint or, in the Alternative, to Stay Proceedings. (Doc. No. 12.) Plaintiff Parker Hannifin Corporation filed a Brief in Opposition on August 19, 2019, to which Defendant replied on September 9, 2019. (Doc. Nos. 17, 18.) Plaintiff was later granted leave to file a sur-reply on September 16, 2019. (Doc. No. 20.) For the following reasons, Defendant's Motion is GRANTED IN PART and DENIED IN PART, as set forth below.

## I.     Procedural History

On March 20, 2019, Plaintiff Parker Hannifin Corporation (hereinafter "Parker Hannifin" or "Parker") filed a Complaint in this Court against Defendant Standard Motor Products, Inc. on the basis of diversity jurisdiction, asserting claims for breach of contract (Counts I and II), breach of the duty to defend and settle (Count III), breach of the duty of good faith and fair dealing (Count IV), breach of duty imposed by law (Count V), and declaratory judgment (Count VI). (Doc. No. 1.)

Defendant Standard Motor Products, Inc. (hereinafter "Standard Motor" or "SMP") filed a Motion to Dismiss or, in the alternative, Motion to Stay Proceedings on June 5, 2019. (Doc. No. 12.) Therein, Standard Motor argued that the Complaint should be dismissed for lack of personal

jurisdiction under Fed. R. Civ. P. 12(b)(2) or, in the alternative, for failure to state a claim upon relief could be granted pursuant to Fed. R. Civ. P. 12(b)(6) with respect to all six of Parker Hannifin's claims. (*Id.*) In the alternative, Standard Motor requested the Court stay the instant proceedings. (*Id.*) Parker Hannifin filed a Brief in Opposition on August 19, 2019, to which Standard Motor replied on September 9, 2019. (Doc. Nos. 17, 18.) Parker Hannifin was later granted leave to file a sur-reply on September 16, 2019. (Doc. No. 20.)

On October 2, 2019, the Court ordered the parties to submit supplemental briefing regarding Parker Hannifin's Declaratory Judgment claim. (Doc. No. 21.) The parties timely complied on October 16, 2019. (Doc. Nos. 22, 23.)

Thus, this matter is now ripe and ready for resolution.

## II.    Factual Allegations

The Complaint contains the following factual allegations.[1] On August 4, 1986, Parker Hannifin and Standard Motor entered into an agreement for the sale of Parker Hannifin's EIS Division to Standard Motor (hereinafter "the 1986 Agreement"). (Doc. No. 1 at ¶ 7.) This Division was engaged in the business of manufacturing and remanufacturing brake parts for vehicle brake systems. (*Id.*) Specifically, during the time period that Parker Hannifin owned the EIS Division, that Division manufactured and sold automotive friction products (i.e., brake shoes), some of which were made using asbestos-containing friction lining from outside vendors. (*Id.* at ¶ 9.)

For a number of years prior to the 1986 Agreement, civil lawsuits were filed against Parker Hannifin alleging bodily injury as a result of alleged exposure to asbestos contained in the EIS friction

---

[1] The parties submitted Affidavits and Exhibits in support of their arguments regarding personal jurisdiction. The Court will discuss these additional factual allegations *infra*, in the context of its jurisdictional analysis.

products. (*Id.* at ¶ 10.) Parker Hannifin disclosed the existence of these asbestos claims to Standard Motor during the due diligence that preceded the 1986 Agreement, and the parties expressly accounted for these types of actions in allocating liabilities arising out of post-Closing product liability claims. (*Id.* at ¶¶ 11, 17.)

The 1986 Agreement contains the following provisions relevant to this issue. Section 2.1 provides, in relevant part, that "at the Closing, Purchaser [i.e., Standard Motor] will assume and become directly and solely responsible for the payment or discharge of all of the Assumed Liabilities." (*Id.* at ¶ 12). *See also* Doc. No. 12-2 at PageID# 104. The term "Assumed Liabilities" is defined in Section 2.4 as "all liabilities and obligations of the Seller as of the Closing arising solely out of Seller's conduct of the Business . . . but excluding the Excluded Liabilities."[2] (*Id.* at ¶ 14.) *See also* Doc. No. 12-2 at PageID# 107. Section 2.4 further explains:

> Without limiting the generality of the foregoing, the Assumed Liabilities will include the following liabilities and obligations (other than Excluded Liabilities) which arise or have arisen solely out of Seller's conduct of the Business at or prior to the Closing:
>
> * * *
>
> (d) **Except as provided in Sections 7.4** and 7.5 hereof, all liabilities and obligations arising out of, resulting from, or relating to claims, whether founded upon negligence, breach of warranty, strict liability in tort, and/or other similar legal theory, seeking compensation or recovery for or relating to injury to person or damage to property occurring after the Closing and arising out of a defect or alleged defect of a Product whether manufactured or purchased for resale by Seller before the Closing or by Purchaser after the Closing

*See* Doc. No. 12-2 at PageID# 107-108 (emphasis added).

---

[2] The parties do not argue, at this time, that any of the specific Excluded Liabilities enumerated in Section 2.5 of the 1986 Agreement are relevant to the instant dispute.

Section 7.4 then goes on to specifically allocate liability relating to asbestos claims, as follows:

> 7.4 <u>Asbestos Claims</u>. Notwithstanding the allocation in Sections 2.4(d) and 2.5(c) between the parties of responsibility for claims whether founded upon negligence, breach of warranty, strict liability in tort, and/or other similar legal theory, seeking compensation or recovery for or relating to injury to persons arising out of a defect or alleged defect of a Product, **the parties hereto agree that claims alleging any illness, disease, injury or other physical damage arising out of or relating in any way to alleged exposure to asbestos-containing Products asserted, in writing, <u>on or prior to the fifteenth (15th) annual anniversary of the Closing Date shall be deemed Excluded Liabilities</u>. Claims alleging any illness, disease, injury or other physical damage arising out of or relating in any way to alleged exposure to asbestos-containing Products asserted, in writing<u>, after the fifteenth (15th) anniversary of the Closing Date shall be deemed Assumed Liabilities</u>.** The special allocation provisions established in this Section 7.4 relate only to personal injury claims arising out of alleged exposure to asbestos-contained Products, are based on the parties recognition of the difficulties in establishing liability between the parties hereto as to any one Product for such claims, and shall not apply to any other type of claims, including, but not limited to, alleged asbestos-related property damages. Notwithstanding the foregoing, Purchaser shall be responsible for all claims alleging any illness, disease, injury or other physical damage arising out of or relating in any way to alleged exposure to asbestos-containing Products asserted, in writing, after the Closing Date, if claimant's first alleged exposure to asbestos-containing Products occurred after the Closing Date.

(Doc. No. 12-2 at PageID# 148) (emphasis added).

Thus, Parker Hannifin alleges that, in allocating liability arising out of post-Closing product liability claims, the 1986 Agreement expressly anticipated and accounted for potential liabilities arising from asbestos claims and distinguished those claims from other product liability claims that did not involve asbestos. [3] (Doc. No. 1 at ¶ 16.) With respect to asbestos claims, Parker Hannifin

---

[3] With regard to non-asbestos claims, Parker Hannifin alleges as follows: "All non-asbestos product liability claims where the injury occurred before the Closing (Section 2.5(c)) or during the first year after the Closing (Section 7.5) are defined as Excluded Liabilities and are thus Parker's responsibility. On the other hand, all non-asbestos product liability claims where the injury occurred after the first anniversary following the Closing (Section 7.5) are Assumed Liabilities, and thus SMP's responsibility." (*Id.* at ¶ 16.)

alleges the Agreement is clear and unambiguous that Parker "agreed to assume 100% responsibility for any Asbestos Claim asserted in writing during the 15-year period following the Closing [i.e., from August 31, 1986 to August 31, 2001] (unless the claimant's first exposure to asbestos occurred after the Closing Date), and Standard Motor agreed, using the language in Section 2.1 of the 1986 Agreement, to 'assume and become directly and solely responsible for the payment or discharge of' any Asbestos Claims asserted in writing thereafter." (*Id.* at ¶ 18.)

The 1986 Agreement also contains the following indemnification and duty to defend provisions relevant to this dispute:

> 9.1 <u>Indemnification of Seller</u>. Purchaser will indemnify, defend, and hold Seller harmless from and against any and all liabilities, damages, losses, claims, costs, and expenses (including reasonable attorneys' fees) arising out of or resulting from any misrepresentation or breach of warranty by Purchaser for which notice is given by Seller within the period specified in Section 3.5 hereof, Purchaser's failure to pay or satisfy or cause to be paid or satisfied any of the Assumed Liabilities when due and payable, or nonperformance of any obligations to be performed on the part of Purchaser under this Agreement.

> \*\*\*

> 9.3 <u>Claims.</u> In the event that any legal proceedings shall be instituted or that any claim or demand shall be asserted by any person in respect of which payment may be sought by either Purchaser or Seller (the "Claimant") from the other (the "Indemnitor") under the provisions of this Article IX, the Claimant shall promptly cause written notice of the assertion of any claims of which it has knowledge which is covered by this indemnity to be forwarded to the Indemnitor, and the **Indemnitor shall have the right, at its option and expense, to be represented by counsel of its choice and to defend against, negotiate, settle or otherwise deal with any proceeding, claim or demand which relates to any loss, liability, damage or deficiency indemnified against hereunder; provided, however, that the Claimant may participate in any such proceeding with counsel of its choice and at its expense.** To the extent the Indemnitor elects not to defend such proceeding, claim or demand and the Claimant defends against, settles or otherwise deals with any such proceeding, claim or demand, the Claimant will act reasonably and in accordance with its good faith business judgment. **The parties hereto agree to cooperate fully with each other in connection with the defense, negotiation or settlement of any such legal proceeding, claim or demand.** After any final judgment or award shall have been

rendered by a court, arbitration board or administrative agency of competent jurisdiction and the expiration of the time in which to appeal therefrom, or a settlement shall have been consummated, or the Claimant and the Indemnitor shall have arrived at a mutually binding agreement with respect to each separate matter indemnified by the Indemnitor hereunder, the Claimant shall forward to the Indemnitor notice of any sums due and owing by it pursuant to this Agreement with respect to such matter and the Indemnitor shall be required to pay all of the sums so owing to the Indemnitor within thirty (30) days after the date of such notice.

(*Id*. at ¶ 22.)  *See* Doc. No. 12-2 at PageID#s 155-156.  Lastly, the 1986 Agreement provides that it "will be governed by and construed in accordance with the laws of the State of Ohio."  (*Id*. at ¶ 25.) *See also* Doc. No. 12-1 at PageID# 161 (Section 11.13.)

Parker Hannifin alleges that, after the Closing and until the fifteenth annual anniversary of the Closing Date (i.e, until August 31, 2001), Parker and Standard Motor "treated each EIS Asbestos Claim to be an Excluded Liability, and thus Parker's sole responsibility, regardless of whether the plaintiff asserted that the entity liable for their injuries was Parker, Standard Motor, or both Parker and Standard Motor, and irrespective of the legal theories being pursued or the recoveries being sought."  (Doc. No. 1 at ¶ 26.)  Parker Hannifin further alleges that the complaints filed in these pre-August 31, 2001 Asbestos Claims "frequently sought punitive damages."  (*Id*.)  It maintains that, up until August 31, 2001, "Parker accepted full responsibility for hundreds of EIS Asbestos Claims, defending the suits, obtaining dismissals when possible, negotiating and paying settlements when necessary, and otherwise completely protecting Standard Motor and holding Standard Motor harmless."  (*Id*. at ¶ 27.)

Parker Hannifin alleges that, after August 31, 2001 (and until November 2018), Standard Motor likewise treated each EIS Claim to be as Assumed Liability under the 1986 Agreement and "thus Standard Motor's sole responsibility, regardless of whether the plaintiff asserted that the entity liable for their injuries was Parker, Standard Motor, or both, and regardless of the types of specific

claims alleged, the legal theories being pursued, or the recoveries being sought," including claims for punitive damages.  (*Id.* at ¶ 29.)

According to the Complaint, then, the parties worked cooperatively and everything proceeded smoothly with respect to EIS asbestos-related claims for over thirty years.  This harmonious state of affairs, however, came to an abrupt end when a California jury returned a $6 million punitive damages award in favor of a plaintiff in an asbestos case filed against Parker Hannifin and Standard Motor.

In October 2017, Plaintiff Barbara Barr filed suit in the Superior Court of the State of California, Alameda County, against both Parker Hannifin and Standard Motor, in addition to other defendants (hereinafter "the Barr Suit").  (*Id.* at ¶ 30.)  Ms. Barr alleged that she had been exposed to asbestos from asbestos-containing friction products from 1974 to 1988 and was subsequently diagnosed with mesothelioma.  (*Id.* at ¶ 31.)  Ms. Barr asserted claims for negligence, strict liability, negligent misrepresentation, and fraud by nondisclosure, and sought both compensatory and punitive damages.  (*Id.* at ¶¶ 33, 34.)

Parker Hannifin was served with complaint in the Barr Suit and, on November 13, 2017, tendered it to Standard Motor for handling as an Assumed Liability under the 1986 Agreement.  (*Id.* at ¶ 36.)  The tender letter "made clear that Parker was 'tendering 100% of Parker's defense'" to Standard Motor and added:

> As such, we expect Standard Motor to retain its own local counsel to defend Parker's interests in this case and pay 100% of the fees, costs and indemnity to resolve this case, as needed.
>
> * * *
>
> If this is not your understanding of the agreement between Parker and Standard Motor, please contact me immediately.

(*Id*. at ¶ 37.) Standard Motor replied to and accepted Parker Hannifin's tender of the Barr Suit the same day. (*Id*. at ¶ 38.) According to the Complaint, "[a]t no time prior to the jury's verdict did Standard Motor ever take the position with Parker that any of the Barr Suit claims or damages were not Standard Motor's responsibility." (*Id*. at ¶ 47.)

Parker Hannifin alleges Standard Motor "controlled all aspects of the Barr Suit." (*Id*. at ¶ 42.) Specifically, Standard Motor chose counsel to defend itself and Parker Hannifin, and determined "how and when to negotiate with the plaintiff, whether to accept the plaintiff's formal offer to compromise all claims (for an amount far less than the compensatory damages later awarded by the jury), and whether to settle the plaintiff's claims or challenge those claims at trial." (*Id*.) Parker Hannifin alleges that Standard Motor failed to settle the Barr Suit claims,[4] and a jury trial commenced on October 9, 2018. (*Id*. at ¶ 43.)

On November 5, 2018, the jury returned a verdict on special interrogatories, finding Parker Hannifin and Standard Motor liable for Ms. Barr's mesothelioma under the theories of strict liability-design defect; strict liability- failure to warn; product liability- negligent failure to warn; and negligence. (*Id*. at ¶ 48.) The jury apportioned 85% responsibility for Ms. Barr's mesothelioma to "EIS brakes at Plaintiff's worksite" and found she suffered economic damages in the amount of $620,086.37 and non-economic damages in the amount of $8,000,000. (*Id*.) In special interrogatories asking whether plaintiff had sufficiently proven certain predicate facts to support an award of punitive damages against Standard Motor and Parker Hannifin, the jury answered "yes" as to Parker Hannifin and "no" as to Standard Motor. (*Id*. at ¶ 49.)

