## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

Parker Hannifin Corp.,                                  Case No. 1:19cv00617

                          Plaintiff,

         -vs-

                                                        JUDGE PAMELA A. BARKER

Standard Motor Products, Inc.,

                          Defendant                     MEMORANDUM OPINION AND
                                                        ORDER


This is a breach of contract action involving an agreement executed in 1986 between Plaintiff Parker Hannifin Corporation ("Parker Hannifin" or "Parker") and Defendant Standard Motor Products ("Standard Motor") for the sale of Parker Hannifin's EIS automotive brake division to Standard Motor.  The central question presented in the instant case is whether, under the parties' agreement, Standard Motor is responsible for indemnifying Parker Hannifin for a multi-million-dollar punitive damages award assessed against Parker Hannifin by a California jury in 2018 for asbestos liability relating to an EIS brake product.

Currently pending are (1) Parker Hannifin's Motion for Summary Judgment (Doc. No. 88) and (2) Standard Motor's Motion for Summary Judgment (Doc. No. 90.)  The parties filed their respective Briefs in Opposition on June 21, 2022, and their respective Reply Briefs on July 12, 2022. (Doc. Nos. 104, 107, 113, 115.)  For the following reasons, Parker Hannifin's Motion for Summary Judgment (Doc. No. 88) is GRANTED as set forth herein, and Standard Motor's Motion for Summary Judgment (Doc. No. 90) is DENIED.

## I.     Facts

### A.     The EIS Division

In 1978, Parker Hannifin acquired the EIS Automotive Corporation, which manufactured certain relined and remanufactured automotive brake products.  (Deposition of J. Pophal Vol. I (Doc. No. 92-2) at Tr. 18; Deposition of S. Kay[1] (*Coogan* Depo) (Doc. No. 92- 12) at PageID# 5287; Doc. No. 89-4.)  Parker Hannifin thereafter renamed this business its "EIS Division."  (Doc. No. 89-4 at PageID# 2110.)  Parker Hannifin's EIS Division sold brake products that contained asbestos-containing material.  (Pophal Depo. Vol. I at Tr. 19.)  It is undisputed that, during the period of its ownership of the EIS Division, Parker Hannifin was named as a defendant in asbestos-related litigation.  (*Id*. at Tr. 23.)

In the summer of 1986, Parker Hannifin and Standard Motor entered into negotiations for the sale of Parker's EIS Division to Standard Motor.  (Deposition of M. Ellis (Doc. No. 95-7) at Tr. 23-25, 29-30.)  As part of due diligence, Parker Hannifin provided to Standard Motor information regarding the EIS asbestos lawsuits that were then-pending against Parker Hannifin.  (Pophal Depo. Vol. I at Tr. 73-74, 131-132; Deposition of J. Burke (Doc. No. 92-1) at Tr. 278- 279; Deposition of R. Haber (Doc. No. 92-10) at Tr. 130-136.)  Specifically, Parker Hannifin provided a document to Standard Motor entitled "Status of EIS Asbestos Litigation," which provided in relevant part that: "Parker and its subsidiaries have been sued in a total of 137 cases involving asbestos brake parts. 78

---

[1] Sanford Kay worked for Standard Motor for many years, including as Vice President of Human Resources and Corporate Secretary.  Mr. Kay was not deposed in this action due to his death in 2020.  However, for many years, he was designated as Standard Motor's "Person Most Knowledgeable" for purposes of asbestos lawsuits involving EIS products.  As such, Mr. Kay was deposed several times in various EIS related asbestos lawsuits around the country.  One of these lawsuits was *Coogan v. Borg-Warner Morse Tech, Inc., et al*. (Superior Court of Washington for Pierce County) (hereinafter "the *Coogan* case").  (Doc. No. 92-12.)

of these cases have been settled.  To date, total accrued indemnity liability in these cases is $70,925 ($815 per settled case) and total accrued defense liability is $72,425 ($832 per settled case)."[2]  (Doc. No. 88-7.)  *See also* Pophal Depo. Vol. I at Tr. 73-74.  This document included a list of the specific EIS asbestos cases that were then-pending against Parker and its subsidiaries.[3]  (Doc. No. 88-7 at PageID#s 1904-1905.)

Between July and August 1986, the parties (through counsel) exchanged several drafts of the agreement and met in person to negotiate its terms.  (Ellis Depo. at Tr. 29-30; Haber Depo. at Tr. 115-116.)  In depositions taken in the instant matter, the participants in the negotiations testified either that the specific issue of punitive damages in EIS asbestos cases was not discussed; or that they could not specifically recall whether the term "punitive damages" came up during the negotiations.  *See* Deposition of L. Sills (Doc. No. 92-9) at Tr. 146-147, 182, 193; Ellis Depo. at Tr. 40-41, 159-160; Pophal Depo. Vol. I at Tr. 160; Deposition of F. Garbinski (Doc. No. 95-5) at Tr. 51-53.

**B.     The 1986 Agreement**

On August 4, 1986, Parker Hannifin and Standard Motor entered into an agreement for the sale of the EIS Division to Standard Motor (hereinafter the "1986 Agreement" or "Agreement").  (Doc. No. 88-4; Doc. No. 91-1 at PageID#s 3525- 3687.) Several provisions of the 1986 Agreement are relevant to the instant dispute.

---

[2] Of these 137 cases, thirty-one (31) involved asbestos claims related to EIS brake products and were still pending as of the summer of 1986.  (Doc. No. 88-7 at PageID# 1903.)  *See also* Plaintiff's Answers to Defendant's First Set of Interrogatories, Response to Interrog. No. 1 (Doc. No. 89-14 at PageID# 3182-3183.)  According to Parker Hannifin, seventeen (17) of the thirty-one (31) pending EIS asbestos cases included a demand for punitive damages.  (Doc. No. 89-14 at PageID# 3182-3183.)

[3] Another copy of this document attached two exemplar asbestos complaints, which included demands for punitive damages.  *See* Pophal Depo. Exh. 5 at SMP007959 – SMP007993; Pophal Depo. at Tr. 73-74, 84-85; Buke Depo. at Tr. 278-279.  It is not entirely clear from the record whether this copy (along with its attached exemplar asbestos complaints) was provided to Standard Motor during due diligence.

3

Section 2.1 of the Agreement provides, in relevant part, that "at the Closing, Purchaser [i.e., Standard Motor] will assume and become directly and solely responsible for the payment or discharge of all of the Assumed Liabilities."  (Doc. No. 88-4 at PageID# 1834).  *See also* Doc. No. 91-1 at PageID# 3532.  The term "Assumed Liabilities" is defined in Section 2.4 as "all liabilities and obligations of the Seller as of the Closing arising solely out of Seller's conduct of the Business . . . but excluding the Excluded Liabilities."  (Doc. No. 88-4 at PageID# 1837).  *See also* Doc. No. 91-1 at PageID# 3535.

Section 2.4 sets forth the meaning of the term "Assumed Liabilities," in relevant part, as follows:

> Without limiting the generality of the foregoing, the Assumed Liabilities will include the following liabilities and obligations (other than Excluded Liabilities) which arise or have arisen solely out of Seller's conduct of the Business at or prior to the Closing:
>
> * * *
>
> (d) Except as provided in Sections 7.4 and 7.5 hereof, all liabilities and obligations arising out of, resulting from, or relating to claims, whether founded upon negligence, breach of warranty, strict liability in tort, and/or other similar legal theory, seeking compensation or recovery for or relating to injury to person or damage to property occurring after the Closing and arising out of a defect or alleged defect of a Product whether manufactured or purchased for resale by Seller before the Closing or by Purchaser after the Closing

(Doc. No. 88-4 at PageID# 1837-1838).  *See also* Doc. No. 91-1 at PageID#s 3535-3536.

Section 2.5 of the 1986 Agreement is captioned "Excluded Liabilities" and sets forth the meaning of that term in pertinent part as follows:

> For the purposes hereof the term "Excluded Liabilities" means the following liabilities and obligations as the same shall exist as of the Closing:
>
> **

4

(c) Except as provided in Sections 7.4 and 7.5 hereof, all liabilities and obligations arising out of, resulting from, or relating to claims, whether founded upon negligence, breach of warranty, strict liability in tort, and/or other similar legal theory, seeking compensation or recovery for or relating to injury to person or damage to property occurring before or on the Closing Date and arising out of a defect or alleged defect of a Product manufactured or purchased for resale by the Seller before the Closing

(Doc. No. 88-4 at PageID# 1838-1839).  *See also* Doc. No. 91-1 at PageID#s 3536-3537.

Section 7.4 allocates liability relating to asbestos claims, as follows:

7.4  Asbestos Claims. Notwithstanding the allocation in Sections 2.4(d) and 2.5(c) between the parties of responsibility for claims whether founded upon negligence, breach of warranty, strict liability in tort, and/or other similar legal theory, seeking compensation or recovery for or relating to injury to persons arising out of a defect or alleged defect of a Product, **the parties hereto agree that claims alleging any illness, disease, injury or other physical damage arising out of or relating in any way to alleged exposure to asbestos-containing Products asserted, in writing, on or prior to the fifteenth (15th) annual anniversary of the Closing Date shall be deemed Excluded Liabilities.  Claims alleging any illness, disease, injury or other physical damage arising out of or relating in any way to alleged exposure to asbestos-containing Products asserted, in writing, after the fifteenth (15th) anniversary of the Closing Date shall be deemed Assumed Liabilities. The special allocation provisions established in this Section 7.4 relate only to personal injury claims arising out of alleged exposure to asbestos-contained Products, are based on the parties recognition of the difficulties in establishing liability between the parties hereto as to any one Product for such claims, and shall not apply to any other type of claims, including, but not limited to, alleged asbestos-related property damages.** Notwithstanding the foregoing, Purchaser shall be responsible for all claims alleging any illness, disease, injury or other physical damage arising out of or relating in any way to alleged exposure to asbestos-containing Products asserted, in writing, after the Closing Date, if claimant's first alleged exposure to asbestos-containing Products occurred after the Closing Date.

(Doc. No. 88-4 at PageID# 1868) (emphasis added). *See also* Doc. No. 91-1 at PageID# 3567.

The 1986 Agreement also contains the following indemnification and duty to defend provisions relevant to the parties' dispute:

9.1  Indemnification of Seller.  **Purchaser will indemnify, defend, and hold Seller harmless from and against any and all liabilities, damages, losses, claims, costs, and expenses (including reasonable attorneys' fees) arising out of or resulting from** any misrepresentation or breach of warranty by Purchaser for which notice is

5

given by Seller within the period specified in Section 3.5 hereof, **Purchaser's failure to pay or satisfy or cause to be paid or satisfied any of the Assumed Liabilities when due and payable, or nonperformance of any obligations to be performed on the part of Purchaser under this Agreement**.

\*\*\*

9.3 <u>Claims.</u>  In the event that any legal proceedings shall be instituted or that any claim or demand shall be asserted by any person in respect of which payment may be sought by either Purchaser or Seller (the "Claimant") from the other (the "Indemnitor") under the provisions of this Article IX, the Claimant shall promptly cause written notice of the assertion of any claims of which it has knowledge which is covered by this indemnity to be forwarded to the Indemnitor, and the Indemnitor shall have the right, at its option and expense, to be represented by counsel of its choice and to defend against, negotiate, settle or otherwise deal with any proceeding, claim or demand which relates to any loss, liability, damage or deficiency indemnified against hereunder; provided, however, that the Claimant may participate in any such proceeding with counsel of its choice and at its expense**.**  To the extent the Indemnitor elects not to defend such proceeding, claim or demand and the Claimant defends against, settles or otherwise deals with any such proceeding, claim or demand, the Claimant will act reasonably and in accordance with its good faith business judgment. The parties hereto agree to cooperate fully with each other in connection with the defense, negotiation or settlement of any such legal proceeding, claim or demand**.** After any final judgment or award shall have been rendered by a court, arbitration board or administrative agency of competent jurisdiction and the expiration of the time in which to appeal therefrom, or a settlement shall have been consummated, or the Claimant and the Indemnitor shall have arrived at a mutually binding agreement with respect to each separate matter indemnified by the Indemnitor hereunder, the Claimant shall forward to the Indemnitor notice of any sums due and owing by it pursuant to this Agreement with respect to such matter and the Indemnitor shall be required to pay all of the sums so owing to the Indemnitor within thirty (30) days after the date of such notice.

(Doc. No. 88-4 at PageID# 1875-1876) (emphasis added). *See also* Doc. No. 91-1 at PageID#s 3574-3575.  The 1986 Agreement provides that it "will be governed by and construed in accordance with the laws of the State of Ohio."  (Doc. No. 88-4 at PageID# 1881.)  *See also* Doc. No. 91-1 at PageID# 3581.

**C.      1986 to 2001:  Standard Motor Tendered EIS Asbestos Cases to Parker Hannifin**

Pursuant to the 1986 Agreement, from the date of the Closing until the fifteenth anniversary of the Closing Date (i.e., from August 1986 to August 2001), Standard Motor treated EIS-related asbestos claims as "Excluded Liabilities" and tendered them to Parker Hannifin for defense and indemnification.  (Doc. No. 89-12.)  Specifically, Standard Motor sent "tender letters"[4] to Parker Hannifin, in which Standard Motor (1) identified the EIS-related asbestos claim by case name, number, and court; (2) specified whether Standard Motor, Parker Hannifin, or both, were named as defendants; (3) enclosed copies of the notice of service of process, summons, and complaint; (4) identified the specific causes of action that were asserted against Standard Motor and/or Parker Hannifin; (5) recited Section 7.4 of the Agreement; and (6) explained that the case fell within Section 7.4 because the plaintiff in that case had alleged that his/her first alleged exposure to asbestos-containing products occurred before the Closing Date.  (*Id.*)  In addition, Standard Motor's tender letters often specifically identified the types and amounts of damages sought., including claims for punitive damages.[5]  (*Id.*)

The record reflects that, between August 1986 and August 2001, Standard Motor tendered at least 161 EIS asbestos claims to Parker Hannifin.[6]  (Doc. No. 89-12.)  It is undisputed that Parker

---

[4] A collection of Standard Motor's tender letters from 1997 through 2001 are attached as Exhibit 14 to Parker Hannifin's Motion for Summary Judgment.  (Doc. No. 89-12.)

[5] Examples of Standard Motor's tender letters that expressly mention claims for punitive damages can be found at Doc. No. 89-12 at PageID#s 2255, 2258, 2268-2269, 2273, 2303, 2308, 2312, 2327, 2376, 2381, 2406, 2446, 2452, 2482, 2518-2519, 2525, 2537, 2555, 2631, 2661, 2679-2680, 2699, 2735, 2862-2863, 2882, 2888-2889, 2924, 2936, 2947, 2970, 3079, 3126.

[6] It is unclear precisely how many EIS asbestos cases were tendered by Standard Motor to Parker Hannifin between 1986 and 2001.  As an Exhibit to its summary judgment motion, Parker Hannifin attaches a "collection" of 161 EIS-related asbestos tender letters sent by Standard Motor to Parker Hannifin between 1987 and 2001.  (Doc. No. 89-12.)  In its Interrogatory Responses, Parker Hannifin sets forth a "non-exhaustive, illustrative list of EIS Asbestos Claims filed

Hannifin never rejected any of the EIS asbestos claims tendered by Standard Motor to Parker Hannifin between 1986 and 2001.  (Burke Depo. at Tr. 250-251; Morgan Depo. at Tr. 66.)  Nor did Parker Hannifin ever issue a reservation of rights letter regarding (or otherwise qualify or limit its acceptance of) any of the EIS asbestos claims tendered by Standard Motor under the 1986 Agreement. (Burke Depo. at Tr. 250-251.)  To the contrary, it is undisputed that Parker Hannifin defended and resolved all EIS asbestos cases tendered to it by Standard Motor under the Agreement.[7]  (*Id.* at Tr. 251.)

### D.      2001 to 2018:  Parker Tendered EIS Asbestos Cases to Standard Motor

Beginning in August 2001, Parker Hannifin began tendering EIS-related asbestos cases to Standard Motor under Section 7.4 of the 1986 Agreement.  From August 2001 until approximately 2014, Parker Hannifin's in-house counsel Mr. Morgan drafted and sent the letters tendering these cases to Standard Motor.  (Morgan Depo. at Tr. 32.)  In these letters, Mr. Morgan identified the EIS-related asbestos case or cases that were being tendered, by plaintiff name, court and docket number, date filed, and date served.  *See, e.g.*, Doc. No. 89-18 (Letter dated Dec. 17, 2004 from C. Morgan to S. Kay) (Doc. No. 89-18.)  The letters read as follows:

> In accordance with the Agreement of Purchase and Sale between Parker and SMP, Parker requests that SMP defend and indemnify Parker as to these claims. Please let me know immediately if you do not agree to this request.