---

[4] According to the Complaint, "[Standard Motor] and Parker were the only defendants remaining at the commencement of trial in the Barr Suit. All other defendants had settled." (*Id*. at ¶ 44.)

Parker Hannifin alleges that "[u]pon learning of the jury's verdict on November 5, 2018, Standard Motor suddenly attempted to reverse course and to thrust upon Parker the adverse consequences of Standard Motor's handling of the Barr Suit, by claiming - for the first time ever - that Parker – not Standard Motor - was directly and solely responsible for any punitive damages that would be assessed by the jury." (*Id*. at ¶ 50.) It further alleges that Standard Motor asserted that the punitive damages claim against Parker Hannifin in the Barr Suit fell outside its duty to defend under the 1986 Agreement. (*Id*.) In response, Parker Hannifin demanded that Standard Motor "honor its obligations to pay 100% of the fees, costs, and indemnity to resolve the Barr Suit." (*Id*. at ¶ 52.)

On November 8, 2018, the jury reconvened and awarded punitive damages in the amount of $6,000,000. (*Id*. at ¶ 53.) The state trial court thereafter entered judgment against Standard Motor and Parker Hannifin in the amount of $7,588,423.35 and "from [Parker Hannifin] an additional $6,000,000," together with interest at 10% per year from November 8, 2018. (*Id*. at ¶ 54.)

Despite Parker Hannifin's repeated assertions that Standard Motor is 100% responsible for the Barr Suit (including punitive damages award), Standard Motor "has consistently claimed that (i) it is not responsible for any aspect of the punitive damages award in the Barr Suit, or any other ESI Asbestos Claim; and (ii) it will not protect Parker's rights on appeal from the Barr Suit award of punitive damages." (*Id*. at ¶ 56.)

## III. Analysis

Standard Motors seeks dismissal under both Fed. R. Civ. P. 12(b)(2) and 12(b)(6). First, Standard Motors argues the Complaint should be dismissed for lack of personal jurisdiction under Rule 12(b)(2) because Parker Hannifin has failed to establish the existence of either general or specific jurisdiction. Assuming there is personal jurisdiction, Standard Motor next argues that all six

of Parker Hannifin's claims should be dismissed for failure to state a claim pursuant to Rule 12(b)(6). Lastly, Standard Motor argues that, if any of Parker Hannifin's claims survive, this matter should be stayed pending the result of the appeal of the Barr suit. The Court will address each of these alternative grounds, below.

### A. Personal Jurisdiction

Plaintiff bears the burden of proving personal jurisdiction. *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991). If a court rules on a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction prior to trial, "it has the discretion to adopt any of the following courses of action: (1) determine the motions based on affidavits alone; (2) permit discovery, which would aid in resolution of the motion; or (3) conduct an evidentiary hearing on the merits of the motion." *Intera Corp. v. Henderson*, 428 F.3d 605, 614 n.7 (6th Cir. 2005). "[T]he decision whether to grant discovery or an evidentiary hearing before ruling on a 12(b)(2) motion is discretionary." *Burnshire Dev., LLC v. Cliffs Reduced iron Corp.*, 198 Fed. Appx. 425, 434 (6th Cir. 2006).

When a district court rules on a jurisdictional motion to dismiss made pursuant to Rule 12(b)(2) without conducting an evidentiary hearing, the court must consider the pleadings and affidavits in a light most favorable to the plaintiff. *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996). To defeat such a motion, a plaintiff need only make a *prima facie* showing of jurisdiction, which can be met by "establishing with reasonable particularity sufficient contacts between the defendant and the forum state to support jurisdiction." *Neogen Corp. v. Neo Gen Screening, Inc.,* 282 F.3d 883, 887 (6th Cir. 2002). A court disposing of a Rule 12(b)(2) motion does not weigh the controverting assertions of the party seeking dismissal but may consider a defendant's undisputed factual assertions. *See CompuServe*, 89 F.3d at 1262; *Theunissen*, 935 F.2d at 1459;

*NTCH-West Tenn, Inc., v. ZTE Corp.*, 761 Fed. Appx. 485, 488 (6th Cir. Jan. 16, 2019) (citing *Kerry Steel, Inc. v. Paragon Industries, Inc.*, 106 F.3d 147, 153 (6th Cir. 1997)). "Dismissal in this procedural posture is proper only if all the specific facts which the plaintiff . . . alleges collectively fail to state a *prima facie* case for jurisdiction." *Id. See also Kerry Steel, Inc.,* 106 F.3d at 149.

"In a diversity case, a federal court can exercise personal jurisdiction over a defendant if jurisdiction is (1) authorized by the law of the state in which it sits, and (2) in accordance with the Due Process Clause of the Fourteenth Amendment." *Tharo Systems, Inc. v. Cab Producktechnik GMBH & Co., KG*, 196 Fed. Appx. 366 (6th Cir. 2006). Because "Ohio's long-arm statute is not coterminous with federal constitutional limits," to establish a *prima facie* case of personal jurisdiction, a plaintiff must demonstrate that (1) Ohio's long-arm statute has been satisfied and (2) exercising jurisdiction would comport with Due Process. *Schneider v. Hardesty*, 669 F.3d 693, 699 (6th Cir. 2012) (quoting *Estate of Thomson ex rel. Estate of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 361 (6th Cir. 2008)); *Kauffman Racing Equip., LLC v. Roberts*, 126 Ohio St.3d 81, 930 N.E.2d 784, 790 (Ohio 2010)).

Here, Standard Motor argues that this matter must be dismissed because it is not subject to either general or specific personal jurisdiction in Ohio.[5] As the Sixth Circuit has explained, "[p]ersonal jurisdiction comes in two flavors: [1] 'general' jurisdiction, which depends on a showing that the defendant has continuous and systematic contacts with the forum state sufficient to justify the state's exercise of judicial power with respect to any and all claims the plaintiff may have against the defendant, and [2] 'specific' jurisdiction, which exposes the defendant to suit in the forum state

---

[5] In its Motion, Standard Motor assumes *arguendo* that the requirements of Ohio's long arm statute are met. (Doc. No. 12-1 at p. 4.) Thus, the Court does not evaluate whether jurisdiction exists under that statute.

only on claims that 'arise out of or relate to' a defendant's contacts with the forum." *Kerry Steel, Inc.*, 106 F.3d at 149 (citing *Helicopteros Nacionales de Colombia S.A., v. Hall*, 466 U.S. 408, 414–415 & fns. 8–10, 104 S.Ct. 1868, 1872 & fns. 8–10, 80 L.Ed.2d 404 (1984) and *Third Nat'l Bank in Nashville v. WEDGE Group, Inc*., 882 F.2d 1087, 1089 (6th Cir.1989)).

Here, Parker Hannifin does not address or oppose Standard Motor's arguments regarding general jurisdiction and, instead, limits its argument to the issue of specific personal jurisdiction. Thus, the Court will assume, for purposes of the instant Motion, that general jurisdiction does not exist and will limit its analysis to the question of whether Parker Hannifin has made a *prima facie* showing of specific jurisdiction over Standard Motor.

In making this determination, "the crucial federal constitutional inquiry is whether, given the facts of the case, the nonresident defendant has sufficient contacts with the forum state that the district court's exercise of jurisdiction would comport with 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 342–43, 85 L.Ed. 278 (1940)). *See also CompuServe*, 89 F.3d at 1263; *Theunissen*, 935 F.2d at 1459. The Sixth Circuit has established the following three-part test for determining whether specific personal jurisdiction exists:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum to make the exercise of jurisdiction over the defendant reasonable.

*CompuServe, Inc*., 89 F.3d at 1263. *See also Calphalon v. Rowlette*, 228 F.3d 718, 721 (6th Cir. 2000); *Southern Mach. Co. v. Mohasco Indus*., 401 F.2d 374, 381 (6th Cir. 1968).

### 1.    Purposeful Availment

The question of whether a defendant has purposefully availed itself of the privilege of doing business in the forum state is "the *sine qua non* for *in personam* jurisdiction." *Mohasco Indus.*, 401 F.2d at 381–82.  *See also Calphalon*, 228 F.3d at 721 ("The purposeful availment prong . . . is essential to a finding of personal jurisdiction.")  The "purposeful availment" requirement is satisfied when the defendant's contacts with the forum state "proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum State," and when the defendant's conduct and connection with the forum are such that he "should reasonably anticipate being haled into court there." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–75, 105 S.Ct. 2174, 2183–84, 85 L.Ed.2d 528 (1985) (quoting *World–Wide Volkswagen v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980)); *Reynolds v. International Amateur Athletic Fed'n*, 23 F.3d 1110, 1116 (6th Cir. 1994).  Courts require purposeful availment to insure that "random," "fortuitous," or "attenuated" contacts do not cause a defendant to be haled into a jurisdiction. *Burger King Corp.*, 471 U.S. at 475 (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984)).

Standard Motor argues that Parker Hannifin has failed to allege sufficient facts to establish purposeful availment.  It relies on the Affidavit of Sanford Kay, a consultant for Standard Motor and former VP of its Human Resources Department.  Mr. Kay avers that Standard Motor is a registered New York corporation with its principal place of business in Long Island City, New York.  (Doc. No. 12-4 (hereinafter "Kay Affidavit") at ¶ 2.)  He states that Standard Motor operates manufacturing and distribution facilities in Virginia, Kansas, Florida, South Carolina, Texas, Indiana, and "other locations internationally," but has "no offices, manufacturing plants, or other facilities located in Ohio

and has not maintained any such facilities." (*Id.* at ¶¶ 2, 3.) Mr. Kay avers that Standard Motor sells its products to customers both nationally and internationally, and that 2018 sales in Ohio generated approximately 4.5% of Standard Motor's total revenue. (*Id.* at ¶ 4.) He further states that Standard Motor employs 10 Ohio residents as part of its sales team, each of whom work out of their homes. (*Id.* at ¶ 5.) Mr. Kay notes that these Ohio employees make up less than 0.5% of Standard Motor's total workforce of 4,400 employees. (*Id.*)

With regard to the 1986 Agreement in particular, Mr. Kay states that the assets that Standard Motor purchased pursuant to that Agreement were not located in Ohio. (*Id.* at ¶ 6.) He further states that Standard Motor "primarily negotiated the agreement from New York, where the law firm employed to assist with the transaction was based." (*Id.* at ¶ 7.) Finally, with respect to the Barr Suit, Mr. Kay states that Standard Motor "hired California counsel to represent both Plaintiff and [Standard Motor], defended the suit in California, mediated in California, and conducted settlement negotiations in California." (*Id.* at ¶ 8.)

Based on the above, Standard Motor argues it did not purposefully avail itself of the privilege of acting in Ohio because "[t]he only potential connection to Ohio is that Standard Motor decided to purchase assets from an Ohio-based company over 30 years ago." (Doc. No. 12-1 at p. 7.) Standard Motor argues the existence of the 1986 Agreement, standing alone, is not sufficient to establish jurisdiction absent any conduct demonstrating that it purposefully availed itself of Ohio's laws. (*Id.*) It asserts that the Ohio choice of law provision in the 1986 Agreement is also not determinative, particularly where (as here) the Agreement was not focused on exploiting any market in Ohio and was only executed in Ohio because that is where Parker Hannifin happened to be headquartered. (*Id.* at p. 8.) Finally, relying principally on *Calphalon Corp. v. Rowlette*, 228 F.3d 718 (6th Cir. 2000),

Standard Motor maintains that this Court lacks jurisdiction because the 1986 Agreement was merely a "one-shot transaction," and Standard Motor "did not contemplate a course of business dealings with Parker in Ohio nor did it desire to expand its business in Ohio." (Doc. No. 18 at 9-12.)

In response, Parker Hannifin argues the Court does have specific jurisdiction because Standard Motor (1) reached out to Parker Hannifin in Ohio to express its interest in acquiring the EIS Division; (2) engaged in extensive negotiations with Parker Hannifin that included mail, telephone calls, and in-person visits to Parker Hannifin's headquarters in Ohio; and (3) proceeded to work cooperatively with Parker Hannifin for the next 33 years regarding the handling, defense, and indemnification of asbestos claims pursuant to the 1986 Agreement. (Doc. No. 17 at p. 8.) In support of its position, Parker Hannifin submits the affidavits of several of its current and former attorneys and in-house counsel, as well as numerous Exhibits.[6]

Specifically, Thomas Meyer (an attorney for Parker Hannifin from 1984 until January 2016) avers that it was Standard Motor that first expressed an interest in the EIS Division. (Doc. No. 17-1 (hereinafter "Myers Affidavit") at ¶ 4.) He further states that, "[o]ver the course of a period of at least 11 weeks, from June 26, 1986 to September 11, 1986, SMP, through its highest corporate officers and outside legal counsel, met with Parker in Ohio, actively and repeatedly communicated its desire to buy the Business from Parker in Ohio, negotiated the terms of the acquisition with Parker in Ohio on an exclusive basis, and closed the transaction with Parker in Ohio." Myers Aff. at ¶ 6.

---

[6] Standard Motor objects to the Court's consideration of these affidavits and exhibits in the context of the arguments raised in connection with its motion to dismiss pursuant to Rule 12(b)(6). As discussed *infra*, the Court agrees that the Affidavits and Exhibits cited by Parker Hannifin constitute materials outside the Complaint and will not consider them in evaluating the parties' arguments relating to Standard Motor's Rule 12(b)(6) motion to dismiss for failure to state a claim.

*See also* Myers Aff. at ¶¶ 7-12, 33, 35, 37, 39.)[7]  Mr. Myers further avers that documentation delivered by Standard Motor to Parker Hannifin in Ohio promised that, after the Closing, Standard Motor would deliver to Parker Hannifin in Ohio any written assurance requested by Parker when a question arose as to any of the Assumed Liabilities, including asbestos claims asserted in writing after August 2001. (Myers Aff. at ¶ 41.)  Written notices regarding asbestos claims filed prior to August 2001 were also required to be submitted by Standard Motor to Parker Hannifin in Ohio.  (Myers Aff. at ¶ 43.)