---

between 1990 and 2001 that included punitive damages demands," which includes 271 cases.  (Doc. No. 89-14 at PageID#s 3183-3188.)  In his deposition, Parker Hannifin's in-house counsel Christopher Morgan testified that, prior to 2001, Standard Motor tendered "several hundred" EIS asbestos cases to Parker Hannifin under the 1986 Agreement. (Deposition of C. Morgan (Doc. No. 92-11) at Tr. 20.)  *See also* Declaration of C. Morgan (Doc. No. 17-2) at ¶ 12 ("I estimate that during this 15-year period, [Standard Motor] tendered to Parker Hannifin in Ohio over 500 EIS Asbestos Claims under the 1986 Agreement…").

[7] None of the EIS asbestos cases tendered by Standard Motor to Parker Hannifin between August 1986 and August 2001 went to trial.  (Morgan Depo. at Tr. 20-21.)

Please sign and return the duplicate copy of this letter to indicate receipt of these Complaints and the agreement of Standard Motor Products, Inc. to indemnify Parker under the above-mentioned Agreement of Purchase and Sale.

(*Id.*)

At some point after Mr. Morgan's retirement in 2014, Parker Hannifin changed the text of its tender letters. A typical example of this newer version of Parker Hannifin's EIS tender letter reads as follows:

Enclosed please find the case attached in which Parker-Hannifin Corporation is named as successor to EIS Automotive Corporation. Standard Motor Products, Inc. ("Standard Motor") is also a named defendant.

Based on the case profile, this appears to be an automobile friction product case only for Parker and that no other Parker products are implicated. Therefore, pursuant to our Joint Defense Agreement, we are tendering 100% of Parker's defense to Standard Motor. As such, we expect Standard Motor to retain its own local counsel to defend Parker's interests in this case and pay 100% of the fees, costs and indemnity to resolve this case, as needed.

Per our joint defense agreement, Standard Motor will resolve all automobile friction product claims asserted against Parker. In the event of an offer of a voluntary dismissal, Standard Motor will obtain a dismissal with or without prejudice specifically naming Parker. In the event of a settlement, Standard Motor will make sure that all claims related to Parker are extinguished in the release and/or settlement agreement ("release"), Parker is named specifically in the release, and that a dismissal with prejudice will be obtained dismissing Parker from this case. Parker shall be identified in the release and/or order of dismissal in the style it is named in this case or in another style approved in writing by Parker. Standard Motor agrees to provide Parker with a copy of the release and/or a conformed copy of the order of dismissal following its entry. Standard Motor may redact the settlement amount from the release.

Parker and Standard Motor agree to cooperate with each other to defend claims against Parker. Standard Motor will keep Parker's National Coordinating Counsel, Bob Manlowe, up-to-date on significant activities involving this tendered matter at their joint defense teleconference meetings.

If later discovery reveals that the initial assessment of the case for tender purposes was in error, Parker and Standard Motor agree to meet and confer to address the joint defense arrangement pursuant to which Parker is being defended in this case.

> If this is not your understanding of the agreement between Parker and Standard Motor,
> please contact me immediately. Please sign, scan [and] email a copy of this letter to
> [Parker] to acknowledge receipt of this complaint and the acceptance of Parker's 100%
> Tender to Standard Motor to defend and indemnify Parker.

(Letter dated Jan. 5, 2016 from J. Pophal to S. Kay) (Doc. No. 89-19.)   In the "Re" line of the above letter, Parker Hannifin identifies the case name and the court in which it is filed.  (*Id.*)  In addition, Parker Hannifin identifies the case as follows: "Scenario No. 1 – 100% tender—SMP's local counsel to defend."[8]  (*Id.*)  Standard Motor accepted a tendered case by signing and returning a copy of Parker Hannifin's tender letter.  (*Id.*)  *See also* Burke Depo. at Tr. 60.

Since August 2001, Parker Hannifin has tendered hundreds (if not thousands) of EIS-related asbestos cases to Standard Motor,[9] some of which have included claims for punitive damages. (Morgan Decl. (Doc. No. 17-2) at ¶ 32.)  Between August 2001 and 2018, Standard Motor accepted all the EIS-asbestos claims tendered by Parker Hannifin.  (Pophal Depo. Vol. II (Doc. No. 95-9) at Tr. 245-246.)  When it did so, Standard Motor did not qualify or limit its acceptance in any way, nor did it ever issue a reservation of rights letter.  (Deposition of C. Broccole (Doc. No. 92-7) at Tr. 71; Burke Depo. at Tr. 30-33, 141.)  Standard Motor handled the EIS-asbestos cases tendered to it by

---

[8] The phrase "Scenario No. 1—100% tender" refers to an asbestos case that names Parker Hannifin as a defendant solely in its capacity as the alleged successor-in-interest to EIS.  In other words, a lawsuit identified as a "Scenario No. 1- 100% tender" only involved an EIS-related asbestos product. *See, e.g.*, Deposition of R. Manlowe (Doc. No. 92-16) at Tr. 154; Burke Depo. at Tr. 48, 50-51, 53-54.  By contrast, a "Scenario No. 2- 50/50% Tender" refers to a case that potentially involves both EIS-related products and non-EIS-related products. *See, e.g.*, Doc. No. 108-2.  Lastly, "Scenario No. 3" refers to cases in which Parker Hannifin and Standard Motor are both named individually for their own (or unknown) product lines. *See, e.g.*, Doc. No. 108-3.

[9] In a Declaration filed earlier in this lawsuit, Mr. Morgan averred that "[f]rom September 1, 2001 until my retirement on November 1, 2014, Parker tendered … hundreds of EIS Asbestos Claims to [Standard Motor] …" (Morgan Decl. (Doc. No. 17-2) at ¶ 32.)  In its discovery responses, Standard Motor identified a much larger number, stating that "[b]etween August 31, 2001 to the present, over 9,700 asbestos-related lawsuits have been filed against Parker." (Doc. No. 89-16 at PageID# 3203.)  In addition, Standard Motor produced an extensive, 274-page report that identifies numerous lawsuits alleging EIS Asbestos Claims against Parker Hannifin.  (Doc. No. 89-17.)

10

Parker Hannifin and did not seek Parker Hannifin's consent or approval with respect to the handling of those cases.  (Burke Depo. at Tr. 104; Pophal Depo. Vol. II at Tr. 250-253, 266.)

Between 2001 and 2017, Standard Motor settled (or otherwise resolved prior to trial) all EIS asbestos claims that Parker Hannifin tendered under the 1986 Agreement.  (Burke Depo. at Tr. 185.) Both Parker Hannifin and Standard Motor agree that, from the date of closing in 1986 until the summer of 2018, the parties had an excellent relationship that was both cordial and cooperative. (Burke Depo. at Tr. 70; Broccole Depo. at Tr. 47-48, Pophal Depo Vol. I at Tr. 204.)  As discussed below, however, all that changed when a California jury returned a $6 million punitive damages award in favor of a plaintiff in an EIS asbestos case filed against Parker Hannifin and Standard Motor.

### E.      The Barr Case

In October 2017, Barbara Barr filed suit in the Superior Court of the State of California, Alameda County, against both Parker Hannifin and Standard Motor, in addition to other defendants (hereinafter "the Barr Suit").  *See Barr v. A-1 Clutch Co., et al.*, Case No. PG17880698 (Sup. Ct. Calif. Alameda Cty).  *See also* Doc. No. 89-26 at PageID#s 3272- 3298.  Therein, Ms. Barr alleged that she had been exposed to asbestos from asbestos-containing friction products from 1974 to 1988 and was subsequently diagnosed with mesothelioma.  (*Id.*)  Ms. Barr asserted claims against Parker Hannifin and Standard Motor (among other defendants) for negligence, strict liability, negligent misrepresentation, and fraud by nondisclosure.  (*Id.*)  She sought both compensatory and punitive damages.  (Doc. No. 89-26 at PageID#s 3280, 3282, 3284, 3285, 3295.)

Parker Hannifin was served with the complaint in the Barr Suit and, on November 13, 2017, tendered it to Standard Motor for handling as an Assumed Liability under the 1986 Agreement.  (Doc. No. 89-26 at PageID#s 3266-3268.)  Parker Hannifin's tender letter identified the Barr Suit as a

11

"Scenario No. 1 – 100% tender" case and provided that "[a]s such, we expect Standard Motor to retain its own local counsel to defend Parker Hannifin 's interests in this case and pay 100% of the fees, costs and indemnity to resolve this case, as needed."  (*Id*.)  Parker Hannifin's letter concluded as follows: "If this is not your understanding of the agreement between Parker and Standard Motor, please contact me immediately."  (*Id*.)

Later that same day, Sanford Kay replied to and accepted Parker Hannifin's tender of the Barr Suit on behalf of Standard Motor.  (Doc. No. 89-27.)  In his email accepting the tender, Mr. Kay simply wrote: "100% tender; our attorney to handle." (*Id*.)  Neither Mr. Kay (nor anyone else at Standard Motor) communicated any qualifications or limitations on Standard Motor's acceptance of the Barr Suit.  (Broccole Depo. at Tr. 70-71.)  Nor did Standard Motor issue a reservation of rights letter.  (Broccole Depo. at Tr. 71; Burke Depo. at Tr. 141.)  It is undisputed that, prior to the jury's verdict in the Barr Suit, Standard Motor never advised Parker Hannifin that it believed any of Ms. Barr's claims or damages were not Standard Motor's responsibility.   (Burke Depo. at Tr. 33, 155-156, 217-218, 296-297.)

Having accepted the tender of the Barr Suit, Standard Motor proceeded to choose and retain local counsel to handle the defense of both Parker Hannifin and Standard.  Unlike any of the previous EIS asbestos cases tendered under the 1986 Agreement, the Barr Suit proceeded to a jury trial, which commenced on October 9, 2018.   (Doc. No. 89-36 at PageID# 3391.)  On November 5, 2018, the jury found that EIS brakes were a substantial factor in Ms. Barr's risk of developing mesothelioma and returned a verdict on special interrogatories finding Parker Hannifin and Standard Motor liable under the theories of strict liability- design defect; strict liability- failure to warn; product liability-negligent failure to warn; and negligence.  (*Id*. at PageID#s 3391-3394.)  The jury apportioned 85%

responsibility for Ms. Barr's mesothelioma to "EIS brakes at Plaintiff's worksite" and found she suffered economic damages in the amount of $620,086.37 and non-economic damages in the amount of $8,000,000.  (*Id*. at PageID#s 3394-3395.)  In special interrogatories asking whether plaintiff had sufficiently proven certain predicate facts to support an award of punitive damages against Standard Motor and Parker Hannifin, the jury answered "yes" as to Parker Hannifin and "no" as to Standard Motor.  (*Id*. at PageID# 3395.)

On that same date of November 5, 2018, appellate counsel for Standard Motor raised the issue of "the viability of an indemnification agreement covering punitive damages under California law." (Broccole Depo., Exh. 21 (Doc. No. 95-15 at PageID#19604.)  *See also* Broccole Depo. at Tr. 271-272.  Standard Motor's trial counsel then raised the potential for a conflict of interest between Parker Hannifin and Standard Motor with respect to the punitive damages phase of the trial, which was set to begin on November 8, 2018.  (Broccole Depo. at Tr. 269-271.)  At that point, Parker Hannifin was advised of the potential conflict of interest with respect to the issue of punitive damages.  (Doc. No. 89-37 at PageID# 3403.)  Parker Hannifin's General Counsel, Joseph Pophal, emailed Standard Motor's General Counsel, Carmine Broccole, writing:

> Parker tendered 100% of Parker's defense of the Barr case to Standard Motor Products and our tender letter of November 13, 2017 stated in part: "As such, we expect Standard Motor to retain its own local counsel to defend Parker's interests in this case and pay 100% of the fees, costs and indemnity to resolve this case, as needed." Standard Motor accepted that 100% tender the same day, without reservation, stating in an email: "100% tender, our attorney to handle."
>
> Parker continues to expect Standard Motor to resolve this case and pay 100% of the cost of resolution. Standard Motor has controlled the defense and resolution of this case and has a continuing duty to Parker to resolve it.  Parker urges Standard Motor to take whatever actions are now needed to settle the case and pay 100% of the cost, as Standard Motor is obligated to do. *** The circumstances created by Standard Motor's handling of the defense of Parker do not allow Standard Motor to walk away from its obligations to Parker.  Parker must reserve all of its rights arising out of the handling

13

of the Barr case leading to the present situation.  Any actions that Parker may take to protect its interests are without prejudice to the rights reserved in this email.

(Doc. No. 89-37 at PageID# 3402.)

Ultimately, the Barr trial team continued to represent both Standard Motor and Parker Hannifin during the punitive damages phase of the trial.  (Broccole Depo. at Tr. 278.)   The Barr Suit did not settle, and, on November 8, 2018, the jury reconvened and awarded Ms. Barr punitive damages in the amount of $6,000,000.  (Doc. No. 89-36 at PageID# 3396.)   The state trial court thereafter entered judgment against Standard Motor and Parker Hannifin in the amount of $7,588,423.35 and "from [Parker] an additional $6,000,000," together with interest at 10% per year from November 8, 2018.  (*Id.* at PageID# 3397.)

On November 16, 2018, Mr. Broccole emailed Mr. Pophal and advised that "[Standard Motor] never undertook to insure Parker against its punitive damages, and the Purchase Agreement between Parker and [Standard Motor] did not contemplate that.  Accordingly, we will not agree to pay for Parker's punitive damages now."  (Doc. No. 89-39 at PagedID# 3409.)   Mr. Pophal responded as follows: "Parker obviously disagrees and maintains its position that Standard Motor is financially responsible for the award of punitive damages against Parker in the Barr case for a multitude of reasons, but this is not the time or place for us to cross swords over that question.  Parker reserves it rights."  (*Id.*)

Standard Motor and Parker Hannifin subsequently appealed the jury's verdict.  On November 6, 2020, the Court of Appeals for the State of California, First Appellate District, Division Three, affirmed the jury's verdict, including the award of punitive damages.  (Doc. No. 88-46.)  Shortly thereafter, on November 19, 2020, Parker Hannifin paid $7,218,085.44 to satisfy the punitive

14

damages award entered in the Barr suit, specifically the judgment of $6,000,000 and $1,281,085.44 in interest thereon.  (Doc. No. 89-40.)

On January 28, 2021, Parker Hannifin sent a letter to Standard Motor demanding, pursuant to Section 9 of the 1986 Agreement, that Standard Motor "indemnify and reimburse Parker for all liabilities, damages, losses, claims, costs, and expenses (including reasonable attorneys' fees) arising out of or resulting from [Standard Motor's] failure to pay and satisfy the Assumed Liabilities associated with the Barr Suit punitive damages award when they became due and payable, as well as [Standard Motor's] nonperformance of its obligations under the 1986 Agreement with respect to the Barr Suit punitive damages award."  (Doc. No. 89-41.)  Parker Hannifin demanded payment within 30 days, of the $7,218,085.44 it had paid to satisfy the punitive damages award in the Barr Suit, as well as certain other fees and costs.[10]  (*Id*.)  On February 2, 2021, Standard Motor sent a letter to Parker Hannifin, refusing to pay.[11]  (Doc. No. 88-49.)

## II.  Procedural History

On March 20, 2019, Parker Hannifin filed a Complaint in this Court against Standard Motor on the basis of diversity jurisdiction, asserting claims for breach of contract (Counts I and II), breach of the duty to defend and settle (Count III), breach of the duty of good faith and fair dealing (Count IV), breach of duty imposed by law (Count V), and declaratory judgment (Count VI).  (Doc. No. 1.)

---

[10] In addition to the Barr Suit punitive damages award and interest, Parker demanded that Standard Motor reimburse Parker for fees and costs (1) associated with the appeal of the Barr Suit; (2) associated with the instant action; and (3) incurred by Parker "to supervise and monitor other pending EIS cases as a result of the Barr Suit verdict and [Standard Motor's] erroneous claim that it is not obligated to indemnify Parker for the Barr Suit punitive damages award."  (*Id*.)

[11] At some point after the Barr verdict, Standard Motor revised its EIS tender acceptance letter to include "an express reservation of rights with respect to the issue of whether Parker is entitled to indemnity under the 1986 Agreement and applicable Ohio law for any claims or causes of action seeking punitive damages.  (Doc. No. 95-15 at PageID# 19471.)  *See also* Broccole Depo. at Tr. 62-69.

On June 5, 2019, Standard Motor filed a Motion to Dismiss or, in the alternative, Motion to Stay Proceedings.  (Doc. No. 12.)  Therein, Standard Motor argued that the Complaint should be dismissed for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2) or, in the alternative, for failure to state a claim upon relief could be granted pursuant to Fed. R. Civ. P. 12(b)(6) with respect to all six of Parker Hannifin's claims.  (*Id.*)  In the alternative, Standard Motor requested the Court stay the instant proceedings.  (*Id.)*  Parker Hannifin opposed the Motion.  (Doc. No. 17.)

On October 23, 2019, the Court issued a Memorandum Opinion & Order granting in part and denying in part Standard Motor's Motion.  (Doc. No. 24.)  First, the Court denied Standard Motor's Motion to Dismiss for Lack of Personal Jurisdiction, finding that Standard Motor had sufficient contacts with the State of Ohio to establish the existence of specific jurisdiction under the Due Process Clause.  (*Id.* at pp. 13-26.)