In addition, Parker Hannifin cites evidence regarding the parties' course of dealing, arguing that the 1986 Agreement "represents a carefully structured, long-term relationship" which contemplated that the parties would reach out to each other in their respective states for years to come to tender asbestos claims for defense, handling, and resolution.  (Doc. No. 17 at p. 9.)  Former Parker Hannifin attorney Christopher Morgan avers that, during the period August 31, 1986 to August 31, 2001, Standard Motor "regularly, systematically, and repeatedly acted to enforce its contractual rights against Parker in Ohio by tendering to Parker in Ohio EIS Asbestos Claims for defense, handling and resolution at no expense to SMP regardless of the allegations in the complaint."  (Doc. No. 17-2 (hereinafter "Morgan Aff.") at ¶ 11.)  Indeed, Mr. Morgan states that, during this 15 year time period, Standard Motor tendered to Parker in Ohio over 500 asbestos claims under the 1986 Agreement, by sending copies of the complaints served on Standard Motor by mail to Parker Hannifin in Ohio

---

[7] In addition, Parker Hannifin relies on the affidavit of its former outside counsel Michael Ellis, who represented Parker during the negotiations surrounding the 1986 Agreement.  (Doc. No. 17-4) (hereinafter "Ellis Affidavit").  Mr. Ellis avers that Standard Motor faxed documents to Parker Hannifin in Ohio as part of these negotiations, and that he believed at least one negotiation meeting occurred in Cleveland between Parker Hannifin and Standard Motor Products representatives.  (*Id.* at ¶¶ 11, 14.) He further avers that the Closing occurred in Cleveland.  (*Id.* at ¶ 18.)  Finally, Mr. Ellis avers that "as part of the transaction, Parker and SMP also entered into various ancillary agreements, all of which provided for an ongoing business relationship for various lengths of time, such as a Supply Agreement for new and remanufactured master cylinders and related parts, a Service Agreement for data processing services, and several Warehousing Agreements for sharing warehouse resources between Parker and SMP."  (*Id.* at ¶ 19.)

accompanied by a letter explaining why the asbestos claim qualified as an Excluded Liability under the Agreement and requesting that Parker confirm that it would defend and resolve the case at no cost or liability to Standard Motor.[8]  (*Id*. at ¶ 12.)

In addition, another Parker Hannifin attorney, Joseph Pophal, avers that there are three EIS asbestos cases against Parker Hannifin currently active and pending in Ohio that have been tendered to Standard Motor for handling and resolution as "Assumed Liabilities" under the 1986 Agreement. (Doc. No. 17-3 (hereinafter "Pophal Affidavit at ¶ 11.)  Mr. Pophal states that Parker Hannifin received confirmations from Standard Motor accepting Parker Hannifin's tenders of each of these cases as a 100% tender.[9]  (*Id*. at ¶ 12.)  He avers that "[n]ew EIS Asbestos Claims are being filed naming Parker as a defendant at a regular rate;" i.e., an average of 10 EIS Asbestos Claims per month for the last two and half years.  (*Id*. at ¶ 14.)

Lastly, Parker Hannifin argues that it has suffered damages in Ohio as result of Standard Motor's refusal to accept responsibility for the punitive damages award in the Barr Suit, including having to spend $300,000 to date to retain independent counsel and post the appeal bond in the Barr suit appeal.  (Doc. No. 17. at p. 12.)  *See also* Pophal Aff. at ¶¶ 31, 38.  In addition, Mr. Pophal avers that "[a]bsent a court ruling, Parker will face ongoing uncertainty and may be forced to engage independent counsel to protect Parker's interests in the three EIS Asbestos Claims pending in Ohio." (*Id*. at ¶ 39.)

---

[8] Mr. Morgan's affidavit cites many examples of such tender letters which specifically draw attention to the fact that the plaintiff was seeking punitive damages from Standard Motor.  (Morgan Aff. at ¶¶ 16-17, 22, 23, 24, 26, 27) (citing Exhibits 10 - 16.)

[9] In addition, Mr. Pophal states that Parker's records show that Standard Motor is "obligated under the 1986 Agreement to be providing Parker in Ohio 100% defense and indemnity protection in connection with 399 other Asbestos Claims pending in 14 other jurisdictions," noting that Standard Motor accepted the tenders of each of these cases.  (*Id*. at ¶ 13.)

For the following reasons, the Court finds that Parker Hannifin has demonstrated that Standard Motor purposefully availed itself of the privilege of acting in Ohio. The Supreme Court has "emphasized that parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King*, 471 U.S. at 473. Here, Parker Hannifin has come forward with evidence that Standard Motor "reached out" to Parker Hannifin in Ohio when it expressed an interest in purchasing the EIS Division and thereafter continued to do so when it engaged in lengthy negotiations that included mail, calls, and visits to Parker Hannifin in Ohio. *See* Myers Aff. at ¶ 6-12, 33, 35, 37, 39; Ellis Aff. at ¶¶ 11, 14.) *See Cole v. Mileti*, 133 F.3d 433, 436 (6th Cir. 1998) ("If, as here, a nonresident defendant transacts business by negotiating and executing a contract via telephone calls and letters to an Ohio resident, then the defendant has purposefully availed himself of the forum by creating a continuing obligation in Ohio.").

Moreover, the Court agrees with Parker Hannifin that the 1986 Agreement created a continuing relationship and ongoing obligations between Standard Motor and Parker Hannifin in Ohio with respect to the handling, defense, and indemnification of EIS asbestos claims. As discussed above, Section 7.4 of the Agreement allocated liability arising out of post-Closing asbestos claims by requiring Parker Hannifin to assume responsibility for EIS Asbestos claims asserted during the first 15 years following Closing (i.e., from August 31, 1986 to August 2001), and Standard Motor to assume responsibility for all such claims filed thereafter. (Doc. No. 12-2 at PageID# 148.) The Agreement further required all notices, requests, or other communications from Standard Motor to Parker Hannifin to be sent to Parker Hannifin in Cleveland. (Doc. No. 12-2 at PageID# 160.) Thus, by the terms of the contract itself, Standard Motor was aware when it signed the Agreement that it

would be required to submit all EIS Asbestos Claims to Parker Hannifin in Ohio for the next fifteen years. It was, likewise, further aware that, thereafter, it would need to evaluate any EIS Asbestos Claims tendered to it by Parker and then respond to Parker in Ohio regarding whether it would or would not accept responsibility for such claim(s) as Assumed Liabilities under the Agreement.[10] *See Burger King*, 471 U.S. at 479 (when evaluating purposeful availment, a court should consider factors such as the parties' prior negotiations, contemplated future consequences, and the terms of the contract itself).

The parties' actual course of dealing also demonstrates the continuing nature of Standard Motor's obligations to Parker Hannifin in Ohio under the Agreement. *See Burger King*, 471 U.S. at 479 (courts may also consider the parties' actual course of dealing when evaluating purposeful availment); *Air Products and Controls, Inc. v. Safetech Intern, Inc.*, 503 F.3d 544, 551 (6th Cir. 2007) (same); *Huey Jiuan Liang v. AWG Remarketing*, 2015 WL 65258 at * 6 (S.D. Ohio Jan. 5, 2015) (same). As noted *supra,* Parker Hannifin introduced evidence that, between August 1986 and August 2001, Standard Motor tendered over 500 EIS Asbestos Claims to Parker Hannifin in Ohio, each of which included a letter "explaining why the asbestos claim qualified as an Excluded Liability under the Agreement and requesting that Parker confirm that it would defend and resolve the case at no cost or liability to Standard Motor." (Morgan Aff. at ¶ 12.) Parker Hannifin also submitted evidence that, after August 2001, Standard Motors sent confirmations to Parker Hannifin in Ohio acknowledging the tender of over 400 EIS Asbestos Claims as a "100% tender," including three such claims that are currently active and pending in Ohio state court. (Pophal Aff. at ¶ 11- 13.)

---

[10] Further, while not dispositive, the Court notes that the Agreement contains a choice of law provision that "it will be governed by and construed in accordance with the laws of the State of Ohio." (Doc. No. 12-2 at PageID# 161.)

Lastly, the Court finds Parker Hannifin has submitted evidence that Standard Motor's alleged breach caused foreseeable injuries to Parker in Ohio. Mr. Pophal averred that, as a result of Standard Motor's actions, Parker Hannifin has been forced to spend $300,000 to date to retain independent counsel and post the appeal bond in the Barr suit appeal. *See* Pophal Aff. at ¶¶ 31, 38. Moreover, Mr. Pophal avers that "[a]bsent a court ruling, Parker will face ongoing uncertainty and may be forced to engage independent counsel to protect Parker's interests in the three EIS Asbestos Claims pending in Ohio." (*Id*. at ¶ 39.)

For these reasons, the Court agrees with Parker Hannifin that the facts of the instant case are most analogous to those in *Burger King, supra*. In that case, John Rudzewicz and Brian MacShara (both Michigan residents) entered into a 20 year franchise agreement with Burger King, which was headquartered in Florida. The franchise agreement provided that the franchise relationship was established in Miami and governed by Florida law, and called for payment of all required fees and forwarding of all relevant notices to Burger King's Miami headquarters. *Burger King*, 471 U.S. at 466. Over a four month period, Rudzewicz and MacShara negotiated with Burger King to open a franchise in Michigan. *Id*. During this time period, MacShara attended required management courses in Miami, and the franchisees purchased $165,000 worth of equipment from a Burger King division located in Miami. *Id*. Rudzewicz and MacShara ultimately fell behind in their monthly payments and the parties thereafter engaged in prolonged but unsuccessful negotiations. *Id*. at 467. Burger King terminated the franchise agreement and ordered Rudzewicz and MacShara to vacate the premises, which they refused to do. *Id*. Burger King then filed suit in federal district court in Florida. The district court determined that it had personal jurisdiction over Rudzewicz and MacShara, but the court of appeals reversed. *Id*. at 469.

The Supreme Court agreed with the district court and found the exercise of personal jurisdiction in Florida was proper. The Court emphasized that "'the foreseeability that is critical to due process analysis ... is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'" *Id*. at 474 (quoting *World-Wide Volkswagen*, 444 U.S. at 297.) Noting that "the application of that rule will vary with the quality and nature of the defendant's activity," the Court found jurisdiction exists where a defendant has "deliberately . . . engaged in significant activities in a State" or has created "continuing obligations" between himself and the residents of the forum. *Id*. at 475. In this regard, the Court found that "[j]urisdiction in these circumstances may not be avoided merely because the defendant did not *physically* enter the forum State," explaining that "[s]o long as a commercial actor's efforts are 'purposefully directed' towards residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." *Id*. at 476 (emphasis in original).

The Court then examined the Burger King's and Rudzewicz's prior negotiations, contemplated future consequences, the terms of the parties' agreement, and the parties' actual course of dealing to determine that personal jurisdiction existed. The Court explained that, although Rudzewicz had no significant physical ties to Florida, the "franchise dispute grew directly out of a 'contract which had a *substantial* connection with that State.'" *Id*. at 479-480 (emphasis in original) (quotation omitted). In this regard, the Court emphasized that Rudzewicz reached out beyond Michigan and negotiated with a Florida for the purchase of a "long term franchise," which contemplated a "carefully structured 20 year relationship that envisioned continuing and wide reaching contacts with Burger King in Florida." (*Id*.) The Court also noted that "[t]he contract

documents themselves emphasize that Burger King's operations are conducted and supervised from the Miami headquarters, that all relevant notices and payments must be sent there, and that the agreements were made in and enforced from Miami." *Id*. at 480. In addition, the Court relied on the parties' Florida choice of law provision, stating "[a]lthough such a provision standing alone would be insufficient to confer jurisdiction, we believe that, when combined with the 20-year interdependent relationship Rudzewicz established with Burger King's Miami headquarters, it reinforced his deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there." *Id.* at 482.

Finally, the Court looked to the parties' actual course of dealing, which "repeatedly confirmed that decisionmaking authority was vested in [Burger King's] Miami headquarters." *Id*. at 480. Specifically, the Court noted that "the Miami headquarters and the Michigan franchisees carried on a continuous course of direct communications by mail and by telephone, and it was the Miami headquarters that made the key negotiating decisions out of which the instant litigation arose." *Id*. at 481.

Likewise, in the instant case, Standard Motor reached out to an Ohio corporation to purchase one of its divisions and negotiated a contract that included provisions calling for the long-term allocation between the parties of risk relating to EIS Asbestos Claims. By its very terms, the parties' Agreement contemplated that Standard Motor would repeatedly be required to reach out to Parker Hannifin in Ohio to secure the defense and indemnification of asbestos claims for a fifteen-year period and would thereafter be required (for the indefinite future) to confirm or reject the defense and indemnification of asbestos claims filed after August 31, 2001. Indeed, as noted above, Standard Motor tendered over 500 asbestos claims to Parker Hannifin in Ohio prior to August 31, 2001 and

sent confirmations to Parker in Ohio of the tender of over 400 more such claims after August 31, 2001. (Morgan Aff. at ¶12, Pophal Aff. at ¶12-13.) While the nature of the parties' congoing relationship herein might not be as "exacting" as that between Burger King and its franchisees, the Court finds that the quality and nature of Standard Motor's frequent contacts with Parker Hannifin in Ohio under the 1986 Agreement are such that it should reasonably have anticipated being haled into court here.

The Court acknowledges Standard Motor's argument that it has no physical ties to Ohio and did not expand its business in Ohio or otherwise exploit the Ohio market as a result of the 1986 Agreement.[11] However, in *Burger King*, the Supreme Court found personal jurisdiction existed even where defendants in that case similarly had no physical ties to Florida and did not open a franchise, or otherwise "exploit the market," in that State. Instead, the Court in that case focused on the defendant's long-term relationship with and continuing obligations to Burger King in Florida, to find purposeful availment. As discussed above, here, the Court similarly finds that the terms of the 1986 Agreement (including the indefinite indemnity and defense clauses), and the parties' actual course of dealing over the past 33 years, demonstrate that Standard Motor purposefully availed itself of the

---

[11] The Court finds Standard Motor's reliance on *Calphalon, supra* to be misplaced. In that case, the Sixth Circuit found the defendant (a sales representative for Calphalon cookware products) lacked sufficient minimum contacts with Ohio to permit the exercise of personal jurisdiction by an Ohio court under the due process clause. *Calphalon,* 228 F.3d at 723. There, defendant executed one-year manufacturer's representative agreements with Calphalon in 1996 and 1997 to promote the sale of Calphaon's products and keep Calphalon informed of market conditions. Defendant's sales territories were Minnesota, Iowa, North Dakota, South Dakota, and Nebraska. During the term of the agreements, defendant made two visits to Ohio and communicated with Calphalon in Ohio via telephone, fax, and mail. The Sixth Circuit found no purposeful availment because defendant's performance of the agreement was "not focused on exploiting any market for cookware in the State of Ohio." *Id.* at 723. In the instant case, however, the contract entered into by the parties contained indefinite indemnity and defense clauses that expressly contemplated long term, continuing obligations with respect to the allocation of liability for EIS asbestos claims. Thus, although there are some similarities between Calphalon and the instant matter, the Court finds the quality and nature of Standard Motor's contacts with Parker Hannifin in Ohio are distinguishable from those of the defendant in *Calphalon* and support a finding of purposeful availment.

privilege of acting in Ohio and reasonably should have foreseen possible litigation in this State. *See, e.g., Huey Jian Liang*, 2015 WL 65258 at * 6 (finding "the month-long negotiations between the parties, taken with the indefinite indemnity clause, rises to the level of purposeful availment.")

Accordingly, and for all the reasons set forth above, the Court finds Parker Hannifin has demonstrated that Standard Motor purposefully availed itself of the privilege of acting in Ohio or causing a consequence in this State.