Next, the Court considered Standard's Motion to Dismiss for Failure to State a Claim.  The Court began by analyzing Parker Hannifin's first and second counts jointly as breach of contract claims.  The Court concluded that "the plain language of the parties' contract is clear and unambiguous that the Assumed Liabilities and Indemnification provisions include punitive damages claims arising from qualifying EIS Asbestos Claims."  (*Id.* at p. 34.)  The Court then rejected Standard Motor's argument that, if construed as applying to punitive damages, the Assumed Liabilities and Indemnification provisions were void as against Ohio public policy.[12]  (*Id.* at pp. 37-43.)

_____

[12] The Court agreed with Standard Motor, however, that its alleged duty to indemnify Parker Hannifin for the Barr Suit punitive damages award had not yet been triggered under the parties' Agreement because Parker Hannifin's appeal of the Barr Suit was then-pending in California state court.  (*Id.* at p. 43-44.)  The Court, therefore, stayed that claim "until such time as that duty is triggered under Section 9.3 of the Agreement."  (*Id*. at p. 45.)  Likewise, with respect to Parker Hannifin's Declaratory Judgment claim (Count VI), the Court (1) stayed a determination of Parker Hannifin's request for

The Court then denied Standard Motor's Motion to Dismiss Parker Hannifin's claim for breach of the duty of good faith and fair dealing, explaining that it did not construe this claim "as asserting an independent cause of action apart from a breach of the underlying contract." (*Id*. at pp. 50-51.) Rather, the Court determined that Parker Hannifin had alleged that Standard Motor's duty of good faith and fair dealing arose from its obligations under Section 7.4 of the 1986 Agreement itself, i.e., it "fill[ed] a contractual gap" in that provision regarding the parties' obligations to timely notify each other of any limitations when accepting the tender of an EIS Asbestos Claim. (*Id*.) Citing *Dietz-Britton*, 743 N.E.2d 960 (Ohio App. 8th Dist. 2000), the Court found that at least one Ohio court had recognized such a claim under analogous circumstances and allowed the claim to proceed. (*Id.*) Lastly, the Court granted Standard Motor's Motion to Dismiss Counts III and V of the Complaint, which set forth claims for breach of the duty to defend and settle and breach of the "duty imposed by law." (*Id.* at pp. 45-49, 52.)

On November 5, 2019, Standard Motor filed a "Motion to Certify Order for Interlocutory Appeal under 28 U.S.C. § 1292(b) and for a Stay Pending Proceedings Relating to Interlocutory Appeal." (Doc. No. 25.)  Parker Hannifin filed a Brief in Opposition, to which Standard Motor replied. (Doc. Nos. 29, 31.)  On April 23, 2020, this Court issued a Memorandum Opinion & Order denying Standard Motor's Motion to Certify and for a Stay. (Doc. No. 37.)

A Case Management Conference ("CMC") was conducted on June 1, 2020, at which time various case management deadlines were set. (Doc. No. 42.)  A Protective Order regarding

---

declaratory relief regarding Standard Motor's alleged duty to indemnify for the Barr Suit punitive damages award; but (2) allowed Parker Hannifin's request for a declaratory judgment that Standard Motor has a duty to defend the punitive damages award in the Barr Suit appeal, to proceed. (*Id*. at pp. 52- 63.)  As noted *supra*, the California state appellate court affirmed the jury's verdict (including the award of punitive damages) on November 6, 2020. (Doc. No. 88-46.) This Court thereafter lifted the stay on November 18, 2020.

confidential documents was entered shortly thereafter.  (Doc. No. 45.)  In the months that followed, the parties requested, and were granted, numerous extensions of the discovery and dispositive motions deadlines.  *See, e.g.,* Non-Doc Order dated Nov. 17, 2020; Doc. Nos. 55, 58, 61, 62, 77, 86. Several discovery disputes were brought to the Court's attention and resolved.   (Doc. Nos. 54, 56, 66, 78, 81, 83.)

Finally, on May 19, 2022, the parties filed their cross Motions for Summary Judgment.  (Doc. Nos. 88, 90.)  The parties filed their respective Briefs in Opposition on June 21, 2022, and their respective Reply Briefs on July 12, 2022.[13]  (Doc. Nos. 104, 107, 113, 115.)

## III.    Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party."  *Henderson v. Walled Lake Consol. Sch.,* 469 F.3d 479, 487 (6th Cir. 2006).  "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Kentucky Dep't of Transp.,* 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986)).  A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law."  *Henderson,* 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Solutions, Inc.,* 901 F.3d 619,

---

[13] On July 18, 2022, Standard Motor filed a request for Oral Argument, "to the extent the Court would find it helpful in evaluating the parties' cross motions for summary judgment." (Doc. No. 117.) The Court finds that oral argument is not necessary and, therefore, denies the request.

628 (6th Cir. 2018).  In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc.,* 593 Fed. Appx 506, 508 (6th Cir. 2014). The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*, 295 Fed. Appx 758, 764 (6th Cir. 2008).  "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems.*, 593 Fed. Appx at 508-09.  "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'" *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp. 3d 731, 736 (N.D. Ohio 2015) (quoting *Cox,* 53 F.3d at 150).

Here, the parties have filed cross-motions for summary judgment.  "Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law." *Peters v. DCL Medical Laboratories, LLC*, 305 F.Supp.3d 799, 814 (S.D. Ohio 2018).  "The fact that one party fails to satisfy that burden on its own Rule 56 motion does not automatically indicate that the opposing party has satisfied the burden and should be granted summary judgment on the other motion." *Id.*  Rather, in reviewing cross-motions for summary judgment, the court should "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." *Wiley v. United States*,

20 F.3d 222, 224 (6th Cir. 1994).  The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation.  *See Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991); *Allstate Vehicle and Property Ins. Co. v. Hoffa*, 566 F. Supp.3d 816, 820-821 (S.D. Ohio 2021); *Peters,* 305 F. Supp. at 814.

## IV.  Analysis

### A.  Breach of Contract Claims (Counts I and II)

Parker Hannifin and Standard Motor each move for summary judgment in their favor on Counts I and II of the Complaint.  In Count I, Parker Hannifin asserts a claim for breach of contract based on Standard Motor's refusal to "pay and discharge the damages associated with the Barr Suit judgment, and otherwise by refusing to acknowledge that the punitive damages award in the Barr Suit is an Assumed Liability" pursuant to Sections 2.1, 2.4, and 7.4 of the 1986 Agreement.  (Doc.  No. 1 at ¶ 67.)  In Count II, Parker Hannifin asserts that Standard Motor breached Section 9.1 of the Agreement by "repudiating its obligation to be directly and solely responsible for the payment or discharge of the punitive damages award in the Barr Suit; by repudiating its obligation to fully defend Parker in connection with the appeal from the Barr Suit matter; and by asserting that [Standard Motor] is not legally responsible to hold harmless or indemnify Parker with respect to the Barr Suit punitive damages award."  (*Id*. at ¶ 73.)

Parker Hannifin argues that it is entitled to summary judgment in its favor with respect to Counts I and II for several reasons.  Parker Hannifin first notes that, in ruling on Standard Motor's Motion to Dismiss, this Court evaluated the relevant provisions of the 1986 Agreement and expressly determined that the plain language of the parties' contract is clear and unambiguous and that the Assumed Liabilities and Indemnification provisions include punitive damages claims arising from

20

qualifying EIS Asbestos Claims. (Doc. No. 89 at p. 18.)  Parker Hannifin asserts that the Court's prior ruling is correct, constitutes the law of the case, and should not be reconsidered at this time. (Doc. No. 89 at pp. 18-19.)

Parker Hannifin next argues that, in addition to being a correct interpretation of the plain language of the Agreement, the Court's interpretation "perfectly aligns with" the parties' longstanding course of performance.  (*Id.* at pp. 21-27.)  Parker Hannifin argues that, from August 1986 to August 2001, Standard Motor repeatedly drew Parker's attention to the existence of punitive damages claims against Standard Motor in EIS cases and asked Parker to confirm that the claims in the cases were "within the purview of Section 7.4 of the Agreement." (*Id.* at p. 23.)  Parker Hannifin asserts it is undisputed that Parker Hannifin accepted Standard Motor's tenders on these terms and fully performed under the 1986 Agreement.  (*Id.* at p. 26.)  Then, from August 2001 until November 2018, Parker Hannifin tendered EIS cases to Standard Motor (many of which included claims for punitive damages) and "Standard Motor accepted that responsibility, retained and paid defense counsel, made all decisions regarding settlement, and fulfilled its promise in the 1986 Agreement to be 'solely responsible for the payment and discharge of' all claims in the case." (*Id.* at p. 24.)  Parker Hannifin argues that the conduct of the parties "cannot be undone or ignored now" and constitutes an alternative, supplemental basis for entering judgment in Parker's favor on Counts I and II.  (*Id.* at p. 27.)

Lastly, Parker Hannifin argues that this Court should reject Standard Motor's affirmative defense that holding Standard Motor liable for the Barr Suit punitive damages award would violate Ohio public policy.  (*Id.* at pp. 32- 40.)  Specifically, Parker Hannifin argues that this defense is without merit because:  (1) the Court has already ruled as a matter of law that the assumption of

21

liability and indemnification provisions of the 1986 Agreement are not void as against public policy because they were "a negotiated solution for the financial consequences of actions that had already occurred" (Doc. No. 24 at p. 40); (2) a holding by this Court that the Barr jury verdict is binding on Parker would violate Parker's due process rights; (3) Ohio principles of "uninsurability as a matter of public policy" do not apply to an agreement between two sophisticated companies for the purchase and sale of the assets and liabilities of a business division; and (4) under Ohio law, an intent to injure is a necessary element to "uninsurability," and neither the Barr jury's verdict nor the record in this case is sufficient to create a genuine issue of fact as to whether Parker acted with an intent to injure anyone. (*Id*.)

Standard Motor opposes each of Parker Hannifin's arguments and asserts that the Court should instead enter summary judgment in Standard Motor's favor on Counts I and II. (Doc. Nos. 91, 108.) Regarding Parker Hannifin's argument that this Court's prior decision constitutes the law of the case, Standard Motor maintains that this Court is not bound by its prior Memorandum Opinion & Order and that it should revisit its prior interpretation of the 1986 Agreement based on the complete evidentiary record. (Doc. No. 108 at pp. 12-14.) Standard Motor goes on to argue that the Court's previous interpretation of the 1986 Agreement is, in fact, incorrect because it is "based on a misreading of Section 7.4" and fails to properly interpret the Agreement as a whole. (*Id*. at pp. 16-22.) Standard Motor asserts that, based on a proper and wholistic reading of the 1986 Agreement, it is clear and unambiguous that the parties never intended to shift liability for punitive damages awarded solely against one party, to the other. (Doc. No. 91 at p. 7.)

Standard Motor next maintains that its construction of the 1986 Agreement is fully supported by the evidentiary record in this case. Specifically, Standard Motor argues that: (1) the parties did

22

not discuss the issue of punitive damages during the negotiations leading up to the closing of the 1986 Agreement; (2) the due diligence materials provided by Parker Hannifin to Standard Motor demonstrate that Parker did not inform Standard Motor of any intent to transfer liability for punitive damages; (3) the term "punitive damages" does not appear anywhere in the text of the 1986 Agreement; and (4) the parties never discussed the issue of responsibility for punitive damages liability at any time between 1986 and November 2018.  (*Id*. at pp. 7- 12.)

Lastly, Standard Motor argues that "there is no precedent in Ohio or in any other jurisdiction for implying new contractual terms" to shift responsibility for punitive damages.  (*Id.* at pp. 18-22.) Standard Motor asserts that, as a general principle, contracts of indemnity are to be strictly construed and "given no greater scope than the language of the agreement clearly and unequivocally expresses." (*Id*. at p. 19.)  Standard Motor asserts that, because the term "punitive damages" does not appear in the 1986 Agreement and the evidence shows the parties never discussed shifting liability for punitive damages, it would be "unprecedented" and contrary to law to impose liability on Standard Motor for the Barr Suit punitive damages award.  (*Id*. at pp. 19-20.)  Finally, Standard Motor argues that the Court should not construe the 1986 Agreement as shifting punitive damages liability because "transferring punitive damages liability away from the party responsible for the wrongful action is disfavored among courts because punitive damages are imposed to 'punish … outrageous conduct and to deter . . . similar conduct in the future.'"  (*Id.* at p. 21) (citing Restatement (Second) of Torts § 908 (1979)).

In response, Parker Hannifin argues that the 1986 Agreement is not ambiguous and, therefore, any extrinsic evidence regarding the parties' alleged statements during the negotiations of the contract is irrelevant, inadmissible, and barred by the parole evidence rule.  (Doc. No. 105 at pp. 10-11.)

Parker Hannifin also argues that, even assuming *arguendo* that such evidence is admissible, Standard Motor mischaracterizes the evidence of the parties' contract negotiations. (*Id*. at pp. 11-18.) Parker maintains that, in fact, the evidence shows that, prior to closing, Standard Motor was well aware that: (1) there were EIS asbestos claims pending against Parker seeking punitive damages; and (2) the 1986 Agreement was structured such that any liability not expressly identified as an Excluded Liability was an Assumed Liability. (*Id*.) Parker Hannifin then goes on to argue, at length, that Standard Motor's interpretation of the 1986 Agreement is not supported by either the structure or the plain language of the Agreement. (*Id*. at pp. 21-32.) Finally, Parker Hannifin argues that Ohio law permits sophisticated commercial entities to transfer liability for punitive damages arising out of past conduct. (*Id*. at pp. 32- 35.)

The Court will address the parties' arguments in turn, below.

### 1. Law of the Case

As noted above, in ruling on Standard Motor's Motion to Dismiss, this Court conducted a lengthy analysis of the 1986 Agreement and determined that "the plain language of the parties' contract is clear and unambiguous that the Assumed Liabilities and Indemnification provisions include punitive damages claims arising from qualifying EIS Asbestos Claims." (Doc. No. 24.)

Parker Hannifin argues that the Court's determination on this issue constitutes the law of the case. (Doc. Nos. 89, 105, 114.) While acknowledging that the Court is not precluded from reconsidering its prior ruling, Parker Hannifin argues that Standard Motor has failed to establish "any legitimate reason" why this Court should do so. (Doc. No. 114 at p. 5.) In this regard, Parker Hannifin asserts that the language of the 1986 Agreement has not changed, there has been no intervening change in the law, and the evidence now relied upon by Standard Motor in support of its interpretation

24

constitutes inadmissible parole evidence.  (*Id*.)  Parker Hannifin argues that Standard Motor should not be permitted to have a second bite at the apple by presenting entirely new arguments regarding the interpretation of 1986 Agreement that it could have (but did not) raise in its Motion to Dismiss. (*Id*. at p. 6.)

Standard Motor asserts that the law of the case doctrine is not applicable for several reasons. (Doc. No. 108 at pp. 12-14.)  First, Standard Motor argues that this doctrine "exists to enforce district court compliance with appellate court rulings."  (*Id*. at pp. 12.)  Because there is no prior appellate ruling in the instant case, Standard Motor argues that the law of the case doctrine is "inapplicable." (*Id*.)  Second, regardless of the lack of a ruling by a reviewing court in the instant case, Standard Motor asserts that the law of the case doctrine does not operate to bar this Court from reconsidering issues raised in a motion to dismiss, where there has been subsequent development of the evidentiary record.  (*Id*. at pp. 12-13.)  Standard Motor argues that the parties herein have conducted extensive discovery since this Court's prior ruling and, therefore, the Court is "not bound by a ruling made 'on incomplete evidence and a relatively hurried consideration of the issues.'"[14]  (*Id*. at p. 14) (citing cases).

_____

[14] The Court does not agree with Standard Motor's characterization of this Court's prior ruling as a "relatively hurried consideration of the issues."  The Court will refrain from speculating about or evaluating whether Standard Motor's Rule 12(b)(6) briefing was relatively hurried or lacking, given the following.  As to its argument regarding the construction of the 1986 Agreement, Standard Motor's Motion to Dismiss included one paragraph, and its Reply Brief included three paragraphs, all of which were devoid of any of the specific textual arguments it now asserts on summary judgment. As to its briefing regarding its argument that Ohio public policy prohibits indemnification of punitive damages, Standard Motor included two paragraphs in its Motion to Dismiss and four paragraphs in its Reply Brief, which were devoid of any citation to the legal authorities it now relies on regarding Ohio's public policy against indemnification of punitive damages.  What this Court knows is that it gave due consideration to the issues presented, to include reviewing and interpreting all the relevant provisions of the 1986 Agreement only now cited and discussed by Standard Motor and arguments raised by both parties in the context of Standard Motor's Motion to Dismiss, as evidenced by the 64-page Memorandum Opinion & Order it issued on October 23, 2019.  (Doc. No. 24.)