## 2. Arising From

The second factor in evaluating specific jurisdiction requires that a cause of action "arise from" the defendant's activities in the forum state. *Mohasco Indus., Inc.*, 401 F.2d at 381. This requirement is satisfied when "the cause of action, of whatever type, ha[s] a substantial connection with the defendant's in-state activities." *Kerry Steel, Inc.*, 106 F.3d at 152 (quotation marks omitted). "'Only when the operative facts of the controversy are not related to the defendant's contact with the state can it be said that the cause of action does not arise from that contract.'" *Calphalon Corp.*, 228 F.3d at 723–24 (quoting *Mohasco Indus., Inc.*, 401 F.2d at 384 n.29). The Sixth Circuit has also stated that a "lenient standard . . . applies when evaluating the arising from criterion." *Bird v. Parsons*, 289 F.3d 865, 875 (6th Cir. 2002).

Standard Motor argues, summarily and in a footnote, that "the allegations giving rise to [its] purported indemnity obligation at the heart of the Complaint have no relationship with Ohio" because Parker's claims for indemnification "flow from a California lawsuit involving a California plaintiff and arising out of events transpiring in California." (Doc. No. 12-1 at fn 3.) *See also* Doc. No. 18 at fn. 3. Parker Hannifin, on the other hand, argues this factor is satisfied because its "claims in this suit concern Standard Motor's breach of the very same contractual provisions that Standard Motor

has previously sought to enforce against Parker in Ohio hundreds of times . . . and those provisions otherwise form the operative factual backdrop for this dispute." (Doc. No. 17 at p. 14.)

The Court finds Parker Hannifin has satisfied the "arising from" requirement for establishing specific jurisdiction. Parker Hannifin's claims arise out of the parties' conflicting interpretations of certain provisions of the 1986 Agreement, which (as discussed above) was negotiated (in part) in Ohio, closed in Ohio, provides that notices be sent to Parker Hannifin in Ohio, and creates continuing obligations on the part of Standard Motor to Parker Hannifin in Ohio with respect to the handling of EIS asbestos claims such as that directly at issue herein. Given the lenient standard for this factor (and Standard Motor's lack of meaningful opposition), the Court finds Parker Hannifin has demonstrated that the "operative facts" of the instant dispute relate to Standard Motor's contacts with Parker Hannifin in Ohio. *See e.g., See, e.g., Huey Jian Liang*, 2015 WL 65258 at * 7 (finding "arising from" factor met where "[t]he dispute . . . arises from the [parties'] Agreement"); *The Andersons, Inc., v. Demrex Indus. Services, Group, LLC.*, 590 F.Supp.2d 963, 970 (N.D. Ohio 2008) (finding "arising from" factor met where "defendants solicited, negotiated and executed a business contract with an Ohio-based corporation, the same contract on which Andersons base its breach of contract claim.")

### 3. Reasonableness

The third, and final, factor requires that "the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." *Mohasco Indus., Inc*., 401 F.2d at 381. The exercise of jurisdiction is presumed to be reasonable when the plaintiff satisfies the first two prongs of the *Mohasco* analysis. *CompuServe*, 89 F.3d at 1268. "[W]hen considering whether it is reasonable to

exercise personal jurisdiction over a non-resident defendant, a court must consider several factors including the following: (1) the burden on the defendant, (2) the interest of the forum state, (3) the plaintiff's interest in obtaining relief, and (4) other states' interest in securing the most efficient resolution of the controversy." *Intera Corp.*, 428 F.3d at 618.

Standard Motor argues that litigating this suit in Ohio would impose a "substantial burden" given that Standard Motor neither resides nor operates any facilities here. (Doc. No. 18 at fn 7.) It further asserts that the State of New York's interest in resolving his controversy "is at least as strong as that of Ohio's." (*Id.*)

The Court finds this is not the "unusual case" in which the exercise of personal jurisdiction is unreasonable. *Mohasco,* 401 F.2d at 384. Standard Motor provides no specific facts or other particular support for its contention that litigating this matter in Ohio would be substantially burdensome. Moreover, the Court finds that Ohio has "a strong interest in resolving a suit brought by an Ohio company for breach of a multimillion dollar business agreement." *Tharo Sys., Inc.,* 196 Fed. Appx. at 372. *See also The Andersons, Inc.*, 590 F.Supp.2d at 970 (finding reasonableness factor met, in part, because "Ohio has an interest in resolving suits brought by one of its citizens and in seeing that the residents get the benefit of their bargain."). Therefore, the Court finds the exercise of personal jurisdiction over Standard Motor is reasonable.

Accordingly, and for all the reasons set forth above, the Court finds Parker Hannifin has established that this Court may properly assert personal jurisdiction over Standard Motor. Standard Motor's Motion to Dismiss pursuant to Rule 12(b)(2) is, therefore, denied.

## B.      Failure to State a Claim

In its Motion to Dismiss, Standard Motors argues that all six of Parker Hannifin's claims should be dismissed for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  Under that Rule, the Court accepts the plaintiff's factual allegations as true and construes the Complaint in the light most favorable to the plaintiff. *See Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009). In order to survive a motion to dismiss under this Rule, "a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'" *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting in part *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

The measure of a Rule 12(b)(6) challenge — whether the Complaint raises a right to relief above the speculative level — "does not 'require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.'" *Bassett v. National Collegiate Athletic Ass'n.*, 528 F.3d 426, 430 (6th Cir. 2008) (quoting in part *Twombly*, 550 U.S. at 555–556, 127 S.Ct. 1955). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Deciding whether a complaint states a claim for relief that is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679, 129 S.Ct. 1937.

Consequently, examination of a complaint for a plausible claim for relief is undertaken in conjunction with the "well-established principle that 'Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific

facts are not necessary; the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Gunasekera*, 551 F.3d at 466 (quoting in part *Erickson v. Pardus*, 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007)) (quoting *Twombly,* 127 S.Ct. at 1964). Nonetheless, while "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era ... it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal,* 556 U.S. at 679, 129 S.Ct. 1937.

### 1.     Materials Considered in Resolving 12(b)(6) Motion

Before considering the merits of the parties' arguments, the Court must address the materials that are properly considered in evaluating Standard Motor's Rule 12(b)(6) Motion.  In its Brief in Opposition, Parker Hannifin repeatedly cites to and purports to rely on the Affidavits of Messrs. Meyer, Morgan, Pophal, and Ellis (as well as the Exhibits referenced in those Affidavits) in responding to Standard Motor's arguments that Parker has failed to adequately plead claims for breach of contract.  *See e.g.,* Doc. No. 17 at pp. 17, 18, 28, 29.[12]  Standard Motor objects, arguing "this Court should not countenance Parker's illicit attempt to amend its allegations in the Complaint through its Response by submitting improper and incomplete 'evidence' at the motion to dismiss stage."  (Doc. No. 18 at pp. 11 at fn 9, 12 at fn. 10.)

In response, Parker Hannifin argues that the Affidavits and Exhibits at issue were properly submitted in support of its 12(b)(2) motion to dismiss for lack of personal jurisdiction and, "[h]aving placed these detailed facts into the record to establish this Court's jurisdiction over SMP, Parker also

---

[12] At the same time, Parker Hannifin argues the Court may not rely on the jury verdict in the Barr case on the grounds that it is "extrinsic evidence" outside the Complaint.  (*Id.* at p. 25.)  The Court need not reach this issue, however, as it does not address Standard Motor's argument that the Barr Jury Verdict constitutes evidence that Parker Hannifin's underlying conduct in that matter was intentional. *See infra.*

properly cited to them – usually as 'see also' cites—when responding to SMP's various arguments that the Complaint fails to state a claim, and to show the Court the detailed facts underlying the averments in the Complaint."  (Doc. No. 20 at p. 1.)

In ruling on a Rule 12(b)(6) motion, a court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett,* 528 F.3d at 430.  *See also Brent v. Wayne County Dep't of Human Services*, 901 F.3d 656, 694 (6th Cir. 2018) (same); *Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001) ("This circuit has further 'held that 'documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.' ").  Under Rule 12(d), however, "[i]f . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d).  If a motion to dismiss is converted to a motion for summary judgment, the court must give all parties "a reasonable opportunity to present all the material that is pertinent to the motion." *Id*.

Aside from the 1986 Agreement itself, [13] the Court will not consider the extrinsic evidence attached to Parker Hannifin's Brief in Opposition when evaluating the parties' arguments for and against dismissal under Rule 12(b)(6).  The Myers, Morgan, Pophal and Ellis Affidavits are not attached to the Complaint or expressly referred to in that pleading.  *See, e.g., Emerman v. Financial*

---

[13] The Court will consider the 1986 Agreement, copies of which are attached as exhibits to both Standard Motor's Motion and Parker Hannifin's Brief in Opposition.  (Doc. Nos. 12-2, 17-5.)  The 1986 Agreement is specifically referenced in the Complaint and central to the claims set forth therein.  Neither party objects to the Court's consideration of this document in evaluating the parties' arguments relative to Standard Motor's 12(b)(6) Motion.

*Commodity Investments, LLC*, 2015 WL 3742252 at * 5 (N.D. Ohio June 15, 2015). Moreover, Parker Hannifin has not argued or demonstrated that any of the specific Exhibits attached to its Brief in Opposition are both referenced in the Complaint and central to its claims. Further, the Court rejects Parker Hannifin's argument that, because the Affidavits and Exhibits were properly submitted for purposes of opposing Standard Motor's 12(b)(2) motion, they may also be considered in the context of Standard Motor's arguments that the Complaint fails to state a claim under Rule 12(b)(6) without converting it to a summary judgment motion. Parker Hannifin cites no authority for this assertion and the Court finds it to be without merit.

### 2. Breach of Contract (Counts I and II)

Count I of the Complaint asserts a claim for breach of contract based on Standard Motor's refusal to "pay and discharge the damages associated with the Barr Suit judgment, and otherwise by refusing to acknowledge that the punitive damages award in the Barr Suit is an Assumed Liability" pursuant to Sections 2.1, 2.4, and 7.4 of the 1986 Agreement. (Doc. No. 1 at ¶ 67.) Count II asserts that Standard Motor breached Section 9.1 of the Agreement by "repudiating its obligation to be directly and solely responsible for the payment or discharge of the punitive damages award in the Barr Suit; by repudiating its obligation to fully defend Parker in connection with the appeal from the Barr Suit matter; and by asserting that [Standard Motor] is not legally responsible to hold harmless or indemnify Parker with respect to the Barr Suit punitive damages award." (*Id*. at ¶ 73.)

Standard Motor first argues Counts I and II should be dismissed for failure to state a claim because Parker Hannifin failed to adequately plead a binding agreement requiring it to indemnify Parker Hannifin for punitive damages. (Doc. No. 12-1 at pp. 9-10.) It asserts that Parker has "failed to identify any section of the Agreement that refers to punitive damages, let alone expressly imposes

an obligation to indemnify against such damages in the asbestos context." (*Id.*) Citing the Ohio Supreme Court's decision in *State Farm Mut. Ins. Co. v. Blevins*, 551 N.E.2d 955 (Ohio 1990), Standard Motor argues Ohio law provides that "in the absence of specific contractual language, coverage for punitive or exemplary damages will not be presumed." (*Id.* at p. 10.) Given the 1986 Agreement's silence on the issue of punitive damages, Standard Motors argues it is clear the parties "never agreed to indemnify punitive damages." (*Id.*)

Parker Hannifin appears to concede that the 1986 Agreement does not expressly refer to punitive damages but argues generally that Ohio law permits a buyer in an asset purchase transaction to assume the liabilities of seller. (Doc. No. 17 at p. 15.) It maintains that the Agreement's plain language broadly defines "Assumed Liabilities" as including "*all* liabilities and obligations of [Parker] as of the Closing arising solely out of [Parker's] conduct of the Business . . . but excluding the Excluded Liabilities." (*Id.* citing Section 2.4 of the Agreement). Parker further asserts that "none of the Agreement's provisions that reference or describe the Excluded Liabilities could be said to encompass punitive damages awards sought in EIS Asbestos Claims." (*Id.* at p. 16.) Thus, Parker Hannifin argues that, by its own plain terms, the 1986 Agreement contains a blanket assumption of liability that necessarily includes punitive damages awards in EIS Asbestos Claims. (*Id.*) Finally, Parker asserts that the parties' long-standing course of performance demonstrates that they mutually understood and intended for punitive damages claims to fall within the definition of Assumed Liabilities under Sections 2.4 and 7.4 of the Agreement. (*Id.* at p. 17.)

In response, Standard Motor argues that Parker Hannifin failed to respond to the Ohio Supreme Court's decision in *Blevins*, which it argues is directly applicable and precludes indemnification for punitive damages absent a clear statement of intent. (Doc. No. 18 at p. 11.)

Standard Motor maintains that Parker Hannifin "ignores this principle entirely and, despite including 34 attachments to its Response, fails to identify any affirmative basis in the Agreement to suggest that it reaches punitive damages awarded for asbestos claims." (*Id.* at p. 12.) Standard Motor further argues that Parker Hannifin's reliance on evidence of the parties' alleged course of dealing to support its preferred contractual interpretation is "both highly misleading and procedurally improper." (*Id.* at fn. 9.) Standard Motor asserts such evidence constitutes extrinsic evidence of the parties' intent, which is not properly considered on a Rule 12(b)(6) motion. Moreover, Standard Motor further argues that such evidence cannot be considered absent a finding that the contract is ambiguous, which Standard Motor maintains is not the case here. (*Id.*)

"Under Ohio law, the interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir.2008) (citations omitted); *see Ohio Historic al Soc'y v. Gen. Maint. & Eng'g Co.*, 583 N.E.2d 340, 345 (Ohio Ct. App. 7th Dist. 1989). It is the role of the court to discern the intent of the parties, which is "presumed to reside in the language they choose to use in their agreement." *Savedoff,* 524 F.3d at 763 (quoting *Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 952 (Ohio 1996)); *see United States Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.*, 716 N.E.2d 1201, 1208 (Ohio Ct. App. 2nd Dist. 1998). "The Court must look to the plain language of the contract, and only go beyond the plain language of the agreement to determine the rights and obligations of the parties if it is ambiguous."[14] *Airlink Commc'ns, Inc. v. Owl Wireless, LLC*, 2011 WL 4376123 at *2 (N.D. Ohio Sept.20, 2011) (internal citations omitted).

---

[14] "Contractual language is 'ambiguous' only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." *Covington v. Lucia*, 784

Construing the plain language of the Agreement, the Court finds that it is not ambiguous with regard to liability and indemnification for punitive damages in EIS Asbestos cases. The Assumption of Liabilities provision is broadly worded to include "all liabilities and obligations of the Seller," with the only exception being the "Excluded Liabilities" set forth in Section 2.5. While the parties negotiated numerous specific Excluded Liabilities (which are set forth in detail in that Section), the Agreement does not state that punitive damages claims are an Excluded Liability under the Agreement. In addition, the parties specifically addressed the allocation of liability for "Asbestos Claims" in Section 7.4. [15] The Court notes that the term "claim" is used broadly in that Section to refer to claims "whether founded upon negligence, breach of warranty, strict liability in tort, and/or other similar legal theory, seeking **compensation or recovery for or relating to injury to persons** arising out of a defect or alleged defect of a Product." (Doc. No. 1 at ¶17; Doc. No. 12-2 at PageID# 148) (emphasis added).