"Under the doctrine of the law of the case, a decision on an issue made by a court at one stage of a case should be given effect in successive stages of the same litigation." *United States v. Todd*, 920 F.2d 399, 403 (6th Cir. 1990) (citing *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816, (1988)). *See also Hanover Ins. Co. v. Am. Eng'g Co.,* 105 F.3d 306, 312 (6th Cir.1997) ("Issues decided at an early stage of the litigation, either explicitly or by necessary inference from the disposition, constitute the law of the case."); *Omimex Energy, Inc. v. Blohm*, 374 Fed. Appx. 643, 652 (6th Cir. 2010). "This rule of practice promotes the finality and efficiency of the judicial process by 'protecting against the agitation of settled issues.'" *Christianson,*486 U.S. at 816 (quoting 1B J. Moore, J. Lucas, & T. Currier, Moore's Federal Practice ¶ 0.404[1], p. 118 (1984)). *See also Samons v. National Mines Corp.*, 25 F.4th 455, 463 (6th Cir 2022) ("Law of the case thus promotes judicial efficiency by prohibiting parties from indefinitely relitigating the same issue that a court resolved in an earlier part of the case.")

As the Supreme Court has explained, however, this doctrine does not deprive a court of the power to revisit an issue that it has already decided:

> [T]he law-of-the-case doctrine "merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power." ... A court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances....

*Christianson,* 486 U.S. at 817 (quoting *Messenger v. Anderson*, 225 U.S. 436, 444 (1912)). *See also Todd,* 920 F.2d at 403 (stating that the doctrine of the law of the case "does not foreclose a court from reconsidering issues in a case previously decided by the same court or another court.") Extraordinary circumstances that justify reconsidering a previous ruling include the following: "(1) where substantially different evidence is raised on subsequent trial; (2) where a subsequent contrary view

of the law is decided by the controlling authority; or (3) where a decision is clearly erroneous and would work a manifest injustice." *Hanover Ins. Co.*, 105 F.3d at 312.  *See also Omimex Energy, Inc.*, 374 Fed. Appx. at 652; *Bench Billboard Co. v. City of Covington, Ky.*, 547 Fed. Appx. 695, 706 (6th Cir. 2013).

The Sixth Circuit has made clear that law of the case doctrine is "not an inexorable command" and courts must use "common sense" in applying it.  *Hanover Ins. Co.*, 105 F.3d at 312 (quoting *Coal Res. Inc. v. Gulf & W. Inds., Inc.*, 865 F.2d 761, 767 (6th Cir. 1989)).  *See also Omimex Energy, Inc.*, 374 Fed. Appx. at 652.  "It is within the sole discretion of a court to determine if a prior ruling should be reconsidered." *Todd,* 920 F.2d at 403.  *See also Omimex Energy, Inc.*, 374 Fed. Appx. at 652 ("A district court's application of the law of the case doctrine to that court's own rulings is reviewed for abuse of discretion because it is a 'discretionary tool' meant to promote judicial efficiency and not a limit on the court's power.'")

As an initial matter, the Court rejects Standard Motor's argument that the law of the case doctrine is "inapplicable" in this case because the sole purpose of the doctrine is "to enforce district court compliance with appellate court rulings."  (Doc. No. 108 at pp. 12-13.)  As both the Supreme Court of the United States and the Sixth Circuit have made clear, the law of the case doctrine does not apply only to rulings made by reviewing courts but, rather, may also apply to a district court's prior rulings in the same case.  Specifically, the Supreme Court has stated that "the [law of the case] doctrine applies as much to the decisions of a coordinate court in the same case **as to a court's own decisions**." *Christianson*, 486 U.S. at 816 (emphasis added).  Following that precedent, the Sixth Circuit found, in a reported decision, that the law of the case doctrine "applies with equal vigor … **to**

27

**a court's own decisions**." [15] *Todd,* 920 F.2d at 403 (emphasis added).  *See also Omimex Energy, Inc*., 374 Fed. Appx. at 652 (affirming district court's application of the law of the case doctrine to its own prior rulings).

Relying on these decisions, several district courts in this Circuit have expressly rejected the argument that the law of the case doctrine "only applies to appellate decisions on remand and not to the trial court's own prior decisions." *League of Women Voters of Ohio v. Blackwell,* 432 F.Supp.2d 742, 744 (N.D. Ohio 2006) ("Defendants contend the law of the case doctrine applies only to appellate decisions on remand and not to the trial court's own prior decisions. … Put simply, defendants are mistaken.).  *See also United States v. Greene*, 2007 WL 1748698 at * 5 (S.D. Ohio June 15, 2007) (holding that "the law of the case doctrine does apply to a district court's own prior decisions"); *Gaynor v. Miller*, 2019 WL 7899695 at * 3 (E.D. Tenn. Dec. 6, 2019) (applying law of the case doctrine, noting that "[a] court has the power to revisit an issue that it has previously decided"). Based on the above, the Court rejects Standard Motor's argument that "the law of the case doctrine applies only where there has been an appellate ruling on an earlier issue." [16]  (Doc. No. 116 at p. 2.)

---

[15] In a concurring opinion, Judge Sutton recently explained that the law of the case doctrine has "two parts," as follows: "What we call law of the case has two parts. The first part, known as the 'mandate rule,' is vertical. A lower court 'is bound by the decree [of a higher court] as the law of the case and must carry it into execution according to the mandate.' The rule springs from the hierarchical structure of our judicial system and leaves no room for discretion. If the U.S. Supreme Court resolves an issue in a case and remands the matter to us, we are duty bound to follow the mandate of the superior court. So too at the trial level. If we decide an issue and remand the case, the trial court must carry out its duties in accordance with that mandate.  The second part, the part implicated by this case, is horizontal. It 'expresses the practice of courts generally to refuse to reopen what has been decided' by an earlier panel of the same court in the same case. Unlike its upward counterpart, the sideways version of the law of the case is 'not a limit to [a court's] power.' *Id*. A later panel of an appellate court, like a district court, 'has the power to revisit prior decisions of its own or of a coordinate court in any circumstance." *Medical Center at Elizabeth Place LLC v. Atrium Health Systems*, 922 F.3d 713, 733-734 (6th Cir. 2019) (Sutton, J.) (concurring) (internal citations omitted).

[16] The Court notes that Standard Motor failed to acknowledge or address the Supreme Court's decision in *Christianson v. Colt Indus. Operating Corp*., 486 U.S. 800, 816, (1988), the Sixth Circuit's decisions in *United States v. Todd*, 920 F.2d 399, 403 (6th Cir. 1990) and *Omimex Energy, Inc. v. Blohm*, 374 Fed. Appx. 643, 652 (6th Cir. 2010), or any of the

Standard Motor next asserts that the law of the case doctrine does not operate to bar this Court from reconsidering issues raised in a motion to dismiss, where (as here) there has been subsequent development of the evidentiary record.  (Doc. No. 108 at pp. 12-13.)  In support of this argument, Standard Motor cites Sixth Circuit authority for the proposition that "a decision 'on a motion to dismiss does not establish the law of the case for purposes of summary judgment when the complaint has been supplemented by discovery.'" *Devlin v. Kalm*, 630 Fed. Appx. 534, 539 (6th Cir. 2015) (internal citations omitted).  *See also Miller v. Maddox*, 866 F.3d 386, 389–90 (6th Cir. 2017) ("[T]his court's prior holding on a motion to dismiss does not establish the law of the case for purposes of summary judgment, when the complaint has been supplemented by discovery."); *In re B & P Baird Holdings, Inc*., 759 Fed. Appx. 468, 477–78 (6th Cir. 2019) ("We have held that the law of the case doctrine does not apply to earlier proceedings where a different legal standard governs.")

Here, however, in its previous Opinion & Order, this Court applied well-established principles of contract construction to the four corners of the 1986 Agreement to find that that it was clear and unambiguous that the Assumed Liabilities and Indemnification provisions include punitive damages arising from EIS asbestos claims.  In this context, then, the Court is not persuaded by Standard Motor's argument that the law of the case doctrine is inapplicable because the parties subsequently engaged in discovery.

Nonetheless, the fact that the law of the case doctrine applies does not necessarily mean that this Court is precluded from revisiting its prior ruling.  As noted above, in this context, the law of the case doctrine is not a limit on the Court's authority but is a "discretionary tool" to be used in the

---

district court decisions noted above, all of which hold that the law of the case doctrine applies to a district court's own prior rulings.

exercise of the Court's "good sense." *See Christianson*, 486 U.S. at 817; *Omimex Energy, Inc.*, 374 Fed. Appx. at 652.   In the instant case, the Court is not inclined to reaffirm its prior ruling solely on the basis that it constitutes the law of the case.  Although Parker Hannifin is correct that the language of the 1986 Agreement has not changed, both Parker Hannifin and Standard Motor cite extensively to the evidentiary record developed in discovery, throughout their briefing on Counts I and II of the Complaint.[17] Indeed, Parker Hannifin cites a great deal of deposition testimony and documentary evidence regarding the parties' course of conduct between August 1986 and November 2018 in support of its argument that Standard Motor breached Sections 2.4, 7.4 and 9.1 of the 1986 Agreement.  (Doc. No. 89 at pp. 2 - 16, 23- 25.)

Given the complexity of the issues and the extensive factual record that has been developed by the parties over the course of the last three years, the Court finds, in the exercise of its discretion, that it is appropriate to consider the parties' arguments anew in the context of these summary judgment proceedings.  Accordingly, the Court will proceed to address the parties' respective arguments regarding Parker Hannifin's breach of contract claims.

## 2.   Interpretation of the Plain Language of the 1986 Agreement

Parker Hannifin argues that it is entitled to summary judgment in its favor on Counts I and II of the Complaint because the plain language of the 1986 Agreement clearly and unambiguously provides that Standard Motor is liable for the Barr Suit punitive damages award.  (Doc. No. 89 at pp. 17-18; Doc. No. 105 at pp. 22-32.)  Parker Hannifin asserts that this Court's prior analysis of the relevant provisions of the 1986 Agreement is correct and should be reaffirmed on summary judgment.

---

[17] The record reflects that, in support of their respective Motions for Summary Judgment, the parties cite to sixteen (16) deposition transcripts, hundreds of pages of documentary exhibits, and three expert reports.  *See generally* Doc. Nos. 88-1 through 88-51; Doc. Nos. 91-1 through 91-21; Doc. No. 92; Doc. No. 95; Doc. Nos. 107-1 through 107-20.

Specifically, Parker Hannifin maintains that, read as a whole, the 1986 Agreement "makes clear that Standard Motor is assuming *all liabilities attributable to Parker's past operation of the EIS business* except for those that are specifically defined as Excluded Liabilities." (Doc. No. 105 at p. 22) (emphasis in original). Parker Hannifin emphasizes that the parties agreed to define the term "Assumed Liabilities" broadly in Section 2.4 of the Agreement, while Section 2.5 contains a "limited, exhaustive" list of Excluded Liabilities. (*Id*. at pp. 22-23.) Parker notes that Section 2.5 does not list punitive damages as an "Excluded Liability." (*Id*.)

Parker Hannifin then argues that Sections 2.4 and 2.5 of the Agreement must be read in conjunction with Section 7.4, which expressly carves out asbestos claims and creates a "claims-made" structure for such claims. (*Id*.) Specifically, Parker asserts that Section 7.4 "makes clear that, as to an asbestos claim, the question of which party bears responsibility turns not on when the injury occurs … but rather on *when the claim is first asserted in writing*." (*Id*. at p. 24) (emphasis in original). Parker Hannifin maintains that, because the Barr Suit constitutes a "claim[] alleging any illness, disease, injury or other physical damage arising out of or relating in any way to alleged exposure to asbestos-containing Products" that was "asserted in writing after the fifteenth (15th) anniversary of the Closing Date," the punitive damages award in the Barr Suit "shall be deemed [an] Assumed Liabilit[y]" under the plain language of Section 7.4. (*Id*. at pp. 24-25.) And, because the Barr punitive damages award constitutes an "Assumed Liability," Parker maintains it is clear and unambiguous that Standard Motor is required to indemnify Parker for this award under Section 9.1 of the Agreement. (*Id*.)

Standard Motor argues that the Court should reject Parker Hannifin's arguments and, instead, enter summary judgment in Standard Motor's favor with respect to Counts I and II. Citing

extensively to the evidentiary record, Standard Motor first asserts that the documentary evidence and deposition testimony regarding the negotiations leading up to the 1986 Agreement establish that the parties never intended to shift liability for punitive damages attributable solely to Parker's own pre-agreement misconduct, from Parker to Standard Motor.  (Doc. No. 91 at pp. 7-13.)  Standard Motor then argues that the plain language of the Agreement is consistent with this evidence of the parties' intent.  (*Id*.)  Specifically, Standard Motor asserts that it is clear and unambiguous that the Barr Suit punitive damages award is an "Excluded Liability" under Section 2.5(c) of the Agreement because that award constitutes a liability arising out of a claim seeking compensation or recovery for injury occurring before the Closing Date and arising out of a product defect manufactured by Parker before the Closing.  (*Id*. at p. 14- 18.)

Standard Motor further asserts that Section 7.4 does not apply to the Barr Suit punitive damages award for two reasons.  First, according to Standard Motor, Section 7.4 relates only to "personal injury claims" and "that language on its face does not encompass punitive damages, which are not awarded as compensation or recovery for personal injury but instead to punish the wrongdoer."  (*Id.* at p. 17.)  Second, Standard Motor contends that Section 7.4 does not apply because "there would be no 'difficulties in establishing liability between the parties hereto' with respect to the Barr punitive damages award, because these damages could only be based on the malice or oppressive conduct of a Parker managing agent."  (*Id*.)

Because Section 7.4 does not apply, Standard Motor argues, "any punitive damages award is governed by the baseline liability rules in Sections 2.4 and 2.5, which provide that pre-closing conduct remains Parker's responsibility as an Excluded Liability, and post-closing conduct and other specifically enumerated liabilities become [Standard Motor's] responsibility as an Assumed

Liability." (Doc. No. 108 at p. 21.) Standard Motor asserts that it is undisputed that the Barr punitive damages award is predicated on Parker's conduct prior to the closing date and, therefore, that award is an Excluded Liability under Section 2.5(c). (*Id.* at pp. 21-22.)

"Under Ohio law,[18] the elements of a breach of contract claim are: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff as a result of the breach." *Asset Mgmt. One LLC v. U.S. Bank Nat. Ass'n*, 569 Fed. Appx. 438, 441 (6th Cir. 2014) (quoting *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012)). *See also Gerling & Associates, Inc. v. Odulair, LLC*, 2017 WL 2790669 at * 7 (S.D. Ohio June 28, 2017).

"[T]he interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) (citations omitted*); see Ohio Historic al Soc'y v. Gen. Maint. & Eng'g Co.,* 583 N.E.2d 340, 345 (Ohio App. 7th Dist. 1989). It is the role of the court to discern the intent of the parties, which is "presumed to reside in the language they choose to use in their agreement." *Savedoff*, 524 F.3d at 763 (quoting *Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 952 (Ohio 1996)); *see United States Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.*, 716 N.E.2d 1201, 1208 (Ohio App. 2nd Dist. 1998). The first step, then, in ascertaining the parties' intent is to look at the plain meaning of the words in the contract. *SHH Holdings, LLC v. Allied World Health Specialty*

---

[18] In a diversity case, federal courts apply the substantive law of the forum state. *Kepley v. Lanz*, 715 F.3d 969, 972 (6th Cir. 2013). Here, the parties agree (and the 1986 Agreement expressly provides) that Ohio law applies. A federal court exercising diversity jurisdiction must "follow the decisions of the state's highest court when that court has addressed the relevant issue." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008) (internal quotation marks omitted). If the Ohio Supreme Court has not addressed the issue presented, we "must anticipate how [Ohio's] highest court would rule and may rely on the state's intermediate appellate court decisions, along with other persuasive authority, in making this determination." *Kepley*, 715 F.3d at 972 (internal quotation marks omitted).

*Ins. Co.*, 65 F. 4th 830, 2023 WL 3029729 at * 4 (6th Cir. April 21, 2023).  If the language is clear and unambiguous, contract terms are given their plain and ordinary meaning.  *Id.*  "The Court must look to the plain language of the contract, and only go beyond the plain language of the agreement to determine the rights and obligations of the parties if it is ambiguous." *Airlink Commc'ns, Inc. v. Owl Wireless, LLC*, 2011 WL 4376123 at *2 (N.D. Ohio Sept.20, 2011) (internal citations omitted).

"Contractual language is 'ambiguous' only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." *Covington v. Lucia*, 784 N.E.2d 186, 190 (Ohio App. 10th Dist. 2003) (citation omitted).  *See also Lager v. Miller–Gonzalez*, 896 N.E.2d 666, 669 (Ohio 2008) ("Ambiguity exists only when a provision at issue is susceptible of more than one reasonable interpretation."); *Sec'y of USAF v. Commemorative Air Force*, 585 F.3d 895, 900 (6th Cir. 2009). "[C]ourts may not use extrinsic evidence to create an ambiguity; rather, the ambiguity must be patent, i.e., apparent on the face of the contract." *Covington*, 784 N.E.2d at 190.  In determining whether contractual language is ambiguous, the contract "must be construed as a whole," *Tri–State Group, Inc. v. Ohio Edison Co*., 782 N.E.2d 1240, 1246 (Ohio App. 7th Dist. 2002), so as "to give reasonable effect to every provision in the agreement." *Stone v. Nat'l City Bank,* 665 N.E.2d 746, 752 (Ohio App. 8th Dist. 1995).