Moreover, Section 9.1 of the Agreement (entitled "Indemnification of Seller") provides that Standard Motor "will indemnify, defend, and hold Seller harmless from and against **any and all liabilities, damages, losses, claims**, costs, and expenses (including reasonable attorneys' fees) arising out of or resulting from . . . Purchaser's failure to pay or satisfy or cause to be paid or satisfied any of the Assumed Liabilities when due and payable, or nonperformance of any obligations to be

---

N.E.2d 186, 190 (Ohio Ct. App. 10th Dist. 2003) (citation omitted*); see Sec'y of USAF v. Commemorative Air Force*, 585 F.3d 895, 900 (6th Cir.2009).

[15] Exhibit F-1 of the 1986 Agreement (entitled "Status of EIS Asbestos Litigation") demonstrates that asbestos claims were pending against Parker Hannifin at the time of the parties' negotiations and Agreement. (Doc. No. 12-2 at PageID# 217.) Specifically, that Exhibit states that "Parker and its subsidiaries have been sued in a total of 137 cases involving asbestos brake parts." (*Id*.) Seventy-eight (78) of those cases had been settled at the time of the Closing, with Parker and its subsidiaries remaining as defendants in 59 cases, all of which were filed in state court in California. (*Id.*)

performed on the part of Purchaser under this Agreement." *See* Doc. No. 1 at ¶22; Doc. No. 12-2 at PageID# 155) (emphasis added).

The Court finds the Agreement's broad assumption of "*all liabilities and obligations* of the Seller" (including EIS Asbestos Claims "seeking compensation or recovery for or relating to injury to persons") necessarily includes claims for punitive damages in qualifying asbestos cases. This construction is further supported by the parties' failure to specifically include punitive damages in the Excluded Liabilities section, particularly in light of the fact that Parker Hannifin disclosed to Standard Motor the existence of numerous asbestos cases then-pending against it. Moreover, the Court's reading of Sections 2.4, 2.5 and 7.4 of the Agreement is consistent with the language of Section 9.1, which likewise broadly states that "Purchaser will indemnify, defend, and hold harmless from and against *any and all liabilities, damages, losses, [and] claims*." (Doc. No. 1 at ¶ 22; Doc. No. 12-2 at PageID# 155.) Thus, and confining its review to the four corners of the Agreement,[16] the Court finds that the plain language of parties' contract is clear and unambiguous that the Assumed Liabilities and Indemnification provisions includes punitive damages claims arising from qualifying EIS Asbestos Claims.

Standard Motor argues, however, that the Court cannot, as a matter of Ohio law, presume that the Agreement covers punitive damages in the absence of specific contractual language providing therefor. (Doc. No. 12-1 at p. 10.) In support of this argument, Standard Motor relies on *State Farm Mutual Ins. Co v. Blevins*, 551 N.E.2d 955 (Ohio 1990), in which the Ohio Supreme Court held that "[i]n the absence of specific contractual language, coverage for punitive or exemplary damages will

_____

[16] Because the Court finds the terms of the 1986 Agreement to be unambiguous, it does not consider Parker Hannifin's allegations regarding the parties' actual course of dealing.

not be presumed under a provision for uninsured motorist coverage." In that case (which was decided four years after the 1986 Agreement at issue herein was executed), State Farm issued an automobile liability insurance policy to Mary and Thomas Blevins, that included uninsured motorist coverage as required by Ohio Rev. Code § 3937.18. The Blevins's were subsequently injured in an accident caused by an uninsured motorist. State Farm and the Blevins's were unable to reach a negotiated settlement, and the Blevins's demanded arbitration. An arbitration panel found that the Blevins's were entitled to collect damages from the uninsured motorist in the total amount of $40,000 in compensatory damages and $75,000 in punitive damages. The arbitrators further determined that the Blevins's uninsured motorist policy provided coverage for punitive damages. State Farm challenged the award, and the state trial court vacated it on the ground the arbitrators exceeded their authority in awarding punitive damages. The state appellate court affirmed on different grounds.

The Ohio Supreme Court considered the issue of "whether the insurance policy, which is the contract between the parties, grants the power to award punitive damages." *Id.* at 167. Noting that "the purpose of punitive damages is to punish the offending party and make the offender an example to others so that they might be deterred from similar conduct," the court found that "Ohio law has long disfavored insurance against punitive damage resulting from the insured's own torts." *Id.* at 168. The court noted that "uninsured motorist coverage insures against the tortious acts and financial responsibility of persons other than the insured." *Id.* The court went to find, however, that "the economic reality is that many uninsured motorists are judgment-proof" and "thus the insurer will often not recover punitive damages from the tortfeasor." *Id.* The court reasoned that "more likely, the insurer will raise premiums and pass the loss on to financially responsible consumers," in effect, "punishing" the wrong party. *Id.* Under these circumstances, the court found "no reason to conscript

35

insurers into an unwitting commitment to provide coverage for punitive damages," and therefore held that coverage for punitive damages in uninsured motorist cases will not be presumed "in the absence of specific contractual language" providing for it. *Id.* It then held that the arbitrators exceeded their power when they made an award of punitive damages and affirmed the decision of the lower court. *Id.* at 169.

The Court finds Standard Motor's reliance on *Blevins* to be misplaced. Central to the Ohio Supreme Court's reasoning in that case are concerns relating to who should bear the responsibility for punitive damages awards in uninsured motorist cases. In that case, the court explained that requiring insurers to provide coverage for punitive damages in uninsured motorist cases did not serve the public policy of punishing tortfeasors for their "offending conduct" because the tortfeasors themselves were not likely to ever be required to pay such damages. Rather, insurers were more likely to pass the cost of punitive damage awards along to "financially responsible" consumers in the form of higher premiums. In light of these policy concerns, the court declined to presume coverage for punitive damages in uninsured motorist coverage cases in the absence of specific contractual language to that effect.

The instant case, however, arises in an entirely different context. The instant dispute does not involve uninsured motorist coverage or, for that matter, any other form of insurance policy. Rather, the Agreement at issue herein is an Asset Purchase Agreement between two sophisticated entities for the purchase and sale of a business. The assumption of liabilities and indemnification provisions of that Agreement were carefully negotiated between the parties and their counsel, and expressly allocated the parties' relative liabilities as to EIS asbestos claims. The parties, through their counsel and with knowledge that many asbestos claims had already been filed and were currently pending,

agreed that Standard Motor would assume "*all liabilities and obligations* of the Seller" (including EIS Asbestos Claims "seeking compensation or recovery for or relating to injury to persons") and indemnify Parker Hannifin for from and against "*any and all liabilities, damages, losses, [and] claims.*"

In light of the above, the Court finds the Ohio Supreme Court's analysis in *Blevins* is not applicable to the instant case. The 1986 Agreement does not involve the transfer of responsibility for punitive damages awards stemming from a third-party's tortious acts onto an "unwitting" insurer only to be passed on to blameless consumers. Rather, the parties herein carefully negotiated the Agreement at issue and were aware of and expressly accounted for "all liabilities and obligations," including EIS Asbestos Claims "seeking compensation or recovery for or relating to injury to persons."[17] Under these circumstances, the Court finds *Blevins* is not applicable and does not require the Court to interpret the 1986 Agreement as not covering the punitive damages award at issue herein.

Standard Motor next argues that, "even if Plaintiff were able to plead that the Agreement extended indemnity to punitive damages . . . such a provision would be void 'because Ohio law prohibits the indemnification of monies paid to an award of punitive damages arising out of the insured's own conduct." (Doc. No. 12-1 at pp. 10-11.) Standard Motor asserts that, because the

---

[17] In addition, the insurance policy at issue in *Blevins* provided simply that "we will pay damages for bodily injury an insured is legally entitled to collect from the owner or driver of an uninsured motor vehicle." *Id*. at 165. The Ohio Supreme Court found that this language "clearly limits the insurer's liability to compensatory damages for personal injury," finding "under no construction can the language ' for bodily injury' be read to include punitive damages" because "punitive damages are not awarded for bodily injury." *Id.* at 169. Here, on the other hand, the 1986 Agreement provides that Standard Motor is responsible for "all liabilities and obligations of the Seller" (including EIS Asbestos Claims "seeking compensation *or recovery for or relating to* injury to persons") and indemnify Parker Hannifin for from and against "any and all liabilities, damages, losses, [and] claims." The Court finds this language is more expansive than that at issue in *Blevins* and unambiguously includes (for all of the reasons set forth *infra*) punitive damages claims in EIS asbestos cases.

punitive damages in the Barr Suit arose from Parker Hannifin's intentional conduct, Ohio's public policy forbids their insurance by a third party. (*Id.*) Standard Motor also notes that at least one Ohio court has invalidated indemnity provisions in asset purchase agreements for intentional torts on policy grounds. *See Diamond Wine & Spirits, Inc. v. Dayton Heidelberg Distrib. Co.*, 774 N.E.2d 775 (Ohio Ct. App. 3rd Dist. 2002).

Parker Hannifin argues this argument should be rejected because it is not seeking indemnification for punitive damages but, rather, is seeking indemnification for Standard Motor's breach of contract. (Doc. No. 17 at p. 20.) It maintains that Ohio public policy "clearly permits the wholesale assumption of liabilities by successor entities, including punitive damages liability." (*Id.*) Even if the Agreement required Standard Motor to indemnify Parker Hannifin for Parker's punitive damages liability, Parker argues that "such an obligation would not contravene any established Ohio public policy because (i) the Agreement is not an insurance contract; (ii) Standard Motor's obligations relate solely to Parker's *past conduct* and do not impact third parties; and (iii) the Barr jury's verdict cannot establish intentional conduct on Parker's part." (*Id.* at p. 21) (emphasis in original).

In response, Standard Motor argues that Ohio's public policy against indemnification for punitive damages applies in the instant case because it is not concerned solely with deterring future conduct but is also intended to punish an offender for the wanton, reckless, malicious or oppressive character of the act committed. (Doc. No. 18 at p. 9.) Finally, Standard Motor argues that the Barr verdict necessarily required a finding that Parker Hannifin acted with malice and, therefore, is sufficient to establish the intentional nature of Parker's conduct with respect to the underlying award of punitive damages. (*Id.*)

While the freedom to contract is fundamental and courts should not lightly disregard agreements that are freely entered into between parties, a contract may be void if it violates public policy. *See Teodecki v. Litchfield Twp*., 38 N.E.3d 355, 363 (Ohio Ct. App. 9th Dist. 2015); *Brown v. Gallagher*, 902 N.E.2d 1037, 1040 (Ohio Ct. App. 4th Dist. 2008); *Core Funding Group, LLC v. McDonald*, 2006 WL 832833 at \*10 (Ohio Ct. App. 6th Dist. March 31, 2006). "[P]ublic policy is that principle of law which holds that no one can lawfully do that which has a tendency to be injurious to the public good." *Eagle v. Fred Martin Motor Co*., 809 N.E.2d 1161, 1180 (Ohio Ct. App. 9th Dist. 2004). Accordingly, "contracts which bring about results which the law seeks to prevent are unenforceable as against public policy." *Id. See also Brown*, 902 N.E.2d at 1040.

As Standard Motor correctly notes, Ohio courts have held that "public policy prevents insurance contracts from insuring against claims for punitive damages based upon an insured's malicious conduct."[18] *Neal-Pettit v. Lahman*, 928 N.E.2d 421, 425 (Ohio 2010). *See, e.g, Burlington Ins. Co. v. Eden Cryogenics LLC*, 126 F.Supp.3d 947, 959 (S.D. Ohio 2015); *Lumbermens Mut. Cas. Co. v. S- W Indus., Inc*, 39 F.3d 1324, 13239 (6th Cir. 1994). *See also Casey v. Calhoun*, 531 N.E.2d 1348, 1350 (Ohio Ct. App. 8th Dist. 1987) ("We hold that both the legislature and the judiciary have articulated a clear policy against the insurability of punitive damages and that a contract provision which contravenes that policy must be declared void.") "The public policy prohibiting the protection of insurance for punitive damages stems from the underlying assumptions that an individual should

---

[18] In addition, Ohio Rev. Code § 3937.182 provides that: "No policy of automobile or motor vehicle insurance that is covered by sections 3937.01 to 3937.17 of the Revised Code, including, but not limited to, the uninsured motorist coverage, underinsured motorist coverage, or both uninsured and underinsured motorist coverages included in such a policy as authorized by section 3937.18 of the Revised Code, and that is issued by an insurance company licensed to do business in this state, and no other policy of casualty or liability insurance that is covered by sections 3937.01 to 3937.17 of the Revised Code and that is so issued, shall provide coverage for judgments or claims against an insured for punitive or exemplary damages."

not be able to escape punishment for his or her intentionally malicious acts and that the deterrent effect of punitive damages would be diminished if tortfeasors can be indemnified against them." *The Corinthian v. Hartford Fire Ins. Co.*, 758 N.E.2d 218, 223 (Ohio Ct. App. 8th Dist. 2001). *See also Motorists Mut. Ins. Co. v. Dandy-Jim, Inc.*, 912 N.E.2d 659, 667 (Ohio Ct. App. 8th Dist. 2009).

For the following reasons, the Court agrees with Parker Hannifin that the indemnification provision of the 1986 Agreement is not void as against public policy because it relates solely to Parker Hannifin's past conduct.[19] As discussed above, under Section 7.4 of the Agreement, Parker Hannifin was responsible for EIS Asbestos Claims asserted "on or prior to the fifteenth (15) anniversary of the Closing Date" while Standard Motor was responsible for EIS Asbestos Claims "asserted in writing after the fifteenth (15) anniversary of the Closing Date." (Doc. No. 12-2 at PageID# 148.) Moreover, that Section further states that Standard Motor "shall be responsible for all claims alleging any illness, disease, injury or other physical damage arising out of or relating in any way to alleged exposure to asbestos-containing Products asserted, in writing, after the Closing Date, if the claimant's first alleged exposure to asbestos-containing Products occurred after the Closing Date." (*Id.*)

Thus, the parties' Agreement was not a form of insurance against Parker Hannifin's future acts, but rather a negotiated solution for the financial consequences of actions that had already occurred. In other words, the Agreement does not allow Parker Hannifin to continue to engage in tortious conduct without fear of financial consequences in the form of punitive damages. Rather, the Agreement is limited solely to allocating responsibility for Parker Hannifin's past conduct.

_____

[19] As the Court's decision on this issue is dispositive, the Court need not reach Parker Hannifin's arguments that (1) it is not seeking indemnification for punitive damages; (2) the public policy issues identified by Standard Motor are not applicable in the context of an asset purchase agreement; and (3) the Barr jury verdict does not establish intentional conduct on the part of Parker Hannifin.

Accordingly, Ohio's public policy concern that indemnification of punitive damages would diminish the deterrent effect of punitive damages awards, is not implicated under the circumstances presented.