Here, both parties cite extensively to extrinsic evidence in support of their various interpretations of the 1986 Agreement.  The Court, however, will first confine its review to the four corners of the 1986 Agreement itself to determine whether the plain language of that Agreement clearly and unambiguously encompasses the punitive damages award in the Barr Suit.[19]  *See Airlink*

---

[19] In its Reply Brief in support of its Motion for Summary Judgment, Standard Motor argues for the first time that this Court may consider extrinsic evidence regarding the parties' intent because there is a "latent ambiguity" in the 1986 Agreement.  (Doc. No. 116 at p. 11-12.)  It is well established, however, that courts will not normally consider issues

34

*Commc'ns, Inc.*, 2011 WL 4376123 at *2 (holding that a court may "only go beyond the plain language of the agreement to determine the rights and obligations of the parties if it is ambiguous.")

After careful consideration, and for all the reasons set forth below, the Court finds that the plain language of the 1986 Agreement is clear and unambiguous that the Barr Suit punitive damages award is an Assumed Liability and, further, that Standard Motor is required to indemnify Parker Hannifin for that award under the Agreement's Indemnification provision.

Section 2.1 provides, in relevant part, that, at the Closing, Standard Motor "will assume and become directly and solely responsible for the payment or discharge of all of the Assumed Liabilities." (Doc. No. 88-4 at PageID# 1834.) Section 2.4 proceeds to define the term "Assumed Liabilities" broadly as "all liabilities and obligations of [Parker Hannifin] as of the Closing arising solely out of [Parker Hannifin's] conduct of the Business . . . but excluding the Excluded Liabilities." (*Id*. at PageID# 1837.) Thus, the Agreement is structured so that a liability or obligation arising solely out of Parker's conduct of the EIS Division is considered an Assumed Liability, and is only excluded if it is specifically enumerated as an Excluded Liability under the Agreement. The "Excluded Liabilities" are specifically enumerated in subparagraphs (a) through (h) of Section 2.5. (*Id*. at

---

raised for the first time in Reply Briefs, as it deprives the non-movant of a full and fair opportunity to respond. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir.2008) (explaining that "reply briefs reply to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration") (emphasis in original) (quoting *Novosteel SA v. U.S., Bethlehem Steel Corp.*, 284 F.3d 1261, 1274 (Fed. Cir. 2002)); *Lexicon, Inc. v. Safeco Ins. Co. of Am., Inc.*, 436 F.3d 662, 676 (6th Cir. 2006) (stating that "[i]t is impermissible to mention an issue for the first time in a reply brief because the [opponent] then has no opportunity to respond") (quoting *Knighten v. Commissioner*, 702 F.2d 59, 60 n. 1 (5th Cir. 1983)). Accordingly, the Court will not consider this issue herein.

PageID#s 1838-1840.)  It is undisputed that none of the subparagraphs in Section 2.5 include any mention of punitive damages.[20]  (*Id.*)

As Standard Motor correctly notes, Section 2.4 ("Assumed Liabilities") and Section 2.5 ("Excluded Liabilities") both contain specific subparagraphs that relate generally to liabilities and obligations arising out of, resulting from, or relating to claims seeking compensation or recovery for "injury to person or damage to property" arising out of an alleged Product defect.  Section 2.4(d) provides that such liabilities and obligations are Assumed Liabilities if they seek compensation or recovery for "*injury to person* or damage to property *occurring after the Closing* and arising out of a defect or alleged defect of a Product whether manufactured or purchased for resale by [Parker Hannifin] before the Closing or by [Standard Motor] after the Closing."  (*Id*. at PageID# 1838.)  In other words, under this provision, Standard Motor expressly assumes all liabilities relating to claims seeking compensation or recovery for personal injury arising out of an alleged Product defect where the injury occurs after the Closing, regardless of whether the Product was manufactured by Parker prior to Closing or by Standard Motor after the Closing.

In a corresponding provision, Section 2.5(c) provides that such liabilities and obligations are Excluded Liabilities if they relate to claims seeking compensation or recovery for "*injury to person* or damage to property *occurring before or on the Closing Date* and arising out of a defect or alleged defect of a Product manufactured or purchased for resale by [Parker Hannifin] before the Closing."  (*Id*. at PageID# 1839.)  Under this provision, then, Standard Motor does not assume liabilities or obligations relating to personal injury claims arising out an alleged Product defect where the injury

---

[20] The Court notes that, in its Motion to Dismiss, Standard Motor did not argue that the Barr Suit punitive damages award constituted an "Excluded Liability" under Section 2.5(c).  (Doc. No. 12.)

occurs before or on the Closing and the Product was manufactured or purchased by Parker before the Closing.

Importantly, however, certain asbestos claims are expressly excepted from both Section 2.4(d) and Section 2.5(c). Both of these Sections begin with the prefatory clause "[e]xcept as provided in Sections 7.4 and 7.5 hereof." (Doc. No. 88-4 at PageID#s 1838, 1839.) Section 7.4 specifically provides that liability for certain asbestos claims is allocated differently than in Sections 2.4(d) and 2.5(c). (*Id.* at PageID# 1868.) It reads as follows:

> 7.4 <u>Asbestos Claims</u>. **Notwithstanding the allocation in Sections 2.4(d) and 2.5(c)** between the parties of responsibility for claims whether founded upon negligence, breach of warranty, strict liability in tort, and/or other similar legal theory, seeking compensation or recovery for or relating to injury to persons arising out of a defect or alleged defect of a Product, **the parties hereto agree that claims alleging any illness, disease, injury or other physical damage arising out of or relating in any way to alleged exposure to asbestos-containing Products <u>asserted, in writing, on or prior to the fifteenth (15th) annual anniversary of the Closing Date shall be deemed Excluded Liabilities</u>. Claims alleging any illness, disease, injury or other physical damage arising out of or relating in any way to alleged exposure to asbestos-containing Products <u>asserted, in writing, after the fifteenth (15th) anniversary of the Closing Date shall be deemed Assumed Liabilities</u>. The special allocation provisions established in this Section 7.4 relate only to personal injury claims arising out of alleged exposure to asbestos-contained Products, are based on the parties recognition of the difficulties in establishing liability between the parties hereto as to any one Product for such claims, and shall not apply to any other type of claims, including, but not limited to, alleged asbestos-related property damages.** Notwithstanding the foregoing, Purchaser shall be responsible for all claims alleging any illness, disease, injury or other physical damage arising out of or relating in any way to alleged exposure to asbestos-containing Products asserted, in writing, after the Closing Date, if claimant's first alleged exposure to asbestos-containing Products occurred after the Closing Date.

(Doc. No. 88-4 at PageID# 1868) (emphasis added). Thus (and unlike Sections 2.4(d) and 2.5(c)), Section 7.4 allocates liability for claims alleging illness, disease, injury or other physical damage arising out of alleged exposure to asbestos-containing Products *based on when the claim is asserted in writing*. The plain language of this Section explains that the parties negotiated this "claims-based"

structure because of "the parties['] recognition of the difficulties in establishing liability between the parties hereto as to any one Product for such claims."  (*Id.*)  By its plain reading, then, Section 7.4 creates a bright-line method for allocating responsibility for asbestos-related personal injury claims - claims that are asserted in writing prior to the fifteenth anniversary of the Closing Date are Excluded Liabilities and, therefore, Parker's responsibility, while claims that are asserted in writing after the fifteenth anniversary of the Closing Date "shall be deemed Assumed Liabilities" and, therefore, Standard Motor's responsibility. (*Id.*)

Standard Motor does not dispute that the Barr Suit is covered under Section 7.4 because it constitutes a claim alleging illness, disease, injury, or other physical damage arising out of or relating in any way to alleged exposure to an asbestos-containing Product that was asserted in writing after the fifteenth anniversary of the Closing Date.  Nor does Standard Motor dispute that the compensatory damage award in the Barr Suit is an Assumed Liability under Section 7.4.  (Doc. No. 116 at p. 7.)  Standard Motor does argue, however, that Section 7.4 does not apply to the punitive damages award in the Barr Suit because that Section only relates to "personal injury claims," which do "not encompass punitive damages."  (Doc. No. 91 at p. 17.)

The Court finds this argument to be without merit.  As noted above, Standard Motor has not disputed (in any of its extensive summary judgment briefing) that the Barr Suit itself constitutes a "claim" falling within the scope of Section 7.4.[21]  Under the plain language of Section 7.4, therefore,

---

[21] As noted *supra*, in her Complaint, Ms. Barr asserted the following causes of action against both Parker Hannifin and Standard Motor: (1) Negligence (Count I); (2) Strict Liability (Count II); (3) Negligent Misrepresentation (Count III); and (4) Fraud by Nondisclosure (Count IV). (Doc. No. 89-26.)  Standard Motor does not argue that any of these specific causes of action do not constitute "claims" for purposes of Section 7.4, i.e., "claims alleging any illness, disease, injury, or other physical damage arising out of or relating in any way to alleged exposure to asbestos-containing Products." (Doc. No. 88-4 at PageID# 1868.)

38

the Barr Suit "shall be deemed" an "Assumed Liability" for purposes of the Agreement.  And, as noted *supra*, Section 2.4 defines the term "Assumed Liabilities" as meaning "*all liabilities and obligations of [Parker Hannifin]* as of the Closing arising solely out of [Parker Hannifin's] conduct of the Business."  (Doc. No. 88-4 at PageID# 1837) (emphasis added).

Standard Motor points to no language in Section 7.4 that would nevertheless parse out and exclude the specific types of damages that are sought by (and awarded by the jury as a result of) the Barr Suit.  And the Court sees no reasonable basis to interpret Section 7.4 to permit such an outcome.  The damages awarded by the Barr Suit jury (both compensatory and punitive) do not exist in isolation but instead flow directly from Ms. Barr's claims in the Barr Suit.  Having conceded that the Barr Suit falls within the scope of Section 7.4, there is no textual support for arguing that Section 7.4 does not apply to the punitive damages that were awarded as a result of the claims in that Suit.  Moreover, the Court's construction is consistent with (1) the broad definition of "Assumed Liabilities" in Section 2.4; and (2) the general structure of the Agreement that all of Parker Hannifin's liabilities and obligations as of the Closing constitute "Assumed Liabilities" unless specifically listed as an "Excluded Liability," and punitive damages are not so listed. [22]

---

[22] Standard Motor asserts that the Barr Suit punitive damages award cannot be covered by Section 7.4 because "punitive damages are not awarded for bodily injury."  (Doc. No. 91 at p. 17) (quoting *State Farm Mut. Ins. Co. v. Blevins*, 551 N.E.2d 955, 959 (Ohio 1990)).  However, having conceded that the Barr Suit is an asbestos-related claim falling within the scope of Section 7.4, Standard Motor cannot show the punitive damages awarded in that Suit are not also covered by that Section because there is no language in the Agreement supporting such a construction. Moreover, *Blevins* is distinguishable for several reasons.  First, the specific policy language in *Blevins* is more restrictive than the language in the 1986 Agreement. As this Court previously explained, the insurance policy at issue in *Blevins* provided that "we will pay damages for bodily injury an insured is legally entitled to collect from the owner or driver of an uninsured motor vehicle.' *Blevins*, 551 N.E.2d. at 959. The Ohio Supreme Court found that this language "clearly limits the insurer's liability to compensatory damages for personal injury," finding "under no construction can the language 'for bodily injury' be read to include punitive damages" because "punitive damages are not awarded for bodily injury." *Id.* Here, on the other hand, the 1986 Agreement provides that Standard Motor is responsible for "all liabilities and obligations of the Seller" and must indemnify Parker Hannifin from and against "any and all liabilities, damages, losses, [and] claims" arising out its failure to pay or satisfy an Assumed Liability.  (Doc. No. 88-4 at PageID#s 1837, 1875.) The Court finds this language is more expansive than that at issue in *Blevins*.  Moreover, and as this Court discussed at length in its

Standard Motor nevertheless argues that Section 7.4 is not applicable because, by its own terms, that Section was included in the Agreement due to "the difficulties in establishing liability between the parties hereto as to any one Product" with respect to asbestos-related personal injury claims.  Standard Motor asserts that there would be no difficulty establishing liability between the parties with respect to the Barr punitive damages award "because these damages could only be based on the malice or oppressive conduct of a Parker managing agent." (Doc. No. 91 at p. 17.)  Therefore, Standard Motor maintains, Section 7.4 does not apply and "any punitive damage award is governed by the baseline liability rules set forth in Sections 2.4 and 2.5, which provide that pre-closing conduct remains Parker's responsibility as an Excluded Liability and post-closing conduct and other specifically enumerated liabilities become [Standard Motor's] responsibility as Assumed Liabilities." (Doc. No. 108 at p. 21.)  As set forth below, the Court rejects this argument for several reasons.

Standard Motor's argument is premised on the following sentence in Section 7.4:

> The special allocation provisions established in this Section 7.4 relate only to personal injury claims arising out of alleged exposure to asbestos-contained Products, are based on the parties['] recognition of the difficulties in establishing liability between the parties hereto as to any one Product for such claims, and shall not apply to any other type of claims, including, but not limited to, alleged asbestos-related property damages.

---

October 2019 Memorandum Opinion & Order, Standard Motor's reliance on *Blevins* is misplaced because *Blevins* considered the question of who should bear responsibility for punitive damage awards under the terms of an uninsured motorists insurance policy, which is a very different context from an Asset Purchase Agreement between two sophisticated entities.  *See* Doc. No. 24 at pp. 34-38.  Standard Motor's reliance on *Brookridge Party Center, Inc. v. Fisher Foods, Inc.*, 468 N.E.2d 63 (Ohio App. 8th Dist. 1983) is also misplaced.  In that case, the state appellate court found that an indemnity agreement covering liability "arising out of damage to property belonging to" the plaintiff did not cover punitive damages because "[p]unitive damages arise from reprehensible conduct by a tortfeasor, coincident with some compensable damage to the tort victim" and not from "the victim's damages." *Id.* at 69.  Here, however, the 1986 Agreement broadly provides that Standard Motor must indemnify Parker from and against "any and all liabilities, damages, losses, [and] claims" arising out of its failure to pay or satisfy an Assumed Liability.

40

(Doc. No. 88-4 at PageID# 1868.)  Read in context, it is clear that the purpose of this sentence is to provide context for the "special allocation provisions" of Section 7.4 and to explain that such provisions are limited to "personal injury claims arising out of alleged exposure to asbestos-contained Products." (*Id.*)  However, neither this sentence nor any other language in Section 7.4 negate the claims-made structure of that Section with respect to such claims or otherwise carve out damages arising out of such claims that are directed towards only one of the parties.  Rather, the only limiting language in this sentence is that the special allocation provision relates solely to "claims alleging any illness, disease, injury, or other physical damage arising out of or relating in any way to alleged exposure to asbestos-containing Products."[23]  (*Id.*)  The Court is simply not persuaded that the plain language of Section 7.4 demonstrates any sort of intent on behalf of the parties to carve out certain punitive damage awards in asbestos-related personal injury claims.

Moreover, the Court agrees with Parker Hannifin that Standard Motor's interpretation would negate the very purpose of Section 7.4, which was to create a bright line "claims made" division of responsibility for asbestos-related personal injury claims.   As Section 7.4 itself explains, the parties recognized that it would be difficult to establish liability between them with respect to such claims and, therefore, they mutually agreed to establish a clear cut way to handle them under the Agreement—all such claims asserted in writing prior to the fifteenth anniversary of the Closing would be "Excluded Liabilities" and belong to Parker Hannifin, whereas all such claims asserted in writing

---

[23] Indeed, a plain reading of the sentence relied upon by Standard Motor, as a whole, indicates that the parties' intent was not to distinguish between certain types of damages awards but to distinguish between asbestos-related *personal injury claims* and asbestos-related *property damage claims*.  Standard Motor does not argue that the Barr Suit constitutes an asbestos-related property damage claim or that the Barr Suit punitive damages award arises out of an asbestos-related property damage claim.

41

thereafter would be "Assumed Liabilities" and belong to Standard Motor.  The interpretation now advanced by Standard Motor would undermine that very purpose by introducing uncertainty and doubt as to whether, for any specific asbestos-related personal injury claim, it would or would not be "difficult" to establish liability between the parties.