Ohio courts have reached this conclusion under similar circumstances. In *Brown v. Gallagher*, 902 N.E.2d 1037 (Ohio Ct. App. 4th Dist. 2008), Brown brought suit against Gallagher for injuries he sustained in an auto accident. The parties entered into a settlement agreement, pursuant to which Gallagher agreed to indemnify Brown for "any and all claims, liability and expenses . . . for any claim or demand of any party, and any claim or demand of any third party" resulting from the collision. *Id.* at 1038. Brown subsequently pled guilty to a charge of vehicular assault in a criminal case that arose from the same incident and was ordered to pay restitution in the amount of $7,923.44 to Gallagher's employer for leave payments made during his convalescence. *Id.* Brown then filed a complaint against Gallagher in municipal court based on the indemnification provision of their settlement agreement. *Id.* The court granted Gallagher's motion to dismiss, and Brown appealed.

On appeal, Gallagher argued that enforcing the indemnification provisions of the settlement agreement in this context was against Ohio public policy because it would "nullify the twin aims of felony sentencing as stated in R.C. 2929.11, that is, protecting the public from future crimes and punishing the offender." *Id.* at 1040. The state appellate court disagreed, explaining as follows:

> {¶ 13} "There may be no dispute that one may not contract for indemnification for the consequences of a criminal or illegal act to occur in the future. But the distinction has always been sharply made, with contrary effect, with respect to agreements to indemnify one post factum for the financial consequences of a crime or illegal act. In other words, one may make an agreement to be indemnified or to indemnify with respect to a crime or illegal act which occurred prior to the making of the agreement. This has been the law for many years throughout the United States and in this State." (Citations omitted.) *Feuer v. Menkes Feuer* (1959), 8 A.D.2d 294, 297–298, 187 N.Y.S.2d 116. "[W]ith respect to past events, there may be many quite valid, and even desirable, purposes in allocating the ultimate financial responsibility among persons involved in a transaction or relation." *Id.* at 298, 187 N.Y.S.2d 116.

{¶ 14} The 8th Circuit Court of Appeals recently examined the issue in *Katun Corp. v. Clarke* (C.A.8, 2007), 484 F.3d 972. In deciding that the appellant could be indemnified for criminal penalties under a settlement agreement when the wrongdoing occurred before the settlement was reached, the court stated that "[b]ecause the indemnification provision at issue in this case did not create the kind of negative incentives normally associated with attempts to insure against penal sanctions and because a contract should not be voided absent an unmistakable violation of public policy, we cannot conclude that the claim for indemnification was an illegal demand or patently in violation of public policy." (Citation omitted.) *Id*. at 978. *See also Brauer v. Cent. Trust Co.* (1980), 77 A.D.2d 239, 433 N.Y.S.2d 304; *Pettit Grain & Potato Co. v. N. Pacific Ry. Co.* (1948), 227 Minn. 225, 35 N.W.2d 127.

**{¶ 15} In the case *sub judice*, appellee and appellant entered into the settlement agreement more than two years after the vehicular assault occurred. Nothing in the agreement indemnifies appellant for prospective acts or in any way encourages future illegal behavior. Instead, the agreement simply allocates financial responsibility for the consequences of the prior illegal act: in consideration of $87,500, appellee agreed to indemnify appellant for all financial obligations that might arise from the incident. As indicated in the cases cited above, in such instances the public interest in protection from future crimes is not injured.**

*Id*. at 1040-1041 (emphasis added).

Although *Brown* involved indemnification for restitution in a criminal case rather than punitive damages in a civil action, the *Brown* court's reasoning is equally applicable to the instant case. In both cases, Ohio's public policy concerns include deterring future misconduct. In both cases, the indemnification provisions at issue relate solely to past misconduct and, therefore, do not "in any way encourage future" misconduct. The Court agrees with this reasoning and finds it fully applicable to the indemnification provision at issue herein.[20] Moreover, the Court rejects Standard Motor's

---

[20] Courts in other States have reached the same conclusion under similar circumstances. *See, e.g., Katun Corp. v. Clarke*, 484 F.3d 972, 976–78 (8th Cir.2007) (under Minnesota law, a settlement agreement allegedly resolving disputed indemnification claims asserted by a corporation and its parent company against the corporation's former shareholders based on alleged prior illegal conduct by the corporation pursuant to an indemnification provision in the parties' merger agreement when the parent company acquired the corporation was not void as a matter of public policy); *Loscher v. Hudson*, 182 P.3d 25, 34 (Kan.Ct.App.2008) ("Unless an indemnity agreement encourages the commission of the illegal act, a contract to indemnify against the consequences of an illegal act that has already been committed has generally been upheld.");*Feuer v. Menkes Feuer, Inc.*, 187 N.Y.S.2d 116, 120 (N.Y.App.Div.1959)) ("[O]ne may make an agreement to

argument that the parties' indemnification provision is nonetheless void because it does not serve

Ohio's policy interest in "punishing" Parker Hannifin for its intentional misconduct. Standard Motor

cites no Ohio case law for the proposition that the policy objective to "punish" wrongdoers is a

sufficient basis, standing alone, to invalidate a carefully negotiated indemnification provision relating

to past conduct only. Moreover, under Section 7.4 of the Agreement, Parker Hannifin bore all

responsibility for EIS Asbestos Claims filed between August 31, 1986 and August 31, 2001. Thus,

Parker did not escape the consequences of its past alleged intentional misconduct entirely unscathed.

Accordingly, and for all the reasons discussed above, the Court rejects Standard Motor's

argument that the assumption of liability and indemnification provisions of the 1986 Agreement are

void as against public policy.

Finally, Standard Motor argues that Counts I and II should be dismissed because Parker

Hannifin "cannot plead that SMP's indemnity obligation has arisen." (Doc. No. 12-1 at pp. 11-12.)

Specifically, Standard Motor argues that Section 9.3[21] of the Agreement requires that the appeals

process be completed before any obligations to indemnify are triggered. (*Id.*) Because the Barr Suit

---

be indemnified or to indemnify with respect to a crime or illegal act which occurred prior to the making of the agreement. This has been the law for many years throughout the United States and in this State."); *Oxy USA, Inc. v. Southwestern Energy Prod. Co.,* 161 S.W.3d 277, 286–87 (Tex.App.2005) (an indemnity agreement executed by two oil and gas companies releasing one company from liability for intentional tort claims arising out of a seismic survey project did not violate public policy, where the agreement was limited to actions that had already occurred). *See also* 8 Williston on Contract, § 19:18 (4th ed.) ("A contract to indemnify against the consequences of an act that has already been committed has also been generally upheld unless there was an understanding prior to the commission of the act that subsequently indemnity would be given").

[21] Section 9.3 of the Agreement provides that: "After any final judgment or award shall have been rendered by a court, arbitration board or administrative agency of competent jurisdiction and the expiration of the time in which to appeal therefrom, or a settlement shall have been consummated, or the Claimant and the Indemnitor shall have arrived at a mutually binding agreement with respect to each separate matter indemnified by the Indemnitor hereunder, the Claimant shall forward to the Indemnitor notice of any sums due and owing by it pursuant to this Agreement with respect to such matter and the Indemnitor shall be required to pay all of the sums so owing to the Indemnitor within thirty (30) days after the date of such notice." (Doc. No. 12-2 at PageID# 156.)

is pending on appeal in California, Standard Motor argues that no indemnity obligation has accrued and there can be no breach as a matter of law. (*Id.*) Standard Motor further asserts that Parker Hannifin cannot avoid this problem because the Complaint fails to adequately plead an anticipatory breach. (*Id.* at pp. 12- 13.) Parker Hannifin fails to either acknowledge or address this argument.

The Court agrees with Standard Motor that, in light of the pending Barr Suit appeal, its duty to indemnify Parker Hannifin for the punitive damages award in that case has not yet been triggered under Section 9.3 of the Agreement. Thus, to the extent Counts I and II allege claims for breach of contract based on the duty to indemnify as to the Barr Suit punitive damages award, the Court agrees that those claims are not yet ripe.

However, Count II also alleges that Standard Motor breached Section 9.1 of the Agreement when it "repudiated its obligation to fully defend Parker in connection with the appeal from the Barr Suit matter." (Doc. No. 1 at ¶ 73.) The Complaint further alleges that Standard Motor's breach of the duty to defend has caused damages to Parker, including (1) "the cost of the appeal bond for the punitive damages award, which [Standard Motor] has refused to pay;" and (2) the cost of defense counsel specially retained by Parker to ensure that appropriate actions are taken to defend Parker's interests in connection with the appeal in the Barr Suit and other EIS Asbestos Claims." (*Id.* at ¶ 75.) Standard Motor does not argue that Parker's breach of contract claim based on the duty to defend the punitive damages award in the Barr suit on appeal, is not ripe and, indeed, the Court finds that the allegations in the Complaint are sufficient to demonstrate the ripeness of that claim.

Thus, the Court is faced with a situation where Counts I and II of the Complaint allege a claim that is ripe (i.e., breach of the duty to defend on appeal) and a claim that is not yet ripe (i.e., breach of the duty to indemnify as to the Barr Suit punitive damages award). Given the interdependence of

these claims, the Court is not inclined to dismiss the breach of the duty to indemnify claim at this time. Rather, the Court will stay determination of Parker Hannifin's breach of the duty to indemnify claim until such time as that duty is triggered under Section 9.3 of the Agreement. The Court will, however, allow Parker Hannifin's breach of the duty to defend on appeal claim to proceed, as that claim is ripe for consideration at this time.

### 3. "Breach of Contract--Duty to Defend and Settle" (Count III)

Count III of the Complaint asserts a breach of contract claim based on Standard Motor's failure to defend and settle the Barr Suit at trial. (Doc. No. 1 at ¶¶ 78-87.) Specifically, Count III alleges that Sections 9.1 and 9.3 of the Agreement "imposed additional and independent duties on Standard Motor to mount a vigorous, thorough, well-prepared and well-supported defense of Parker against all of the claims and allegations made in the Barr Suit." (*Id.* at ¶ 81.) Parker further alleges that "[h]aving agreed to accept Parker's 100% tender of the Barr Suit without qualifications, and assigning its own retained counsel to defend both Parker and Standard Motor, Standard Motor was obligated to avoid the very outcome that occurred in the Barr Suit, where a jury was permitted to consider a separate imposition of liability on Parker that Standard Motor would later claim Standard Motor was not legally responsible for." (*Id.* at ¶ 83.) Parker alleges that Standard Motor could, and should, have taken "any number of actions that it failed to take that would have avoided the outcome of the Barr Suit trial." (*Id.* at ¶ 84.) Lastly, Parker alleges that Standard Motor's "duties to Parker included the duty to negotiate and fully fund a settlement of the Barr Suit, and Standard Motor failed and continues to fail to take the actions necessary to settle the Barr Suit." (*Id.* at ¶ 86.)

Standard Motor next argues that this claim fails as a matter of law because the Agreement's terms impose neither a duty to defend or a duty to settle with respect to punitive damages. (Doc. No.

12-1 at p. 13.) It asserts that "no duty to defend punitive damages arises because punitive damages are beyond the scope of the Agreement." (*Id*. at p. 14.) Standard Motor argues that "the Agreement does not encompass punitive damages and, even if such an obligation could be read into the Agreement, Ohio law would render the provision void." (*Id*. at p. 14-15.)

These arguments are rejected for the reasons discussed, at length, above. Specifically, the Court has already found that the 1986 Agreement encompasses punitive damages and, further, that it is not void as against Ohio public policy. Accordingly, these arguments are without merit.

Standard Motor argues that "Plaintiff's duty to settle claim fails as a matter of law because such a duty does not exist outside of the insurance context." (Doc. No. 12-1 at p. 13-14.) It further argues that Standard Motor did, in fact, defend the Barr Suit as it was obligated to do under the Agreement. (*Id.* at fn 9.) Standard Motor maintains that, while Parker "may be dissatisfied with the trial outcome in the Barr Suit, that disappointment has no bearing on whether Standard Motor satisfied its contractual obligations." (*Id*.) Rather, it asserts that Parker's allegations "amount to an impermissible attempt to challenge the adequacy of Standard Motor's performance of its contractual duties via a quasi-tort claim," which is foreclosed by Ohio law. (*Id*.)

Parker Hannifin argues that the duty at issue here arises from the terms of the 1986 Agreement itself, which gave Standard Motor "the right, at its sole option and expense to be represented by counsel of its choice to defend against, negotiate, settle, or otherwise deal with" the Barr Suit. (Doc. No. 17 at p. 27.) Parker argues that Standard Motor "materially breached its obligation in numerous ways, including (by way of example): by failing to put before the jury the available evidence of the warnings used by Parker; by allowing the jury to consider a separate charge of punitive damages

against Parker; and by refusing to defend Parker's interests on appeal from the jury's verdict rendered in the case." (*Id.* at pp. 27-28.)

For the following reasons, Parker Hannifin's breach of contract claims based on the duty to defend and settle the Barr suit at trial fail to state claims and are dismissed. With respect to the duty to defend, the Complaint alleges that Standard Motor (1) accepted Parker's tender of the Barr Suit; (2) "exercised its rights under the 1986 Agreement to choose counsel to defend itself and Parker;" and (3) defended both Parker Hannifin and Standard Motor in the Barr Suit trial. (Doc. No. 1 at ¶ 39, 45.) As Standard Motor did, in fact, defend Parker Hannifin at trial pursuant to the terms of the 1986 Agreement, the Court finds Parker Hannifin cannot state a claim that Standard Motor breached its duty to defend during trial.

The Court also finds that Count III fails to state a claim for breach of the duty to settle. Section 9.3 of the 1986 Agreement authorizes Standard Motor to elect "to be represented by counsel of its choice and to defend against, negotiate, settle or otherwise deal with any proceeding, claim or demand which relates to any loss, liability, damage or deficiency indemnified against hereunder." (Doc. No. 12-2 at PageID# 155.) While this provision *authorizes* Standard Motor to settle, the Court does not interpret this language as imposing a *duty* on Standard Motor to settle every EIS Asbestos Claim that it has agreed to defend under the Agreement. Thus, the Court finds Parker Hannifin cannot state a claim for breach of the duty to settle the Barr Suit.

Parker Hannifin argues, however, that Count III should not be dismissed because it alleges that Standard Motor breached its duty to defend under the Agreement when it failed to provide a good defense at trial; i.e., "a vigorous, thorough, well-prepared and well-supported defense of Parker" during the trial of the Barr Suit, particularly with regard to the issue of punitive damages. Read

liberally, this Count also appears to allege that Standard Motor's duty to defend included the duty to properly evaluate the Barr Suit for settlement and negotiate a fair settlement, and that Standard Motor breached that duty as well.