Accordingly, the Court rejects Standard Motor's argument that the Barr Suit punitive damages award does not fall within the scope of Section 7.4 and that the "baseline liability rules in Sections 2.4 and 2.5 apply" instead.[24]  For all the reasons discussed above, the Court finds that the Barr Suit constitutes a "claim" falling within the scope of Section 7.4 and, further, that there is no support in the plain language of the Agreement for carving out the punitive damages award in that Suit from Section 7.4.  The Court further finds that, by its express terms, the special, "claims made" allocation provisions in Section 7.4 are expressly excepted from and take predominance over Sections 2.4(d) and Section 2.5(c).  Because the Barr Suit falls within Section 7.4 and was asserted in writing after the fifteenth anniversary of the Closing Date, the Court finds that it is clear and unambiguous from the plain language of the Agreement that the Barr Suit punitive damages award constitutes an Assumed Liability under the 1986 Agreement.  As such, the Court further finds that it is clear and

---

[24]  Although it need not reach this issue, the Court notes that it is not persuaded by Standard Motor's argument that Section 2.4(d) and Section 2.5(c) "clearly demonstrate" that the parties' overall intent was for each party to remain responsible for their own conduct.  As discussed above, Section 2.4 of the Agreement defines Assumed Liabilities to mean all liabilities and obligations "*arising solely out of [Parker Hannifin's] conduct of the Business.*"  (Doc. No. 88-4 at PageID# 1837) (emphasis added).  Moreover, Section 2.4(d) states that Standard Motor assumes all liabilities and obligations relating to personal injury claims arising out of an alleged Product defect where the injury occurs after the Closing*, regardless of whether the Product was manufactured by Parker prior to Closing or by Standard Motor after the Closing*.  Standard Motor fails to acknowledge or address the import of either of these provisions anywhere in its briefing. Lastly, even assuming *arguendo* that "the parties' overall intent was for each party to remain responsible for their own conduct," it is undisputed that Ms. Barr alleged that she was exposed to asbestos-containing friction products from 1974 to 1988. Standard Motor purchased the EIS Division in August 1986. Thus, approximately two years of Ms. Barr's alleged exposure was during the time period that Standard Motor owned the EIS Division. Standard Motor fails to adequately address this in its summary judgment briefing.

unambiguous that Standard Motor is required to defend and indemnify Parker for this award pursuant to Section 9.1 of the Agreement.

### 3.  Consideration of the Extrinsic Evidence

The Court has determined that the 1986 Agreement is clear and unambiguous and, therefore, the Court need not consider the extrinsic evidence cited by the parties.  *See, e.g., Airlink Commc'ns, Inc.*, 2011 WL 4376123 at *2 (holding that a court may "only go beyond the plain language of the agreement to determine the rights and obligations of the parties if it is ambiguous.")  However, assuming *arguendo* that the 1986 Agreement is ambiguous with respect to the issue of punitive damages liability, the extrinsic evidence cited by the parties[25] does not create a genuine issue of

---

[25] In support of its argument that the 1986 Agreement does not "shift responsibility for punitive damages," Standard Motor relies, in part, on the testimony of its expert witnesses Regina Lee and Byron Egan, as well as the testimony of Parker Hannifin's expert witnesses Nancy Gutzler and Thomas Thompson.  (Doc. No. 91 at pp. 12-14.)  In particular, Standard Motor relies on the opinion of its expert, Mr. Egan, that "because 'litigation risks were heavily negotiated,' M&A lawyers negotiating an asset purchase transaction in the 1980s would have reasonably concluded that the 1986 Agreement's 'silence with respect to punitive damages meant that it did not obligate [Standard Motor] to indemnify Parker for punitive damages awarded because of Parker's wrongful conduct.'" (*Id.* at p. 13) (quoting B. Egan Expert Report (Doc. No. 91-15) at p. 15.)  Parker objects to the admissibility of Mr. Egan's and Ms. Lee's testimony "on all grounds available, including fit, reliability, methods, relevance, and admissibility under Rule 702 and the parol evidence rule." (Doc. No. 105 at pp. 18-21.)  In addition, Parker Hannifin objects to Mr. Egan's testimony on the grounds that it is a "bald legal conclusion" that is not the proper subject of expert testimony.  (*Id.*)  Lastly, Parker Hannifin states that it has not offered the reports and/or testimony of its own experts (i.e., Ms. Gutzler and Mr. Thompson) and objects to Standard Motor's attempt to put their testimony before the Court at this time.  (*Id.*)  Although Standard Motor filed a Reply Brief, it did not respond to or otherwise address Parker's objections.  For the following reasons, the Court will not consider the expert reports and/or testimony cited by Standard Motor in its Motion for Summary Judgment.  It is well established that an expert witness may not testify to a legal conclusion or opine regarding the meaning of legal terms. *See, e.g., Diamond Transportation Logistics, Inc. v. Kroger Co., Inc.,* 2023 WL 34688 at * 6 (S.D. Ohio Jan. 4, 2023); *Navarro v. Procter & Gamble Co.*, 2021 WL 868586 at * 11 (S.D. Ohio March 8, 2021) (citing *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994)); *Goodwin v. American Marine Express, Inc.*, 2021 WL 848948 at * 9 (N.D. Ohio March 5, 2021). Nor may an expert witness testify regarding the parties' intentions. *See, e.g., Cincinnatus Partners I, LP v. Farm Bureau Property & Casualty Ins. Co*., 2014 WL 12748836 at * 5 (S.D. Ohio April 9, 2014) ("Opinions that are based upon Myer's analysis of 'the intent of the parties at the time the Partnership Agreement was entered into' are inadmissible."). Mr. Egan's testimony that the Agreement's "silence with respect to punitive damages meant that it did not obligate [Standard Motor] to indemnify Parker for punitive damages" is a legal conclusion on the ultimate issue in the case.  It is, therefore, inadmissible.  Standard Motor's attempted reliance on Mr. Thompson's testimony fails for the same reason.  Finally, Standard Motor has not offered any response to Parker's argument that this Court should not consider the expert reports of Ms. Gutzler and Ms. Lee. The Court finds that Standard Motor has abandoned this issue and, therefore, the Court will not consider the reports of Ms. Gutzler or Ms. Lee in the context of these summary judgment proceedings.

material fact as to whether the parties intended to include punitive damages arising from qualifying EIS asbestos claims in the Assumed Liability and Indemnification provisions of the 1986 Agreement. Indeed, consideration of the extrinsic evidence cited by the parties demonstrates to this Court that the parties *did* intend to include punitive damages arising from qualifying EIS asbestos claims in the Assumed Liability and Indemnification provisions of the 1986 Agreement.

"Extrinsic evidence is admissible to ascertain the intent of the parties when the contract is unclear or ambiguous, or when circumstances surrounding the agreement give the plain language special meaning." *Graham v. Drydock Coal Co*., 667 N.E.2d 949, 952 (Ohio 1996) (citing *Shifrin v. Forest City Enterprises*, 597 N.E.2d 499, 501 (Ohio 1992)).  "Extrinsic evidence may indicate 'the circumstances which surrounded the parties at the time [the agreement] was made, the object intended to be accomplished, and the construction which the acts of the parties show they gave to their agreement.'" *Lublinsussman Group LLP v. Lee*, 107 N.E.3d 724, 728 (Ohio App. 6th Dist. 2018) (quoting *Mosier v. Parry*, 54 N.E. 364 (Ohio 1899)).  *See also Graham*, 667 N.E.2d at 952.

"A court may also look to the parties' course of conduct as evidence of their construction of a contract when the contract language is unclear." *Transportation Ins. Co. v. Busy Beaver Bldg. Centers, Inc*., 969 F.Supp.2d 875, 888 (S.D. Ohio 2013) (citing *Shifrin*, 597 N.E.2d at 501).  *See also State ex rel. Burgess & Niple v. Linzell*, 93 N.E.2d 9 (Ohio 1950) (holding that, where terms are reasonably susceptible to more than one interpretation and "the parties to such contract have by their acts and conduct in the performance of the contract over a reasonable period of time mutually adopted one of those interpretations, the interpretation so adopted will be given to those words."); *William Powell Co. v. Onebeacon Ins. Co*., 75 N.E.3d 909, 917 (Ohio App. 1st Dist. 2016) (finding that the parties' post-contract formation conduct is relevant to determine their intent when a contract is

ambiguous).  In sum, "[w]hen terms of an agreement are ambiguous, parol evidence may be used to explain the understanding of the parties at the time the agreement was entered into." *SPG, Inc. v. First St. Dev., LLC,* 64 N.E.3d 340, 349 (Ohio App. 5th Dist. 2016).  *See also Phillimore v. Butterbaugh*, 2014 WL 5336507 at * 6 (Ohio App. 5th Dist. Oct. 17, 2016).

Here, the record reflects the following.  During the negotiations leading up to the signing of the 1986 Agreement, Parker Hannifin provided a document to Standard Motor entitled "Status of EIS Asbestos Litigation."  (Pophal Depo. Vol. I at Tr. 73-74; Haber Depo. at Tr. 130-136; Doc. No. 88-7.)  This document (which is attached as "Exhibit F-1" to the 1986 Agreement) disclosed that Parker had been sued in numerous asbestos-related cases over the years and specifically listed each of the EIS asbestos-related cases that were then-pending against Parker at the time of Closing.  (Doc. No. 88-7.)  Exhibit F-1 reflects that thirty-one (31) such cases were pending against Parker Hannifin when the 1986 Agreement was signed.  (*Id*. at PageID# 1905.)  Parker Hannifin asserts (and Standard Motor does not dispute) that over half of these cases included claims for punitive damages.[26]  (Exh. 89-14 at PageID#s 3182-3183.)

None of the participants in the parties' negotiations recall expressly discussing liability for punitive damages in EIS asbestos-cases during the 1986 Agreement negotiations. *See, e.g.,* Sills

---

[26] Attorney Robert Haber was Standard Motor's lead negotiator during the 1986 Agreement negotiations.  (Haber Depo. at Tr. 124.)  Mr. Haber testified that he knew about the asbestos cases pending against Parker Hannifin at the time of the contract negotiations but did not make any effort to look at any of the specific cases identified in Exhibit F-1 or otherwise make any attempt to understand the substance of the complaints because it was "not material," i.e., he did not consider this to be a significant liability in the context of the parties' $60 million deal.  (*Id*. at Tr. 136-138, 148-149.)  Specifically, Mr. Haber testified: "At the time that this agreement was being negotiated, the asbestos plaintiffs [bar] was not focused on brake friction, friction cases. And so, there weren't a lot of them and the [sic] -- weren't getting awarded large sums. *** So, with respect to the 25 to 35 boxes of due diligence that we needed to do, these puni [sic] cases were not material at that time in view of a transaction that involved a purchase price when you add together liabilities and obligations, assume with the purchase of the 10 assets, $60 million." (*Id*.)  Mr. Haber did testify, however, that he understood generally that the plaintiffs in asbestos cases occasionally included claims for punitive damages.  (*Id*. at Tr. 149.)

Depo. at Tr. 146-147, 182, 193; Ellis Depo. at Tr. 40-41; Pophal Depo. Vol. I at Tr. 160.  However, once the Agreement was signed, Standard Motor tendered numerous EIS asbestos cases to Parker Hannifin which included claims for punitive damages. Many of Standard Motor's tender letters expressly advised Parker of both the existence and specific dollar amount of the punitive damages demand.[27]  Moreover, in some of these cases, the plaintiffs sought punitive damages against Standard Motor but not against Parker Hannifin.  *See, e.g.,* Doc. No. 89-12 at PageID#s 2533-2538, 2551-2555.  In each of its tender letters, Standard Motors expressly asked Parker to "confirm that the above-captioned claim will be deemed 'Excluded Liabilities' within the purview of Section 7.4 of the Agreement."  *See generally*, Doc. No. 89-12.

Citing recent deposition testimony taken in the instant case, Standard Motor asserts that, when it tendered EIS asbestos claims to Parker Hannifin between August 1986 and August 2001, Standard Motor believed that it tendered the claims to Parker Hannifin to defend Standard Motor and to indemnify for compensatory damages only—and not to indemnify for punitive damages.  (Burke Depo. at Tr. 41, 267-268; Haber Depo. at Tr. 37-38, 62.)  It is undisputed, however, that once Standard Motor tendered an EIS-related asbestos case to Parker Hannifin, Standard Motor did not track or monitor the case in any way, even when the plaintiff sought punitive damages against Standard Motor only (and not against Parker Hannifin.)  (Burke Depo. at Tr. 267-269.)  Moreover, during the first 15 years after the closing of the 1986 Agreement, it is undisputed that Standard Motor never retained counsel to represent its interests with respect to punitive damages claims asserted in EIS-related cases,

---

[27] *See* Doc. No. 89-12 at PageID#s 2255, 2258, 2268-2269, 2273, 2303, 2308, 2312, 2327, 2376, 2381, 2406, 2446, 2452, 2482, 2518-2519, 2525, 2537, 2555, 2631, 2661, 2679-2680, 2699, 2735, 2862-2863, 2882, 2889, 2924, 2936, 2947, 2970, 3079, 3126.

again even in those cases in which the plaintiff only sought punitive damages against Standard Motor

(and not against Parker).  (*Id*. at Tr. 269.)

Moreover, as Parker Hannifin correctly notes, the recent deposition testimony cited by

Standard Motor on this point is quite different than the historic deposition testimony of Sanford Kay,

who worked for Standard Motor from 1976 until his death in 2020.  Among other things, Mr. Kay

was responsible for overseeing the tender of EIS-related asbestos cases to Parker Hannifin from

Standard Motor from August 1986 to August 2001, and for overseeing the defense and settlement of

EIS cases tendered from Parker Hannifin to Standard Motor from 2001 onwards.  Mr. Kay was not

deposed in the instant action; however, he was deposed several times in various EIS-related asbestos

lawsuits around the country as Standard Motor's "Person Most Knowledgeable."  In several of these

suits, Mr. Kay was asked about the relationship between Standard Motor and Parker Hannifin,

including about the parties' relative responsibilities for EIS-related asbestos cases under the 1986

Agreement.  In one of these depositions, Mr. Kay described the parties' responsibilities during the

first 15-year period under the Agreement as follows:

> It was a 15-year period, that is correct, and it started to run from September 1st of '86
> and it ended August 31st of '01.  And during that period, anytime Standard Motor
> Products was served in such a lawsuit, the summons or the summons and complaint,
> was forwarded to the legal department of Parker.  Parker was responsible for retaining
> counsel, for defending the lawsuit, for either trying it to judgment or to verdict or to
> settle it, whatever they did, and **we did not indemnify them at all.  <u>All costs were
> Parker's responsibility; verdicts, settlements, legal fees.</u>**

(Kay Coogan Depo. (Doc. No. 89-20) at PageID# 3239) (emphasis added).  Mr. Kay offered this

testimony in November 2016.  (*Id*. at PageID# 3238.)  He also testified similarly in several other EIS-

related asbestos lawsuits, in October 2017 (Doc. No. 89-21 at Tr. 10) and again in June 2018 (Doc.

No. 89-22 at Tr. 10.)

47

It is undisputed that, between August 1986 and August 2001, Parker Hannifin defended and resolved all the EIS asbestos cases tendered to it by Standard Motor under Section 7.4 of the Agreement.  (Burke Depo. at Tr. 251.)  None of these cases went to trial.  (Morgan Depo. at Tr. 20-21.)

Beginning in August 2001, Parker Hannifin began tendering EIS asbestos cases to Standard Motor under Section 7.4 of the Agreement.  Many of these cases included demands for punitive damages, sometimes against both Parker and Standard Motor and sometimes against Parker only. *See, e.g.,* Doc. No. 105-1.  The earlier version of Parker's tender letter (which was used from 2001 until approximately 2014) identified the case being tendered by case name and number and asked Standard Motor "to defend and indemnify Parker as to these claims." *See, e.g.,* Doc. No. 89-18.  In the more recent version of Parker's tender letter, Parker enclosed a copy of the tendered case and stated that "we expect Standard Motor to retain its own local counsel to defend Parker's interest in this case and **pay 100% of the fees, costs, and indemnity to resolve this case**, as needed."  (Doc. No. 89-19) (emphasis added).  In each of its tender letters, Parker Hannifin expressly asked Standard Motor to let Parker know immediately if "this is not your understanding of the agreement between Parker and Standard Motor."  (*Id.*)

Standard Motor again relies on recent deposition testimony from its representatives that, when Parker Hannifin tendered an EIS asbestos claim, it was Standard Motor's belief that acceptance of that tendered claim only obligated Standard Motor to defend Parker Hannifin and indemnify for compensatory damages.  (Burke Depo. at Tr. 41-42, 84, 134.)  *See also* Broccole Depo. at Tr. 35, 53.  Mr. Kay's testimony in EIS asbestos lawsuits filed prior to the instant action, however, did not recognize this distinction.  In one case, for example, Mr. Kay testified that "any lawsuit served on

48

Parker on or after September 1st of '01, they turned over to us and we were responsible for defending and paying **any settlement or judgment**… Both as against Standard and as against Parker."  (Kay Depo. (Coogan case) (Doc. No. 89-20) at PageID# 3239) (emphasis added).  In another EIS asbestos case, Mr. Kay was asked "Today, in 2017, does Parker Hannifin have any liability for the EIS brake line?" (Kay Depo. (Zaccone case) (Doc. No. 89-21) at Tr. 11.)  Mr. Kay testified: "**No -- not to my knowledge**."  (*Id*.) (emphasis added).