The Court agrees with Standard Motor that these allegations fail to state cognizable breach of contract claims. Ohio courts have held that "a cause of action for negligent performance of a contract is not a cognizable tort claim under Ohio law." *Bolin v. Allstate Property and Casualty Ins. Co.*, 2018 WL 4049293 at * 6 (Ohio Ct. App. 2nd Dist. Aug. 24, 2018). *See also Hoskins v. Aetna Life Ins. Co.*, 452 N.E.2d 1315 (Ohio 1983) (noting that "it is well established in Ohio that it is no tort to breach a contract, regardless of motive"). As one Ohio court explained:

> A breach of contract claim does not create a tort claim, and a tort claim based upon the same actions as those upon which a breach of contract claim is based exists only if the breaching party also breaches a duty owed separately from that duty created by the contract, that is, a duty owed even if no contract existed. *Textron Fin.Corp. v. Nationwide Mut. Ins. Co.* (1996), 115 Ohio App.3d 137, 151, 684 N.E.2d 1261, discretionary appeal not allowed in (1996), 78 Ohio St.3d 1425, 676 N.E.2d 531. Further, there must be damages attributable to the wrongful acts which are in addition to those attributable to the breach of contract. *Id.*

*Prater v. Three C Body Shop, Inc*., 2002 WL 479827 at * 4 (Ohio Ct. App. 10th Dist. March 29, 2002). *See also Garofoli v. Whiskey Island Partners, Ltd*., 25 N.E.3d 400, 405 (Ohio Ct. App. 8th Dist. 2014); *Zuppan v. P.C.S. Automotive, Inc.,* 2010 WL 6886819 at * 5 (Ohio Ct. App. 8th Dist. July 5, 2010).

Here, Count III does not allege that Standard Motor breached a duty separate and apart from that owed under the 1986 Agreement with regard to the defense of the Barr Suit at trial.[22] Moreover, this Count does not allege damages attributable to Standard Motor's allegedly deficient representation

---

[22] Additionally, the Complaint does not allege that Standard Motor breached an implied duty of good faith and fair dealing with respect to its handling of the defense of the Barr Suit at trial.

of Parker Hannifin at trial in the Barr Suit which are separate and apart from damages attributable to its alleged breach of contract. To the contrary, Count III is expressly based on the alleged breach of Section 9.1 of the parties' Agreement and asserts the same damages as set forth in its breach of contract claims in Counts I and II.

Accordingly, and for all the reasons set forth above, Standard Motor's Motion to Dismiss Count III for failure to state a claim is granted.

.        **4.        "Breach of Contract- Duty of Good Faith and Fair Dealing" (Count IV)**

Count IV alleges that, in performing its obligations under the 1986 Agreement, Standard Motor owed to Parker a contractual duty of good faith and fair dealing, which included the duty to "inform Parker promptly, unambiguously, and at the outset of any limitations, qualifications, or conditions attached to [Standard Motor's] assumption of Parker's defense, by accepting Parker's defense subject to a clear and express reservation of rights." (Doc. No. 1 at ¶¶ 91, 92.) Parker Hannifin alleges that Standard Motor breached this "duty of prompt notification" when it undertook its defense of Parker in the Barr Suit without asserting any limitations, qualifications, or conditions, and without issuing a reservation of rights.[23] (*Id.* at ¶¶ 94, 95.)

Standard Motor argues this claim should be dismissed because Ohio courts do not recognize an independent cause of action for breach of the duty of good faith and fair dealing apart from a breach of the underlying contract. (Doc. No. 12-1 at p. 15.) Parker Hannifin argues that Ohio courts

_____

[23] Parker Hannifin also alleges that it suffered substantial prejudice as a result of Standard Motor's breach, including that: "(a) SMP denied Parker the ability to dispute SMP's position before the adverse jury verdict was handed down; (b) SMP denied Parker the ability to protect Parker's interests by retaining Parker's own counsel; (c) SMP denied Parker the ability to seek a dismissal of the demand for punitive damages in advance of trial; (d) SMP denied Parker the ability to develop evidence in discovery to defend against the punitive damages demand; (e) SMP denied Parker the opportunity to negotiate a settlement of the Barr Suit before trial; and (f) SMP denied Parker the opportunity to produce its own testimony and evidence at trial against the demand for punitive damages." (Doc. No. 1 at ¶ 96.)

have, in fact, recognized such a claim under similar circumstances, citing *Dietz-Britton v. Smythe-Cramer Co.*, 743 N.E.2d 960 (Ohio Ct. App. 8th Dist. 2000).

As Ohio courts have explained, "[t]he duty of good faith requires the parties to deal reasonably with each other, and it applies where one party has discretionary authority to determine certain terms of the contract." *Connectivity Systems, Inc. v. National City Bank*, 2009 WL 10709117 at * 4 (S.D. Ohio Aug. 20, 2009) (citing *DavCo Acquisition Holding, Inc. v. Wendy's Int'l, Inc.*, 2008 WL 755283, at *6 (S.D. Ohio Mar. 19, 2008)). The implied duty of good faith and fair dealing may not be used to override the express terms of a contract and has no application where one party to the contract has the absolute and exclusive authority to make the decision at issue. *Id. See also DavCo*, 2008 WL 755283, at *7. The duty may be implied, however, where a contract is silent as to an issue, in which case good faith is used to fill the gap. *See Savedoff v. Access Group, Inc.*, 524 F.3d 754, 764 (6th Cir. 2008) ("[T]his duty is implied only under limited circumstances, such as when the contract is silent as to an issue. In such a case, the parties must use good faith in filling the gap.")

For the following reasons, Standard Motor's Motion to Dismiss Count IV for failure to state a claim is denied. In the Complaint, Parker Hannifin alleges that Standard Motor had a duty to defend the Barr Suit pursuant to Section 7.4 of the 1986 Agreement. Parker further alleges that Standard Motor unconditionally accepted the tender of the Barr Suit pursuant to that Section and "at no time prior to the jury's verdict did Standard Motor ever take the position with Parker that any of the Barr Suit claims or damages were not Standard Motor's responsibility." (Doc. No. 1 at ¶¶ 38, 47.)

The parties do not direct this Court's attention to any specific provision in the Agreement that expressly addresses the parties' obligations (if any) to notify each other of any limitations, qualifications, or conditions when accepting the tender of EIS Asbestos Claims pursuant to Section

7.4. Parker Hannifin asserts that, when Standard Motor agreed to undertake Parker's defense in the Barr Suit pursuant to Section 7.4, it was subject to an implied duty of good faith and fair dealing that included the duty to promptly notify Parker of any limitations, qualifications, or conditions of its defense. Thus, the Court does not construe Count IV as asserting an independent cause of action apart from a breach of the underlying contract. [24] Rather, in this Count, Parker Hannifin alleges that Standard Motor's alleged duty of good faith and fair dealing arises from its obligations under Section 7.4 of the 1986 Agreement itself; i.e., it "fills a contractual gap" in that provision regarding the parties' obligations to timely notify of any limitations when accepting the tender of an EIS Asbestos Claim. At least one Ohio court has recognized such a claim under analogous circumstances. *See Dietz-Britton*, 139 Ohio App.3d at 344-349 (finding a genuine issue of material fact as to whether defendant breached its duty of good faith in connection with its failure to timely reserve it rights in a manner that prejudiced plaintiff's ability to defend herself against third-party fraud claim). [25] At the 12(b)(6) stage, the Court finds Parker Hannifin's allegations to be sufficient to withstand dismissal.

Accordingly, Standard Motor's Motion to Dismiss Count IV is not well-taken and denied.

---

[24] Standard Motor argues that, even if this Count were construed to assert breach of such an implied duty of good faith and fair dealing, it should nonetheless be dismissed because such a duty is only implicated by acts or omissions that could not have been contemplated at the time of drafting, and which therefore were not resolved explicitly by the parties. (Doc. No. 18 at fn 13.) However, the Court finds that it is premature at the 12(b)(6) stage to determine what the parties could or could have not contemplated at the time of drafting with respect to this issue.

[25] Standard Motor argues *Dietz-Britton* is inapposite because it was decided in the "unique context" of insurance law. (Doc. No. 18 at p. 15.) *Dietz-Britton* did not, however, involve an insurance policy. Rather, in that case, the court was asked to construe Defendant Smythe-Cramer's "legal defense program," which offered defense and indemnity for claims against its realtors. *Dietz-Britton*, 139 Ohio App.3d at 343. The court in that case found that "general principles of contract law apply to application of the legal defense program" and specifically noted that "the evidence tends to suggest that the legal defense program is more in the nature of a private indemnity agreement between Smythe, Cramer and its realtors than an insurance program." *Id*. at 355. Moreover, the court noted that "there are . . . other risk-shifting agreements which are not insurance contracts," including "the customary private indemnity agreement where affording the indemnity is not the primary business of the indemnitor and is not subject to governmental regulations but is merely ancillary to and in furtherance of some other independent transactional relationship between the indemnitor and the indemnitee." *Id*.

### 5. "Breach of Duty Imposed by Law" (Count V)

In Count V, Parker Hannifin alleges that "the mutual obligations assumed by Parker and SMP under Section 7.4 of the 1986 Agreement . . . created a special relationship between the parties that allowed . . . Parker to rely upon Standard Motor to protect 100% of Parker's interests in connection with all of the EIS Asbestos Claims asserted after August 31, 2001." (Doc. No. 1 at ¶ 101.) Parker alleges that this "special relationship" required Standard Motor to perform its "duties of mutual protection with care, skill, and knowledge." (*Id*. at ¶ 102.) Parker alleges Standard breached its duties arising from this "special relationship" when it failed to provide Parker with a "vigorous, thorough, well-prepared, and well-supported defense" of Parker in the Barr Suit, including failing to (1) minimize Parker's exposure to damages, (2) avoid the risk of trial, and (3) ensure that every defense to the claim for punitive damages was available and deployed. (*Id*. at ¶ 103.)

The Court finds Count V fails to state a cognizable claim for the same reasons set forth above in connection with Parker's breach of duty to defend and settle at trial claim in Count III.[26] Accordingly, Standard Motor's Motion to Dismiss Count V of the Complaint is granted.

### 6. Declaratory Judgment (Count VI)

In Count VI, Parker Hannifin alleges that "[i]n addition to the unsatisfied judgment entered in the Barr Suit, which is on appeal, Parker continues to be named as a defendant from time to time in additional EIS Asbestos Claims and it is reasonably likely that Parker will be named as a defendant in additional EIS Asbestos Claims from time to time in the future." (Doc. No. 1 at ¶ 108.) Parker

---

[26] In its Brief in Opposition, Parker appears to argue that this claim survives because it states a cognizable claim for breach of the duty of good faith and fair dealing. (Doc. No. 17 at p. 29-30.) However, Count V does not allege a breach of the good faith and fair dealing. Rather, it vaguely alleges a breach of a "duty imposed by law," which the Court finds is not sufficient to plead a claim for breach of the duty of good faith and fair dealing.

Hannifin alleges that "[a]n actual controversy of a justiciable nature presently exists between Parker and SMP as to the respective rights and obligations of the parties under the 1986 Agreement in relationship to the Barr Suit judgment and other EIS Asbestos Claims against Parker so as to make an award of declaratory relief at this time just, necessary, and proper." (*Id.* at ¶ 109.) Thus, Parker Hannifin seeks a declaratory judgment:

> (a) declaring that the award of punitive damage in the Barr Suit is an "Assumed Liability" that SMP "assume[d] and [became] directly and solely responsible for the payment or discharge of" under the 1986 Agreement;
>
> (b) declaring that SMP is obligated under the 1986 Agreement to indemnify, defend, and hold Parker harmless from any and all liabilities, damages, losses, claims, costs, and expenses (including reasonable attorney's fees) arising out of or resulting from the award of punitive damages in the Barr Suit;
>
> (c) declaring that future claims for punitive damages asserted in EIS Asbestos Claims are the legal and financial responsibility of SMP under the 1986 Agreement;
>
> (d) declaring that SMP's conduct in the Barr Suit precludes SMP from asserting any defenses to its liability to Parker arising out of the award of punitive damages; and
>
> (e) otherwise determining the respective rights and liabilities of the parties in this context.

(*Id.* at p. 27.)

Standard Motor first argues this claim should be dismissed because it "fails to present a controversy of sufficient immediacy and reality to justify declaratory relief." (Doc. No. 12-1 at p. 18.) Specifically, Standard Motor asserts that Parker Hannifin's allegations focus on a "contractual indemnity that has yet to accrue" in light of the pending appeal of the Barr Jury verdict. (*Id.*) Standard Motor further maintains that Parker's request for a declaration that punitive damages awards in any current and/or future EIS asbestos claims are SMP's legal and financial responsibility, is speculative and, therefore, "falls well outside the established contours of the case or controversy requirement."

53

(Doc. No. 23 at p. 3.)  In sum, Standard Motor argues Parker's Declaratory Judgment claim should be dismissed because it is "purely hypothetical" and involves "liability that may never be imposed." (Doc. No. 12-1 at p. 18; Doc. No. 23 at p. 2.)

Parker Hannifin argues that its Declaratory Judgment claim presents an actual case or controversy because Standard Motor has consistently claimed since November 5, 2018 that it is not responsible for any aspect of the punitive damages award in the Barr Suit, "or any other EIS Asbestos Claim." (Doc. No. 22 at p. 1.) Parker maintains that Standard Motor's position creates an actual (as opposed to hypothetical) controversy because it has placed Parker in "an untenable position" of having to decide whether to retain its own defense counsel in all pending and future EIS Asbestos Claims. (*Id*.) Parker Hannifin maintains that "this quandary defeats the whole purpose of the special liability allocation provisions for the EIS Asbestos Claims chosen by the parties for the 1986 Agreement, and cries out for prompt judicial resolution." (*Id*. at p. 2.)

Under Article III of the United States Constitution, federal courts may exercise jurisdiction only if the parties have presented a live case or controversy.  U.S. Const. Art. III, § 2.  *See Commodities Export Co. v. Detroit Intern. Bridge Co*., 695 F.3d 518, 525 (6th Cir. 2012).  As the Sixth Circuit has explained, "[w]e have no power to offer an advisory opinion, based on hypothetical facts." *Commodities Export Co*, 695 F.3d at 525 (citing *Fialka–Feldman v. Oakland Univ. Bd. of Trustees*, 639 F.3d 711, 715 (6th Cir. 2011)).  Where a party seeks declaratory relief, "[t]he difference between an abstract question and a 'controversy' ... is necessarily one of degree." *Golden v. Zwickler*, 394 U.S. 103, 108, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969) (internal quotation marks omitted).  Thus, when faced with the "difficult task of distinguishing between actual controversies and attempts to obtain advisory opinions on the basis of hypothetical controversies," *Coal. for Gov't Procurement v.*

*Fed. Prison Indus., Inc*., 365 F.3d 435, 458 (6th Cir.2004) (internal quotation marks omitted), courts consider "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Golden*, 394 U.S. at 108, 89 S.Ct. 956 (internal quotation marks omitted). *See also MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 127, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007) (in determining whether a declaratory judgment action satisfies the case or controversy requirement, the question is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."); *Commodities Export Co*., 695 F.3d at 525.