Regardless, it is undisputed that, prior to the Barr Suit jury verdict, Standard Motor never advised Parker of its understanding that it was not required to indemnify Parker for punitive damages awards under the 1986 Agreement.  To the contrary, it is undisputed that, between August 2001 and 2018, Standard Motor accepted all the EIS-asbestos claims tendered by Parker Hannifin.  (Pophal Depo. Vol. II at Tr. 245-246.)  When it did so, Standard Motor did not qualify or limit its acceptance in any way, nor did it ever issue a reservation of rights letter.  (Broccole Depo. at Tr. 71; Burke Depo. at Tr. 30-33, 141.)  Standard Motor handled the EIS-asbestos cases tendered to it by Parker Hannifin and did not seek Parker Hannifin's consent or approval with respect to the handling of those cases. (Burke Depo. at Tr. 104; Pophal Depo. Vol. II at Tr. 250-253, 266.)

Viewing the above evidence as a whole and in a light most favorable to Standard Motor, the Court finds that Standard Motor has failed to establish that there is a genuine issue of material fact regarding whether the parties intended to shift liability for punitive damages awards under 1986 Agreement.  Rather, for the following reasons, the Court finds that there is no genuine issue of material fact that the parties did, in fact, intend for punitive damages awards in qualifying EIS-asbestos cases to fall within the scope of Section 7.4 of the Agreement and, therefore, constitute "Assumed Liabilities" if asserted, in writing, after the fifteenth anniversary of the Closing Date.

It is undisputed that both parties were aware of the existence of EIS-related asbestos lawsuits (and the potential for punitive damages awards in those cases) at the time the 1986 Agreement was signed; both parties agreed not to list punitive damages as an "Excluded Liability" under the Agreement; and both parties operated consistently under the 1986 Agreement by tendering EIS asbestos cases that included punitive damages demands to the other under Section 7.4 of the Agreement, even when punitive damages were only asserted against the party tendering the case. Further, it is undisputed that, for over three decades, both parties accepted the tendered cases, treated them as falling within the scope of Section 7.4, and never once qualified or limited their acceptance of such cases in any way. Based on this factual record, the Court finds that no reasonable juror could conclude that the parties did not intend to include punitive damages awards in qualifying EIS-asbestos suits in the Assumed Liability and Indemnification provisions of the 1986 Agreement.

Standard Motor argues that the parties' tender letters are "boilerplate forms that merely refer back to the 1986 Agreement" and do not evidence a "course of conduct of indemnifying for punitive damages." (Doc. No. 108 at pp. 1-2, 5-8.) Standard Motor asserts that no such course of conduct could possibly exist because, prior to the Barr Suit, punitive damages were never awarded against either party in any EIS asbestos case and "thus Parker cannot point to a single instance where these 'tender letters' were ever applied in the context of punitive damages." (*Id.* at p. 2.) Standard Motor maintains that, in fact, "the *only* course of conduct between the Parties is that punitive damages were not discussed." (*Id.*) (emphasis in original).

The Court rejects this argument. Standard Motor's tender letters were uniformly lengthy and detailed. (Doc. No. 89-12.) These letters spelled out the asbestos plaintiff's specific causes of action as well as the nature and amounts of damages sought, which often included punitive damages. (*Id.*)

50

Each tender letter explicitly references and discusses Section 7.4 of the Agreement and asks Parker to "confirm that the above-captioned claim will be deemed 'Excluded Liabilities' within the purview of Section 7.4 of the Agreement."  (*Id.*)  Although Standard Motor cites evidence that the parties do not recall expressly talking about punitive damages liability prior to the Barr Suit, the fact remains that the issue of punitive damages was raised and highlighted in writing in numerous Standard Motor tender letters over a fifteen-year period.  *See* Doc. No. 89-12 at PageID#s 2255, 2258, 2268-2269, 2273, 2303, 2308, 2312, 2327, 2376, 2381, 2406, 2446, 2452, 2482, 2518-2519, 2525, 2537, 2555, 2631, 2661, 2679-2680, 2699, 2735, 2862-2863, 2882, 2889, 2924, 2936, 2947, 2970, 3079, 3126. Moreover, while the term "punitive damages" does not appear in Parker Hannifin's tender letters, it is undisputed that Parker attached to the tender letters, copies of the EIS-asbestos cases being tendered, and that many of these cases included punitive damages demands.  *See, e.g.,* Doc No. 105-1.  Parker's letters expressly state that "we expect Standard Motor . . . pay 100% of the fees, costs, and indemnity to resolve this case."  (*Id.*)  Thus, the Court does not agree that the parties' tender letters are nothing but "boilerplate forms" that shed no light on the parties' mutual understanding of the meaning of the Agreement.

Additionally, the Court disagrees with Standard Motor that "Parker cannot point to a single instance where these 'tender letters' were ever applied in the context of punitive damages."  (Doc. No. 108 at p. 2.)  In the newer version of its tender letters, Parker Hannifin specifically states:

> In the event of a settlement, Standard Motor will make sure that **all claims related to Parker are extinguished in the release and/or settlement agreement ("release")**, Parker is named specifically in the release, and that a dismissal with prejudice will be obtained dismissing Parker from this case.  Parker shall be identified in the release … in the style it is named in this case or in another style approved in writing by Parker. Standard Motor agrees to provide Parker with a copy of the release ….  following its entry.

(Doc. No. 105-1) (emphasis added).  Standard Motor does not dispute that many of the EIS asbestos cases tendered to it by Parker included demands for punitive damages and, further, that Standard Motor settled many of these cases.  Standard Motor points to no evidence that, when it settled such an EIS-asbestos case, it *only* settled the asbestos plaintiff's demand for compensatory damages.  And, indeed, it is counterintuitive that such cases would be settled in such a piecemeal fashion. In the absence of evidence demonstrating that this occurred, the Court is not persuaded that there is a genuine issue of material fact regarding whether Standard Motor's settlements of EIS asbestos cases were limited to compensatory damages only.  Thus, in settling or otherwise resolving the EIS asbestos cases tendered by Parker that included punitive damages demands, Standard Motor necessarily settled the punitive damages demands in those cases.  It is undisputed that Standard Motor did, in fact, settle or otherwise resolve many such EIS asbestos cases between 2001 and November 2018.  Accordingly, Standard Motor's argument that the parties' tender letters do not provide any evidence of a course of conduct of indemnifying for punitive damages under Section 7.4 of the Agreement is without merit and rejected.

Standard Motor next asserts that the parties' tender letters cannot be used to amend, modify, or expand the 1986 Agreement to cover punitive damages.  (Doc. No. 108 at pp. 23-24.)  This argument is also without merit.  The Court is not using evidence regarding the parties' tender letters to change the 1986 Agreement.  Rather, despite unequivocally concluding that the 1986 Agreement is not ambiguous, but assuming *arguendo* that it is ambiguous, the Court has considered this evidence to determine whether there is a genuine issue of material fact regarding the parties' intent when they signed the 1986 Agreement.  It is well established under Ohio law that it is appropriate for this Court to do so.  *See, e.g., Transportation Ins. Co.*, 969 F.Supp.2d at 888 ("A court may also look to the

parties' course of conduct as evidence of their construction of a contract when the contract language is unclear."); *State ex rel. Burgess & Niple*, 93 N.E.2d at syllabus (holding that, where terms are reasonably susceptible to more than one interpretation and "the parties to such contract have by their acts and conduct in the performance of the contract over a reasonable period of time mutually adopted one of those interpretations, the interpretation so adopted will be given to those words."); *William Powell Co.*, 75 N.E.3d at 917 (finding that the parties' post-contract formation conduct is relevant to determine their intent when a contract is ambiguous).

Accordingly, assuming *arguendo* that the plain language of the 1986 Agreement is ambiguous – and the Court has found that it is not-- and that the extrinsic evidence cited by the parties could be considered, such evidence does not create a genuine issue of material fact regarding whether the parties intended for punitive damages awards in qualifying EIS-asbestos cases to fall within the scope of Section 7.4 of the Agreement and, therefore, constitute "Assumed Liabilities" if asserted in writing after the fifteenth anniversary of the Closing Date.  Because the Barr Suit falls within Section 7.4 and was asserted in writing after the fifteenth anniversary of the Closing Date, the Court finds that there is no genuine issue of material fact that the parties intended for the punitive damages awarded in that Suit to constitute an Assumed Liability under the 1986 Agreement for which Standard Motor is required to defend and indemnify Parker pursuant to Section 9.1 of the Agreement.

### 4.  Enforceability of the 1986 Agreement

This, however, does not end the inquiry.  Standard Motor argues that, even if this Court were to construe the 1986 Agreement as encompassing the Barr punitive damages award, the Agreement is not enforceable because "there is no precedent in Ohio or in any other jurisdiction for implying new contractual terms" to shift responsibility for punitive damages.  (Doc. No. 91 at pp. 18-22.)

53

Standard Motor asserts that, as a general principle, contracts of indemnity are to be strictly construed and "given no greater scope than the language of the agreement clearly and unequivocally expresses." (*Id*. at p. 19.)  Standard Motor asserts that, because the term "punitive damages" does not appear in the 1986 Agreement and the evidence shows the parties never discussed shifting liability for punitive damages, it would be "unprecedented" to impose liability on Standard Motor for the Barr Suit punitive damages award.  (*Id*. at pp. 19-20.)  Finally, Standard Motor argues that the Court should not construe the 1986 Agreement as shifting punitive damages liability because "transferring punitive damages liability away from the party responsible for the wrongful action is disfavored among courts because punitive damages are imposed to 'punish … outrageous conduct and to deter . . . similar conduct in the future.'"  (*Id.* at p. 21.)

In response, Parker Hannifin argues that Ohio law permits sophisticated commercial entities to transfer liability for punitive damages arising out of past conduct.  (Doc. No. 105 at pp. 32- 35) (citing *Glaspell v. Ohio Edison Company*, 505 N.E.2d 264 (Ohio 1987)).  Parker Hannifin asserts that the cases cited by Standard Motor from California, New Jersey, New York, Kansas, and Maine "have no precedential value because they do not involve Ohio law, and they are entirely unpersuasive because they deal with indemnification for future conduct."  (*Id*. at p. 33.)  Parker Hannifin asserts that "the Court is not in 'uncharted waters' by finding that the Agreement transferred liability for punitive damages" because "it is well-established in Ohio and in other jurisdictions that a party may be indemnified for past conduct, even if that conduct was criminal or illegal." (*Id*.) (citing, *e.g., Brown v. Gallagher*, 902 N.E.2d 1037 (Ohio App. 4th Dist. 2008)).

In its Reply Brief, Standard Motor asserts that, even assuming that punitive damages liability can be transferred in an indemnification agreement, any such transfer must be clear and unequivocal.

(Doc. No. 116 at pp. 4-5.)  Standard Motor argues that the 1986 Agreement does not clearly and unequivocally transfer such liability and, further, that any construction that would impliedly transfer punitive damages liability would be contrary to law.  (*Id*.)  Lastly, Standard Motor argues that Ohio cases holding that courts need not narrowly construe indemnification provisions where the contracting parties are sophisticated business entities, are not applicable because those decisions do not address the specific issue of punitive damages which "raise unique policy concerns." (*Id*.)

"Indemnity arises from contract, either express or implied, and is the right of a person, who has been compelled to pay what another should have paid, to require complete reimbursement." *Worth v. Aetna Casualty & Surety Co*., 513 N.E.2d 253, 256 (Ohio 1987).  "In general, to indemnify is to make whole and has been defined to mean to save harmless by giving security for the reimbursement of a person in case of anticipated loss…" *Id*.[28]  "Courts interpret indemnity agreements the same way they interpret contracts."  *Papatheodorou v. Clark*, 781 F.Supp.2d 582, 586 (N.D. Ohio 2011).  As the Ohio Supreme Court explained:

> The nature of an indemnity relationship is determined by the intent of the parties as expressed by the language used. *See Cleveland Window Glass & Door Co. v. National Surety Co*. (1928), 118 Ohio St. 414, 161 N.E. 280. All words used must be taken in their ordinary and popular sense, *Glaspell v. Ohio Edison Co*. (1987), 29 Ohio St.3d 44, 47, 29 OBR 393, 396, 505 N.E.2d 264, 267, and "[w]hen a * * * [writing] is worded in clear and precise terms; when its meaning is evident, and tends to no absurd conclusion, there can be no reason for refusing to admit the meaning which * * * [it] naturally presents." *Lawler v. Burt* (1857), 7 Ohio St. 340, 350.

> When an indemnitor expressly agrees to indemnify an indemnitee except in certain specified instances, and it is determined that the exceptions do not pertain, the indemnitor is obligated to indemnify the indemnitee under the terms of the agreement.

---

[28] As an Ohio appellate court explained nearly forty years ago, in 1983: "[I]ndemnity agreements are becoming commonplace for numerous commercial transactions, including commercial leases. Such agreements … seek to assign anticipatable risks of loss to one or both parties, for commercial convenience in allocating transaction costs. The party who accepts a risk can then obtain insurance protection against that potential loss, or undertake the status of a self-insurer." *Brookridge Party Center, Inc. v. Fisher Foods, Inc*., 468 N.E.2d 63, 68 (Ohio App. 8th Dist. 1983).

> *Allen v. Standard Oil Co.* (1982), 2 Ohio St.3d 122, 2 OBR 671, 443 N.E.2d 497, paragraph one of the syllabus.

*Worth*, 513 N.E.2d at 256.  *See also Glaspell,* 505 N.E.2d at 267 (noting that indemnity agreement should be construed such as "all the words used [must] be taken in their ordinary and popular sense.")

As Standard Motor correctly notes, in several early cases, the Ohio Supreme Court held that "[p]ublic policy requires that contracts of indemnity purporting to relieve one from the results of his failure to exercise ordinary care shall be strictly construed, and will not be held to provide such indemnification unless so expressed in clear and unequivocal terms."  *George H. Dingledy Lumber Co. v. Erie R. Co.,* 131 N.E. 723, syllabus (Ohio 1921).  *See also Kay v. Pennsylvania R. Co.*, 103 N.E.2d 751, syllabus (Ohio 1952) ("Contracts of indemnity purporting to relieve one from the results of his negligence must be construed strictly.  The intention to provide such indemnification must be expressed in clear, unequivocal terms.")  The Ohio Supreme Court later clarified this ruling, however, as follows:

> Where it is alleged that the agreement protects an indemnitee from the financial consequences of his own negligence, the greater weight of authority, particularly in Ohio, would construe the words of such an agreement most narrowly. [internal citations omitted].

> The requirement that this court strictly construe this particular category of indemnity agreement would be unreasonable, in that the rule was developed to guard against a specific practice. Often one party to a contract, being in a position to impose terms upon the other with no realistic opportunity to bargain afforded, would include those standardized clauses in the contract as would unreasonably impose upon the nonbargaining party burdens which were wholly inequitable. With such contracts of adhesion in hand, the drafting party invariably asserted, "the indemnity or the exculpation, so that the policies supporting the rule of 'contra proferentem' [against the proffering party], * * * caused the courts to apply the rule." Corbin on Contracts (1984 Supp., Part 2) 624, Section 1472(E). **Thus, while clauses limiting the liability of the drafter are ordinarily to be strictly construed, we need not do so when such burden of indemnification was assented to in a context of free and understanding negotiation.** *See, e.g.,* Williston on Contracts, supra, at 141, Section 1750.

*Glaspell,* 505 N.E.2d at 267 (emphasis added).  The court further noted that there is "authority for the proposition that the word 'negligence' need not be utilized where an intention to exclude liability predicated upon such is set forth by words excluding liability 'for any and all harms however caused.'" *Id.* (citations omitted).

"Certain types of indemnity agreements are forbidden under Ohio law," including those involving certain construction contracts and workers' compensation benefits.  *Worth*, 513 N.E.2d at 257.  "In the absence of specific public policy exceptions, however, an agreement to indemnify another is generally enforceable."  *Id.*  Notably, Ohio courts have "decline[d] to make any broad generalization that public policy necessarily precludes indemnity for punitive damages in any situation."  *Brookridge Party Center, Inc.,* 468 N.E.2d at 69.  Moreover, Ohio courts have found that broad indemnity agreements are not necessarily ambiguous and/or unenforceable.  *See, e.g., Cleveland Clinic Health System-East Region v. Innovative Placements, Inc.*, 2012 WL 1998049 at * 2 (N.D. Ohio June 4, 2012) ("But a broad indemnity agreement is not necessarily an ambiguous one."); *Columbus v. Alden E. Stilson & Assocs.*, 630 N.E.2d 59, 63 (Ohio App. 10th Dist. 1993) ("The clear and unambiguous language of the indemnification agreement is enforceable, despite its very broad scope.")  *See also Hydro-Dyne, Inc. v. Ecodyne Corp.*, 812 F.2d 1407, * 8 (6th Cir. 1987) ("Analysis of Ohio law indicates that indemnity provisions must contain broad, all-encompassing language in order to relieve a party from its own negligence.")