Here, the Courts finds as follows. To the extent Parker Hannifin's Declaratory Judgment claim seeks a declaration that Standard Motor has a duty to indemnify it for the punitive damages award in the Barr Suit, the Court finds this claim is not ripe in light of the pending appeal in that action. *See Chad Youth Entertainment Center, Inc. v. Colony Nat. Ins. Co*., 474 Fed. Appx. 429, 431 (6th Cir. 2012) (finding district court lacked jurisdiction over declaratory judgment action at the time of filing because the question of punitive damages coverage was unripe since "the underlying wrongful death case was pending at the time and the court in that case had yet to award punitive damages.") Thus, and consistent with the Court's decision in the context of Parker Hannifin's corresponding breach of contract claim, the Court will stay a determination on Count Six in regard to Standard Motor's alleged duty to indemnify for the Barr Suit punitive damages award.

With regard to Parker Hannifin's request for a declaration that "future claims for punitive damages awards in EIS Asbestos Claims are the legal and financial responsibility of SMP under the

1986 Agreement," the Court agrees with Standard Motor that this request fails to present an actual case or controversy "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc.,* 549 U.S. at 127. Parker's allegation that it is "reasonably likely that [it] will be named as a defendant in additional EIS Asbestos Claims from time to time in the future" is simply too speculative to demonstrate a concrete dispute between the parties, as it is premised on hypothetical controversies that may or may not come to pass. *See e.g., American Natural Resources, Inc. v Strand*, 252 F.3d 808, 813 (6th Cir. 2001) ("Assuming all these stars align, the [plaintiffs] may well face a justiciable controversy after the year 2007. But at this time, any controversy is hypothetical."). Accordingly, the Court grants Standard Motor's Motion to Dismiss this sub-claim for Declaratory Relief.

The Court also rejects Parker Hannifin's request for declaratory relief with respect to all "currently pending" EIS Asbestos Claims, in addition to the Barr Suit. In its Supplemental Briefing, Parker Hannifin maintains that the reference in the "Wherefore Clause" of Count Six to "future claims" encompasses "all EIS Asbestos Claims that are currently pending and that will be filed in the future." (Doc. No. 22 at fn 3.) The Court does not construe Parker's "Wherefore Clause" so broadly. While there are scattered references in the Complaint to the existence of other pending EIS Asbestos Claims (aside from the Barr Suit), Count Six does not sufficiently allege a claim for declaratory relief with respect to the parties' relative responsibilities as to all "currently pending EIS Asbestos Claims." Moreover, a close reading of the Complaint reveals that Parker Hannifin does not clearly allege that Standard Motor has, in fact, refused to defend Parker Hannifin with respect to any such pending

Claims.[27]  Accordingly, the Court finds Count Six does not assert a sub-claim for Declaratory Relief relating to all currently pending EIS Asbestos Claims.

Lastly, with respect to Parker Hannifin's request for a declaration that Standard Motor has a duty to defend the punitive damages award in the Barr Suit appeal, the Court finds this sub-claim for Declaratory Relief does present an actual case or controversy.  Here, the Complaint expressly alleges that, upon learning of the jury verdict in the Barr Suit, Standard Motor "tried to disclaim, in part, its duty to defend Parker by asserting, again for the first time ever, that the punitive damages claim against Parker in the Barr Suit was outside its duty to defend."  (Doc. No. 1 at ¶ 50.)  The Court finds this allegation is sufficient, under all of the alleged circumstances, to show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment with respect to this issue.

This does not end the inquiry, however.  Once the Court determines justiciability, it must next consider whether it should exercise jurisdiction over a parties' request for declaratory relief.  As the Supreme Court has explained, federal courts are not obligated to exercise subject matter jurisdiction in declaratory judgment actions.  *See Brillhart v. Excess Insurance Co. of America*, 316 U.S. 491, 494, 62 S.Ct. 1173, 86 L.Ed. 1620 (1942) ("[a]though the District Court had jurisdiction of the suit under the Federal Declaratory Judgments Act ... it was under no compulsion to exercise that

---

[27] As Parker correctly notes, the Complaint alleges that "SMP has consistently claimed since November 5, 2018 that . . . it is not responsible for any aspect of the punitive damages award in the Barr Suit, or any other EIS Asbestos Claim." (Doc. No. 1 at ¶ 56.)  The Court finds, however, that this does not clearly allege that Standard Motor has refused to provide a defense in all currently pending EIS Asbestos Claims that may include punitive damages claims.  Indeed, by referencing "punitive damages awards," this allegation is more readily interpreted as asserting that Standard Motor has refused responsibility for payment of punitive damages awards in EIS Asbestos Claims as opposed to refusing responsibility to defend such Claims.

jurisdiction").  Rather, the Sixth Circuit considers five factors (the "Grand Trunk factors") to determine whether the exercise of Declaratory Judgment Act[28] jurisdiction is appropriate:

> (1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata;" (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective.

*Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984) (citations omitted).

*See also United Specialty Ins. Co. v. Cole's Place, Inc.*, 936 F.3d 386, 396 (6th Cir. 2019).

Although the above formulation indicates the court should balance the five factors, the Sixth Circuit has never indicated the relative weights of the factors. *See United Specialty Ins. Co.*, 936 F.3d at 396.  Instead, "[t]he relative weight of the underlying considerations of efficiency, fairness, and federalism will depend on facts of the case."  *W. World Ins. Co. v. Hoey*, 773 F.3d 755, 759 (6th Cir. 2014).  The Sixth Circuit has noted, in weighing these factors, "[d]istrict courts must be afforded substantial discretion to exercise jurisdiction 'in the first instance, because facts bearing on the usefulness of the declaratory judgment remedy, and [the] fitness of the case for resolution, are peculiarly within their grasp.'"  *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 554 (6th Cir. 2008) (quoting *Wilton v. Seven Falls Co.,* 515 U.S. 277, 289, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995)).

---

[28] The Declaratory Judgment Act provides, with certain exclusions not applicable here, that: "In a case of actual controversy within its jurisdiction ..., any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C. § 2201(a).

For the following reasons, the Court finds that, on balance, the Grand Trunk factors support the exercise of jurisdiction over Parker Hannifin's Declaratory Judgment claim relating to the duty to defend on appeal the punitive damages award in the Barr Suit.

With regard to the first factor, the Court finds the declaratory action would settle the parties' controversy. As discussed *supra*, the Complaint sufficiently alleges that Parker Hannifin's breach of contract claim based on Standard Motor's duty to defend the Barr Suit on appeal is ripe and has already caused Parker Hannifin to incur damages, including the cost of posting the appeal bond and retaining new counsel in that case. The Court finds that these allegations present an actual controversy for the Court to resolve and, further, that exercise of jurisdiction would settle the controversy with respect to Parker Hannifin's breach of the duty to defend on appeal claim. Indeed, Standard Motor does not present any arguments to the contrary with regard to the specific issue of declaratory relief relating to the duty to defend the Barr Suit on appeal.

The second factor to consider is whether the declaratory action would serve a useful purpose in clarifying the legal relations at issue. *Grand Trunk*, 746 F.2d at 326. The second factor is "closely related to the first factor and is often considered in connection with it." *Flowers,* 513 F.3d at 557. "[I]t is almost always the case that if a declaratory judgment will settle the controversy, then it will clarify the legal relations in issue." *Id.* Consideration of this factor weighs in favor of this Court's exercise of jurisdiction. As the instant declaratory action would settle the parties' controversy with respect to the duty to defend the Barr Suit on appeal, it follows that it would serve a useful purpose in clarifying the parties' legal relations with respect to that issue. Moreover, there is no parallel state court action relating to the question of whether there is a duty to defend the punitive damages award in the Barr Suit under the 1986 Agreement and, therefore, there is no risk of confusion about the legal

relationships at issue in a state court action. *See Flowers*, 513 F.3d at 557 (in considering the second Grand Trunk factor, it is proper to consider whether the court's decision would create any confusion about the parties' legal relations in any pending state court action).

The third factor to consider is whether the use of the declaratory judgment action is motivated by "procedural fencing" or likely to create a race for *res judicata*. *Flowers*, 513 F.3d at 558. Standard Motor argues that "despite the absence of an imminent threat of harm or a concrete dispute for this Court to resolve, Parker has proceeded to request a declaration outlining the parties' obligations in a hypothetical future scenario." (Doc. No. 23 at p. 6.) However, the Court has found that the question of whether Standard Motor has a duty to defend the punitive damages award in the Barr Suit on appeal is a concrete dispute and, further, that Parker Hannifin has sufficiently pled that it has been damaged by Standard Motor's refusal to provide this defense. Thus, Standard Motor's argument with respect to this factor is without merit. Moreover, courts are "reluctant to impute an improper motive to a plaintiff where there is no evidence of such in the record." *Flowers*, 513 F.3d at 558. That is particularly the case where, as here, there is no parallel state court proceeding relating to the question of whether there is a duty to defend the punitive damages award in the Barr Suit under the 1986 Agreement. *See Clifford v. Church Mut. Ins. Co.*, 2013 WL 6199265 at * 4 (S.D. Ohio Nov. 27, 2013), *adopted by* 2014 WL 4805473 (S.D. Ohio Sept. 26, 2014). Thus, the Court finds this factor weighs in favor of the exercise of jurisdiction by this Court.

Under the fourth Grand Trunk factor, a court must consider whether its exercise of jurisdiction would increase friction between federal and state courts and improperly encroach on state jurisdiction. *Flowers*, 513 F.3d at 558. The Sixth Circuit has divided this factor into three sub-factors: (1) whether the underlying factual issues are important to an informed resolution of the case; (2) whether the state

trial court is in a better position to evaluate those factual issues than is the federal court; and (3) whether there is a close nexus between underlying factual and legal issues and state law and/or public policy, or whether federal common or statutory law dictates a resolution of the declaratory judgment action. *Flowers*, 513 F.3d at 560. The first sub-factor "focuses on whether the state court's resolution of the factual issues in the case is necessary for the district court's resolution of the declaratory judgment action." *Id*. The second sub-factor asks "which court, federal or state, is in a better position to resolve the issues in the declaratory action." *Id*. This factor weighs against an exercise of jurisdiction when there are "novel questions of state law." *Id.*

As an initial matter, the Court notes (as it has *supra*) that there is no parallel state court proceeding relating to the question of whether there is a duty to defend the punitive damages award in the Barr Suit under the 1986 Agreement. Thus, there is no risk that resolution of factual or legal issues by a state court will impact this Court's judgment or vice versa, with regard to the duty to defend. Moreover, while the Court has been asked to consider questions of state law to resolve the instant case, federal courts routinely apply principles of Ohio law to construe and interpret contracts in diversity cases. On balance, and viewing the subfactors together, the Court finds that the fourth factor is neutral.

The final Grand Trunk factor requires consideration of whether a better or more effective alternative remedy exists. *Grand Trunk*, 746 F.2d at 326. With regard to this factor, Standard Motor limits its argument to repeating its position that the instant dispute fails to present an actual controversy. Standard Motor does not suggest that there is a more effective alternative remedy. Accordingly, and in the absence of any meaningful opposition with respect to this factor, the Court finds the fifth Grand Trunk factor weighs in favor of the exercise of jurisdiction by this Court.

For all the reasons set forth above, the Court finds that, on balance, the Grand Trunk factors support the exercise of jurisdiction over Parker Hannifin's Declaratory Judgment claim relating to the duty to defend on appeal the punitive damages award in the Barr Suit.

Accordingly, Standard Motor's Motion to Dismiss Count VI is granted in part and denied in part as follows. The Court will stay a determination of Parker Hannifin's request for declaratory relief with regard to Standard Motor's alleged duty to indemnify the Barr Suit punitive damages award. The Court grants Standard Motor's Motion to Dismiss with regard to Parker Hannifin's request for a declaration that "future claims for punitive damages awards in EIS Asbestos Claims are the legal and financial responsibility of SMP under the 1986 Agreement." The Court rejects Parker Hannifin's request for declaratory relief with respect to all "currently pending" EIS Asbestos Claims. Finally, the Court denies Standard Motor's Motion to Dismiss with regard to Parker Hannifin's request for declaratory relief with regard to Standard Motor's alleged duty to defend on appeal the punitive damages award in the Barr Suit.

### C.     Motion to Stay

In the alternative, Standard Motor requests that the Court stay the instant proceedings pending the resolution of the Barr Suit appeal "because Plaintiff's indemnity claims are unripe." (Doc. No. 12-1 at p. 19.) Parker Hannifin opposes the motion, on the grounds that it is currently being harmed by Standard Motor's refusal to defend Parker's interests *vis-à-vis* the punitive damages award in the Barr Suit appeal. (Doc. No. 17 at p. 30.)

Standard Motor's Motion to Stay is granted in part and denied in part. Specifically, the Court will stay a determination of Parker Hannifin's (1) breach of contract claim based on the duty to indemnify the Barr Suit punitive damages award until such time as that duty is triggered under Section

9.3 of the Agreement; and (2) request for declaratory relief with regard to Standard Motor's alleged duty to indemnify the Barr Suit punitive damages award. In all other respects, Standard Motor's Motion to Stay is denied.

## IV. Conclusion

For all the reasons set forth above, Standard Motor's Motion to Dismiss (Doc. No. 12) is GRANTED IN PART and DENIED IN PART as follows:

(1)     Standard Motor's Motion to Dismiss for lack of personal jurisdiction is DENIED.

(2)     Standard Motor's Motion to Dismiss Counts I and II is DENIED with respect to Parker Hannifin's breach of contract claim based on the duty to defend the punitive damages award in the Barr Suit on appeal. To the extent Counts I and II assert claims for breach of the duty to indemnify the punitive damages award in the Barr Suit, the Court will stay a determination of said claims until such time as that duty is triggered under Section 9.3 of the Agreement.

(3)     Standard Motor's Motion to Dismiss Count IV is DENIED.

(4)     Standard Motor's Motion to Dismiss Counts III and V for failure to state a claim is GRANTED.

(5)     Standard Motor's Motion to Dismiss Count VI is GRANTED IN PART and DENIED IN PART as follows. The Court will stay a determination of Parker Hannifin's request for declaratory relief with regard to Standard Motor's alleged duty to indemnify the Barr Suit punitive damages award. The Court grants Standard Motor's Motion to Dismiss with regard to Parker Hannifin's request for a declaration that "future claims for punitive damages awards in EIS Asbestos Claims are the legal and financial responsibility of SMP under the 1986 Agreement." The Court rejects Parker Hannifin's request for declaratory relief with respect to all "currently pending" EIS Asbestos Claims. Finally, the Court denies Standard Motor's Motion to Dismiss with regard to Parker Hannifin's request for declaratory relief with regard to Standard Motor's alleged duty to defend on appeal the punitive damages award in the Barr Suit.

Finally, Standard Motor's Motion to Stay is GRANTED IN PART and DENIED IN PART as follows. The Court will stay a determination of Parker Hannifin's (1) breach of contract claim

based on the duty to indemnify the Barr Suit punitive damages award until such time as that duty is triggered under Section 9.3 of the Agreement; and (2) request for declaratory relief with regard to Standard Motor's alleged duty to indemnify the Barr Suit punitive damages award. In all other respects, Standard Motor's Motion to Stay is denied.

**IT IS SO ORDERED.**


Date:  October 23, 2019

               *s/Pamela A. Barker*
PAMELA A. BARKER
U. S. DISTRICT JUDGE