Here, the Court agrees with Parker Hannifin that Ohio law does not preclude indemnification for the Barr punitive damages award under the terms of the 1986 Agreement.  Under *Glaspell*, the Court is not required to strictly construe the Agreement against Parker, because it is undisputed that both Parker and Standard Motor were sophisticated commercial entities who were represented by

counsel and agreed to the terms of the 1986 Agreement "in a context of free and understanding negotiation." *Glaspell*, 305 N.E.2d at 266-267.  Rather, the Court applies well-established principles of contract construction to determine the parties' intent based on the plain language of the 1986 Agreement.  *See Hydro-Dyne, Inc.*, 812 F.2d at * 8 (noting that the construction of an indemnity provision is a "highly fact-specific" inquiry that depends on the specific language in the parties' agreement); *Worth,* 513 N.E.2d at 256 ("The nature of an indemnity relationship is determined by the intent of the parties as expressed by the language used.").

As set forth at length *supra*, this Court has fully and carefully reviewed the plain language of the 1986 Agreement and determined that it is clear and unambiguous that the Barr Suit punitive damages award constitutes an Assumed Liability under the 1986 Agreement.  The Court has further found that it is clear and unambiguous that Standard Motor is required to indemnify Parker for this award pursuant to Section 9.1 of the Agreement.  This is because Section 9.1 broadly, clearly, and unambiguously provides that Standard Motor "will indemnify, defend, and hold [Parker Hannifin] harmless from and against any and all liabilities, damages, losses, claims, costs, and expenses (including reasonable attorneys' fees) arising out of or resulting from …. [Standard Motor's] failure to pay or satisfy or cause to be paid or satisfied any of the Assumed Liabilities when due and payable…" (Doc. No. 88-4 at PageID# 1875-1876.)

The Court rejects Standard Motor's suggestion that the Assumed Liabilities and Indemnification provisions of the 1986 Agreement are against public policy or otherwise unenforceable.  Although certain types of indemnity agreements are forbidden under Ohio law, [29]

---

[29] The Court is aware that the Ohio Supreme Court has held that "public policy prevents insurance contracts from insuring against claims for punitive damages based upon an insured's malicious conduct." *Neal-Pettit v. Lahman*, 928 N.E.2d 421, 425 (Ohio 2010).  *See also State Farm Mutual Ins. Co v. Blevins*, 551 N.E.2d 955 (Ohio 1990).  However,

Standard Motor does not direct this Court's attention to any Ohio authority that precludes commercial entities from mutually agreeing to indemnification for punitive damages liability arising out of the indemnitee's past conduct.   To the contrary, at least one Ohio appellate court has expressly "decline[d] to make any broad generalization that public policy necessarily precludes indemnity for punitive damages in any situation."   *Brookridge Party Center, Inc.*, 468 N.E.2d at 69.   Rather, this determination depends on the particular language of the indemnification provision at issue, which, in the instant case, the Court has determined clearly and unequivocally requires Standard Motor to indemnify Parker Hannifin for the Barr punitive damages award.

Moreover, none of the Ohio cases cited by Standard Motor address indemnification provisions that relate solely to the indemnitee's *past* conduct.[30]   Rather, all of the Ohio authority cited by Standard Motor relates to indemnification for negligent and/or malicious conduct that occurred *after* the parties executed the indemnity agreement.   This is a significant distinction, as the obvious policy considerations against indemnification for future conduct are simply not present with respect to

---

the instant dispute arises in an entirely different context than an insurance policy.  As this Court explained in its October 23, 2019 Memorandum Opinion & Order: "Rather, the Agreement at issue herein is an Asset Purchase Agreement between two sophisticated entities for the purchase and sale of a business. The assumption of liabilities and indemnification provisions of that Agreement were carefully negotiated between the parties and their counsel, and expressly allocated the parties' relative liabilities as to EIS asbestos claims. The parties, through their counsel and with knowledge that many asbestos claims had already been filed and were currently pending, agreed that Standard Motor would assume 'all liabilities and obligations of the Seller' (including EIS Asbestos Claims 'seeking compensation or recovery for or relating to injury to persons') and indemnify Parker Hannifin for from and against 'any and all liabilities, damages, losses, [and] claims.'" (Doc. No. 24 at pp. 36-37, 40-41.)

[30] While Standard Motor cites numerous cases from outside Ohio for the proposition that transferring punitive damages liability away from the party responsible is "disfavored" and "prohibited" (*see* Doc. No. 91 at pp. 2-22), none of these cases have any precedential value or binding effect because they do not involve the application of Ohio law.  The United States Supreme Court cases cited by Standard Motor are likewise inapposite.  None of the Supreme Court cases cited by Standard Motor applied Ohio law or involved indemnification for past conduct.  *See United States v. M.O. Seckinger*, 397 U.S. 203 (1970) (applying federal law to construction of contract between United States and contractor); *Bisso v. Inland Waterways Corp.,* 349 U.S. 85 (1955) (applying admiralty law to towage contract provision exempting towboat owner from liability for its own negligence); *Boston Metals Co. v. The S/S Winding Gulf*, 349 U.S. 122 (1955) (same).

negotiated allocation of risk for an indemnitee's past conduct.  *See, e.g., Brown*, 902 N.E.2d at 1040

("There may be no dispute that one may not contract for indemnification for the consequences of a

criminal or illegal act to occur in the future. But the distinction has always been sharply made, with

contrary effect, with respect to agreements to indemnify one post factum for the financial

consequences of a crime or illegal act. In other words, one may make an agreement to be indemnified

or to indemnify with respect to a crime or illegal act which occurred prior to the making of the

agreement. This has been the law for many years throughout the United States and in this State.")

(citations omitted).

Here, Section 7.4 of the Agreement provides that Parker Hannifin was responsible for EIS

Asbestos Claims asserted "on or prior to the fifteenth (15) anniversary of the Closing Date" while

Standard Motor is responsible for EIS Asbestos Claims "asserted in writing after the fifteenth (15)

anniversary of the Closing Date." (Doc. No. 88-4 at PageID# 1868.)  Thus, the parties' Agreement

does not allow Parker Hannifin to continue to engage in tortious conduct without fear of financial

consequences in the form of punitive damages.  Rather, the Agreement is limited solely to allocating

responsibility for Parker Hannifin's *past* conduct. Accordingly, any public policy concern that

indemnification of punitive damages would diminish the deterrent effect of punitive damages awards

is not implicated under the circumstances presented. Notably, Ohio courts have reached this

conclusion under similar circumstances. *See Brown*, 902 N.E.2d at 1040[31] (finding that indemnity

---

[31] In *Brown, supra*, Brown sued Gallagher for injuries he sustained in an auto accident. The parties entered into a settlement agreement, pursuant to which Gallagher agreed to indemnify Brown for "any and all claims, liability and expenses . . . for any claim or demand of any party, and any claim or demand of any third party" resulting from the collision. *Id.* at 1038. Brown subsequently pled guilty to a charge of vehicular assault in a criminal case that arose from the same incident and was ordered to pay restitution in the amount of $7,923.44 to Gallagher's employer for leave payments made during his convalescence. *Id.* Brown then filed a complaint against Gallagher in municipal court based on the indemnification provision of their settlement agreement. *Id.* The court granted Gallagher's motion to dismiss, and Brown appealed.  On appeal, Gallagher argued that enforcing the indemnification provisions of the settlement agreement

60

provision in settlement agreement was enforceable because: "Nothing in the agreement indemnifies appellant for prospective acts or in any way encourages future illegal behavior. Instead, the agreement simply allocates financial responsibility for the consequences of the prior illegal act . . . ")

Moreover, the Court rejects Standard Motor's argument that the parties' indemnification provision is nonetheless void because it does not serve Ohio's policy interest in "punishing" Parker Hannifin for its intentional misconduct.  (Doc. No. 91 at pp. 21-22.)  Standard Motor cites no Ohio case law for the proposition that the policy objective to "punish" wrongdoers is a sufficient basis, standing alone, to invalidate a carefully negotiated indemnification provision relating to past conduct only.  Moreover, under Section 7.4 of the Agreement, Parker Hannifin bore all responsibility for EIS Asbestos Claims filed between August 31, 1986 and August 31, 2001. Thus, Parker did not escape the consequences of its past alleged intentional misconduct entirely unscathed.

Accordingly, and for all the reasons discussed above, the Court rejects Standard Motor's argument that the 1986 Agreement is void as against public policy or otherwise unenforceable as a matter of law.[32]

### 5.  Conclusion as to Counts I and II

---

in this context was against Ohio public policy because it would "nullify the twin aims of felony sentencing as stated in R.C. 2929.11, that is, protecting the public from future crimes and punishing the offender." *Id*. at 1040. The state appellate court disagreed and upheld the indemnification agreement, finding that the public policy concerns identified by Gallagher did not apply to indemnification for past conduct.  Although *Brown* involved indemnification for restitution in a criminal case rather than punitive damages in a civil action, the *Brown* court's reasoning is equally applicable to the instant case. In both cases, Ohio's public policy concerns include deterring future misconduct.  In both cases, the indemnification provisions at issue relate solely to past misconduct and, therefore, do not "in any way encourage future" misconduct.  The Court agrees with this reasoning and finds it fully applicable to the indemnification provision at issue herein.

[32] In light of the above, this Court need not (and does not) reach Parker Hannifin's arguments that (1) a holding by this Court that the Barr jury verdict is binding on Parker would violate Parker's due process rights; and (2) under Ohio law, an intent to injure is a necessary element to "uninsurability," and neither the Barr jury's verdict nor the record in this case is sufficient to create a genuine issue of fact as to whether Parker acted with an intent to injure anyone.  (Doc. No. 89.)

For all the reasons set forth above, the Court grants Parker Hannifin's Motion for Summary Judgment (Doc. No. 88) with respect to Counts I and II of the Complaint, as follows.  The Court grants summary judgment in Parker Hannifin's favor as to liability on Counts I and II.  In addition, the Court grants partial summary judgment in Parker Hannifin's favor as to damages on Counts I and II in the amount of $7,218,085.44, which represents the undisputed amount that Parker was required to pay to discharge the judgment against Parker in the Barr Suit, plus costs and pre-judgment interest. Standard Motor's Motion for Summary Judgment (Doc. No. 90) on Counts I and II is denied.

### B.  Breach of the Duty of Good Faith and Fair Dealing (Count IV)

Count IV alleges that, in performing its obligations under the 1986 Agreement, Standard Motor owed to Parker a contractual duty of good faith and fair dealing, which included the duty to "inform Parker promptly, unambiguously, and at the outset of any limitations, qualifications, or conditions attached to [Standard Motor's] assumption of Parker's defense, by accepting Parker's defense subject to a clear and express reservation of rights."  (Doc. No. 1 at ¶¶ 91, 92.)  Parker Hannifin alleges that Standard Motor breached this "duty of prompt notification" when it undertook its defense of Parker in the Barr Suit without asserting any limitations, qualifications, or conditions, and without issuing a reservation of rights.[33]  (*Id*. at ¶¶ 94, 95.)

In its Motion for Summary Judgment, Parker Hannifin states that "Count IV represents a separate, alternative basis to impose on Standard Motor the same liability and damages sought by

---

[33] Parker Hannifin also alleges that it suffered substantial prejudice as a result of Standard Motor's breach, including that: "(a) SMP denied Parker the ability to dispute SMP's position before the adverse jury verdict was handed down; (b) SMP denied Parker the ability to protect Parker's interests by retaining Parker's own counsel; (c) SMP denied Parker the ability to seek a dismissal of the demand for punitive damages in advance of trial; (d) SMP denied Parker the ability to develop evidence in discovery to defend against the punitive damages demand; (e) SMP denied Parker the opportunity to negotiate a settlement of the Barr Suit before trial; and (f) SMP denied Parker the opportunity to produce its own testimony and evidence at trial against the demand for punitive damages." (Doc. No. 1 at ¶ 96.)

Parker under Counts I and II." (Doc. No. 89 at pp. 31-32.) Standard Motor cross moves for summary judgment in its favor with respect to Count IV. (Doc. No. 91 at pp. 22-26.)

In light of Parker's acknowledgement that Count IV is an alternative basis for imposing the same liability and damages sought in Counts I and II, the Court finds that its decision to grant summary judgment in Parker Hannifin's favor with respect to Counts I and II renders it unnecessary to reach the merits of Count IV. Accordingly, Count IV is hereby dismissed.

### C. Declaratory Judgment (Count VI)

As relevant to the instant cross-Motions, Parker seeks a declaratory judgment in Count VI that:

> (a) the award of punitive damage in the Barr Suit is an "Assumed Liability" that [Standard Motor] "assume[d] and [became] directly and solely responsible for the payment or discharge of" under the 1986 Agreement;
>
> (b) [Standard Motor] is obligated under the 1986 Agreement to indemnify, defend, and hold Parker harmless from any and all liabilities, damages, losses, claims, costs, and expenses (including reasonable attorney's fees) arising out of or resulting from the award of punitive damages in the Barr Suit;

(Doc. No. 1 at p. 27.)[34]

In their cross Motions for Summary Judgment, the parties acknowledge that Count VI rises and falls with Counts I, II, and IV. Parker Hannifin asks this Court to "grant summary judgment in Parker's favor on Count VI of the Complaint and enter an order declaring that Standard Motor had a

---

[34] In Count VI, Parker also sought a declaratory judgment (1) declaring that future claims for punitive damages asserted in EIS Asbestos Claims are the legal and financial responsibility of SMP under the 1986 Agreement; (2) declaring that SMP's conduct in the Barr Suit precludes SMP from asserting any defenses to its liability to Parker arising out of the award of punitive damages; and (3) "otherwise determining the respective rights and liabilities of the parties in this context." (Doc. No. 1 at p. 27.) In its October 23, 2019 Memorandum Opinion & Order, however, this Court dismissed Parker's request for a declaratory judgment that future claims for punitive damages are the legal and financial responsibility of Standard Motor under the 1986 Agreement. (Doc. No. 24 at p. 55-56.) The Court also determined that Count VI does not assert a sub-claim for declaratory relief relating to all "currently pending EIS Asbestos Claims." (*Id.*)

duty to defend and indemnify Parker against all claims asserted in the Barr case, including the claims for punitive damages, and that Standard Motor's breach of the 1986 Agreement entitles Parker under Section 9.1 of the 1986 Agreement to recover the reasonable attorneys' fees and costs incurred by Parker to enforce the 1986 Agreement." (Doc. No. 89 at p. 20.)

Standard Motor states only that, "because Parker's declaratory relief claim requires the same analysis for Counts I, II and IV above, [Standard Motor] is likewise entitled to summary judgment under Count VI." (Doc. No. 91 at p. 26.) Standard Motor does not acknowledge or address Parker Hannifin's assertion that, if it prevails on Count VI, it is entitled to recover reasonable attorneys' fees and costs under Section 9.1 of the 1986 Agreement.

As this Court has granted summary judgment in Parker Hannifin's favor with respect to Counts I and II (and has dismissed Count IV as set forth above), the Court grants summary judgment in Parker's favor on Count VI of the Complaint and hereby enters an Order declaring that Standard Motor had a duty to defend and indemnify Parker against all claims asserted in the Barr Suit, including the claims for punitive damages. In addition, and in the absence of any argument to the contrary, the Court further finds that Standard Motor's breach of the 1986 Agreement entitles Parker Hannifin under Section 9.1 of the 1986 Agreement to recover the reasonable attorneys' fees and costs incurred by Parker to enforce that Agreement.

## IV.    Conclusion

For all the reasons set forth above, Parker Hannifin's Motion for Summary Judgment (Doc. No. 88) is GRANTED as set forth herein, and Standard Motor's Motion for Summary Judgment (Doc. No. 90) is DENIED.

By no later than June 12, 2023, Parker Hannifin shall file a Motion for Attorney's Fees and Costs, which is supported by appropriate affidavits and documentation.  In that Motion, Parker Hannifin shall also explain what, if any, additional damages it is seeking with respect to Counts I and II, with citation to supporting authority.  Standard Motor shall file a response by no later than July 12, 2023.  Parker Hannifin shall file a Reply by no later than July 26, 2023.

Given that the parties' briefing was heavily redacted and much of the evidentiary record was filed under seal, the Court will, out of an abundance of caution, temporarily file this Memorandum Opinion & Order under seal.  The Court is mindful, however, that there is a "strong presumption in favor of openness as to court records." *Shane Grp., Inc. v. Blue Cross Blue Shield of Mich*., 825 F.3d 299, 305 (6th Cir. 2016).  The parties shall, therefore, promptly meet and confer to determine what, if any, portions of this Memorandum Opinion & Order warrant redaction.  By no later than fourteen (14) days from the date of this Order, the parties shall file a Joint Notice on the docket regarding the outcome of their meet and confer.  If the parties believe that any portions of this Memorandum Opinion & Order warrant redaction, the Joint Notice must (1) clearly and specifically identify those portions the Opinion that the parties believe should be redacted; and (2) set forth specific reasons and supporting authority which justify said redactions.  *See Shane Group, Inc*., 825 F.3d at 305 ("'Only the most compelling reasons can justify non-disclosure of judicial records.' *** The proponent of sealing therefore must "analyze in detail, document by document, the propriety of secrecy, providing reasons and legal citations.") (internal citations omitted).

**IT IS SO ORDERED.**

 *s/Pamela A. Barker*
PAMELA A. BARKER
Date:  May 11, 2023    U. S. DISTRICT JUDGE

65